IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DISTRICT

| | |
|---|---|
| JOHN HALGREN, JOHN K. STIEGLER, GIL CORTEZ, CHRIS GARON, ROBERT McCORMICK, and JOEL FOX, individually and on behalf of similarly situated employees of the CITY OF NAPERVILLE, | |
| Plaintiffs, | |
| v. | 21 CV 5039 |
| CITY OF NAPERVILLE, EDWARD-ELMHURST HEALTHCARE, and GOVERNOR JAY ROBERT PRITZKER, | |
| Defendants. | |

## COMPLAINT

Now Come JOHN HALGREN, JOHN K. STIEGLER, GIL CORTEZ, CHRIS GARON, ROBERT McCORMICK, and JOEL FOX, individually and on behalf of similarly situated employees of the CITY OF NAPERVILLE, by and through their attorney, JONATHAN LUBIN, and Complain of CITY OF NAPERVILLE, EDWARD-ELMHURST HEALTCARE, and GOVERNOR JAY ROBERT PRITZKER, stating:

### Introduction

1.      In March, 2020, American life was irreparably changed both by COVID-19 and by the

various governments' response to it. During that time, paramedics – who were already heroes –

began to become ever more vital to the health and safety of millions of Americans. Literally before

we had sufficient data to know how susceptible a given individual was to COVID-19, and before we

had come to an understanding of how dangerous the virus was, paramedics were the front line of

America's response to COVID-19. They continued to treat patients in close quarters, even when it

was possible or even likely that such patients suffered from COVID-19, and were therefore

contagious.

1

2.     Now, the State of Illinois and the City of Naperville is threatening to terminate its firefighter/paramedics unless they agree to take a vaccine for the SARS-COV-2 virus that causes COVID-19 (hereinafter, simply "COVID-19"), or submit to weekly testing for COVID-19 despite the fact that many paramedics impacted have already contracted COVID-19, and are therefore largely immune to it already.

3.     The implication that these heroes are somehow public health hazards is wrong, and does a disservice to them and to the health of the people in this State.

**Parties**

4.     Plaintiffs in this matter are employees of the Naperville Fire Department, which is a component of the City of Naperville. The Naperville Fire Department provides fire suppression and emergency medical services to the people in Naperville. Plaintiffs, like the other employees of the Naperville Fire Department, are both vaccinated and non-vaccinated. Like the other employees of the Naperville Fire Department, some have had COVID-19 and others have not.

5.     The City of Naperville is a municipal corporation located in the Northern District of Illinois, Eastern Division.

6.     Edward-Elmhurst Healthcare operates a hospital in Naperville, Illinois, which is located in the Northern District of Illinois. Daryl Wilson, who works for Edward-Elmhurst, supervises the interaction between Edward-Elmhurst Healthcare and the EMS services provided by Naperville Fire Department. He does this in his role as an EMS Medical Director under 210 ILCS 50 *et seq.*

7.     Governor Jay Robert Pritzker is the governor of the State of Illinois. He wrote the Executive Order that is at the center of the controversy surrounding the threatened termination of Plaintiffs and other paramedics.

**Jurisdiction and Venue**

2

8.      This Court has jurisdiction over the parties pursuant to 28 U.S.C. § 1331 because the Complaint seeks equitable relief and damages under federal statutes and the US Constitution.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because the relevant events took place in the Northern District of Illinois.

### Facts Common to All Counts

10.     COVID-19 is a virus that was first detected in Wuhan, China, and eventually made its way to the United States of America, setting off a chain of events that has irretrievably changed the day-to-day life of many if not most Americans.

11.     When the virus first appeared in the United States, some believed that the number of deaths in America would reach 2.2 million[1]. This was based upon an assumption that the Infection Fatality Ratio was as high as 9% in some populations.

12.     Despite these terrifying predictions, paramedics like plaintiffs here nonetheless were frequently among the first medical professionals to encounter patients who were suffering from COVID-19. As a result, paramedics became one of the hardest-hit subgroups in March and April of 2020 in terms of COVID-19 infections[2].

13.     Until now, the Naperville Fire Department did not require any of their employees, including firefighters and EMS personnel, to engage in periodic COVID-19 testing.

14.     Indeed, at no time though the effective date of the Executive Order did anybody require Naperville firefighter and EMS personnel to engage in periodic COVID-19 testing despite the widespread availability of such testing.

---

[1] Report 9: Impact of non-pharmaceutical interventions (NPIs) to reduce COVID-19 mortality and healthcare demand, accessed at https://www.imperial.ac.uk/media/imperial-college/medicine/sph/ide/gida-fellowships/Imperial-College-COVID19-NPI-modelling-16-03-2020.pdf.

[2] COVID-19 fatalities among EMS clinicians, accessed at https://www.ems1.com/ems-products/personal-protective-equipment-ppe/articles/covid-19-fatalities-among-ems-clinicians-BMzHbuegIn1xNLrP/.

15.     This was true despite the fact that case rates in Illinois were highest in the fall and winter of 2020, were higher in May of 2020 and April of 2021 then they are today, and are presently on a downward trend[3].

16.     Relatively speaking, it is safer to be an Illinois resident today than at several different points, spanning weeks and months, over the last 18 months. Still, no COVID-19 testing was required.

17.     The National Institute of Health and other bodies have found that natural immunity to COVID-19 – that is, immunity caused by infection with COVID-19 and recovery – is incredibly strong. Specifically, antibodies against the spoke protein of the COVID-19 virus remain in 98% of people who have recovered from the virus 6 to 8 months after infection (and the outer limit of the study was simply because the study was done on individuals who were 6 to 8 months out of recovery, not because immunity begins to wear off[4]).

18.     Health and Human Services' Assistant Secretary, Dr. Admiral Bret Diroir stated in August, 2021, in a nationally televised interview that "there are still no data to suggest vaccine immunity is better than natural immunity. I think both are highly protective."

19.     Even Dr. Anthony Fauci, one of the vaccines' chief proponents, admitted in September, 2021, while being interviewed on CNN that "I don't have a firm answer," on whether the vaccines offer immunity that was comparable to natural immunity.

20.     The data out of the State of Israel underscores this point. In a paper that is awaiting peer review, scientists out of the State of Israel report that in studying thousands of patients, those whose only source of immunity was a vaccine (in the case of Israel, the Pfizer vaccine was used) had a 5.96 to 13.06-fold increased risk of a breakthrough infection with the Delta variant of COVID-19 over those whose immunity was natural[5].

---

[3] http://dph.illinois.gov/covid19/covid19-statistics
[4] https://www.nih.gov/news-events/nih-research-matters/lasting-immunity-found-after-recovery-covid-19
[5] https://www.medrxiv.org/content/10.1101/2021.08.24.21262415v1.full.pdf

21. Israel is one of the most vaccinated places in the world, with close to 80% of the country having been vaccinated. Israel's bout with the Delta variant of COVID-19 has demonstrated that the vaccine is only 64% effective at preventing symptomatic cases of COVID-19[6].

22. Despite its high vaccination rates, Israel is becoming "the world's COVID hotspot."[7]

23. While the vaccines have been effective at preventing serious cases and deaths, they lag far behind natural immunity in preventing symptomatic cases of COVID-19, and, therefore, transmission of COVID-19.

24. On September 3, 2021, Governor Pritzker issued Executive Order 2021-22. That order requires any Health Care Worker to have the first dose of a COVID-19 vaccine by September 19, 2021, and to have taken a second dose within 30 days after the first dose. EO 2021-22(2)(b), attached as Exhibit A.

25. Health Care Workers include any person who is employed by a Health Care Facility (other than state-owned facilities). A Health Care Facility includes emergency medical services and IDPH licensed emergency medical service vehicles.

26. The executive order is a continuation of the state of emergency declared by the Governor in March, 2020, pursuant to the Illinois Emergency Management Agency Act. 20 ILCS 3305 *et seq.*

27. That statute states that "[u]pon such proclamation, the Governor shall have and may exercise for a period not to exceed 30 days" certain enumerated powers. 20 ILCS 3305/7.

28. Several decisions of the Northern District of Illinois have pertained to the limitation placed on the governor by the simple text of the statute: he may exercise his power "for a period not to exceed 30 days." These decisions have largely found that so long as the governor makes new

---

[6] https://www.washingtonpost.com/politics/2021/07/19/vaccine-skeptics-zero-israel-again-some-reason/
[7] https://www.dailymail.co.uk/news/article-9951117/Israel-worlds-Covid-hotspot-0-2-population-catching-yesterday.html

findings of fact, he may extend these emergency orders (or, more accurately, issue new orders). See, for instance, Cassell v. Snyders, 458 F.Supp.3d 981 (Ill. N.D., 2020).

29.     In the case of Cassell specifically, the Court pointed out that while the governor could extend the emergency orders, his power is not unlimited. As Cassell finds, "[o]nce an emergency has abated, the facts on the ground will no longer justify such findings, and the Governor's emergency powers will cease. And, should this or any future Governor abuse his or her authority by issuing emergency declarations after a disaster subsides, affected parties will be able to challenge the sufficiency of those declarations in court." Cassell v. Snyders, 458 F. Supp. 3d 981, 1002 (N.D. Ill. 2020).

30.     Though COVID-19 is still very much a part of the lives of nearly every Illinoisan, the cases are presently on the wane, and there are many fewer new cases today (to say nothing of deaths) than there were at several other points over the last 18 months.

31.     The Illinois Emergency Management Act enumerates the temporary unilateral powers of the governor. Specifically, it lists the following powers:

> (1) To suspend the provisions of any regulatory statute prescribing procedures for conduct of State business, or the orders, rules and regulations of any State agency, if strict compliance with the provisions of any statute, order, rule, or regulation would in any way prevent, hinder or delay necessary action, including emergency purchases, by the Illinois Emergency Management Agency, in coping with the disaster.
> (2) To utilize all available resources of the State government as reasonably necessary to cope with the disaster and of each political subdivision of the State.
> (3) To transfer the direction, personnel or functions of State departments and agencies or units thereof for the purpose of performing or facilitating disaster response and recovery programs.
> (4) On behalf of this State to take possession of, and to acquire full title or a lesser specified interest in, any personal property as may be necessary to accomplish the objectives set forth in Section 2 of this Act, including: airplanes, automobiles, trucks, trailers, buses, and other vehicles; coal, oils, gasoline, and other fuels and means of propulsion; explosives, materials, equipment, and supplies; animals and livestock; feed and seed; food and provisions for humans and animals; clothing and

bedding; and medicines and medical and surgical supplies; and to take possession of and for a limited period occupy and use any real estate necessary to accomplish those objectives; but only upon the undertaking by the State to pay just compensation therefor as in this Act provided, and then only under the following provisions:

a. The Governor, or the person or persons as the Governor may authorize so to do, may forthwith take possession of property for and on behalf of the State; provided, however, that the Governor or persons shall simultaneously with the taking, deliver to the owner or his or her agent, if the identity of the owner or agency is known or readily ascertainable, a signed statement in writing, that shall include the name and address of the owner, the date and place of the taking, description of the property sufficient to identify it, a statement of interest in the property that is being so taken, and, if possible, a statement in writing, signed by the owner, setting forth the sum that he or she is willing to accept as just compensation for the property or use. Whether or not the owner or agent is known or readily ascertainable, a true copy of the statement shall promptly be filed by the Governor or the person with the Director, who shall keep the docket of the statements. In cases where the sum that the owner is willing to accept as just compensation is less than $1,000, copies of the statements shall also be filed by the Director with, and shall be passed upon by an Emergency Management Claims Commission, consisting of 3 disinterested citizens who shall be appointed by the Governor, by and with the advice and consent of the Senate, within 20 days after the Governor's declaration of a disaster, and if the sum fixed by them as just compensation be less than $1,000 and is accepted in writing by the owner, then the State Treasurer out of funds appropriated for these purposes, shall, upon certification thereof by the Emergency Management Claims Commission, cause the sum so certified forthwith to be paid to the owner. The Emergency Management Claims Commission is hereby given the power to issue appropriate subpoenas and to administer oaths to witnesses and shall keep appropriate minutes and other records of its actions upon and the disposition made of all claims.

b. When the compensation to be paid for the taking or use of property or interest therein is not or cannot be determined and paid under item a of this paragraph (4), a petition in the name of The People of the State of Illinois shall be promptly filed by the Director, which filing may be enforced by mandamus, in the circuit court of the county where the property or any part thereof was located when initially taken or used under the provisions of this Act praying that the amount of compensation to be paid to the person or persons interested therein be fixed and determined. The petition shall include a description of the property that has been taken, shall state the physical condition of the property when taken, shall name as defendants all interested parties, shall set forth the sum of money estimated to be just compensation for the property or interest therein

taken or used, and shall be signed by the Director. The litigation shall be handled by the Attorney General for and on behalf of the State.

   c. Just compensation for the taking or use of property or interest therein shall be promptly ascertained in proceedings and established by judgment against the State, that shall include, as part of the just compensation so awarded, interest at the rate of 6% per annum on the fair market value of the property or interest therein from the date of the taking or use to the date of the judgment; and the court may order the payment of delinquent taxes and special assessments out of the amount so awarded as just compensation and may make any other orders with respect to encumbrances, rents, insurance, and other charges, if any, as shall be just and equitable.

  (5) When required by the exigencies of the disaster, to sell, lend, rent, give, or distribute all or any part of property so or otherwise acquired to the inhabitants of this State, or to political subdivisions of this State, or, under the interstate mutual aid agreements or compacts as are entered into under the provisions of subparagraph (5) of paragraph (c) of Section 6 to other states, and to account for and transmit to the State Treasurer all funds, if any, received therefor.

  (6) To recommend the evacuation of all or part of the population from any stricken or threatened area within the State if the Governor deems this action necessary.

  (7) To prescribe routes, modes of transportation, and destinations in connection with evacuation.

  (8) To control ingress and egress to and from a disaster area, the movement of persons within the area, and the occupancy of premises therein.

  (9) To suspend or limit the sale, dispensing, or transportation of alcoholic beverages, firearms, explosives, and combustibles.

  (10) To make provision for the availability and use of temporary emergency housing.

  (11) A proclamation of a disaster shall activate the State Emergency Operations Plan, and political subdivision emergency operations plans applicable to the political subdivision or area in question and be authority for the deployment and use of any forces that the plan or plans apply and for use or distribution of any supplies, equipment, and materials and facilities assembled, stockpiled or arranged to be made available under this Act or any other provision of law relating to disasters.

  (12) Control, restrict, and regulate by rationing, freezing, use of quotas, prohibitions on shipments, price fixing, allocation or other means, the use, sale or distribution of food, feed, fuel, clothing and other commodities, materials, goods, or services; and perform and exercise any other functions, powers, and duties as may be necessary to promote and secure the safety and protection of the civilian population.

  (13) During the continuance of any disaster the Governor is commander-in-chief of the organized and unorganized militia and of all other forces available for

emergency duty. To the greatest extent practicable, the Governor shall delegate or assign command authority to do so by orders issued at the time of the disaster.

(14) Prohibit increases in the prices of goods and services during a disaster. 20 ILCS 3305/7.

32.     The entirety of the text is brought here to underscore what the statute does not state. The sections pertaining to the governor's power to direct traffic, ingress and egress, and commerce arguably give the governor the power to impose lockdowns. But there is no statutory authority in 20 ILCS 3305/7 that permits the governor to require vaccination of employees, or to direct the terms of their employment.

33.     Further, the act specifically limits the governor's power in stating that the Act shall not be construed to "[a]ffect the jurisdiction or responsibilities of police forces, fire fighting forces, units of the armed forces of the United States, or of any personnel thereof, when on active duty; but State and political subdivision emergency operations plans shall place reliance upon the forces available for performance of functions related to emergency management." 20 ILCS 3305/3(c).

34.     Illinois statute gives an EMS Medical Director may suspend any EMS personnel, but provides that they must first be given a hearing before the local system review board. 210 ILCS 50/3.40.

35.     The City of Naperville, ostensibly in response to Executive Order 2021-22, issued its own vaccination mandate (hereinafter "mandate"). This mandate requires employees of the Fire Department to vaccinate, and confirm their vaccination status, or otherwise submit proof of a weekly COVID test before they can report to work.

36.     Under the mandate, any employee who is not vaccinated and who does not submit proof of a weekly test must be placed on administrative leave without pay.

37.     Like the Executive Order, the mandate goes into effect on September 19, 2021, with the requirement of a weekly test beginning on September 20.

38.     The mandate claims that Naperville was directed to put these requirements in place by Edward-Elmhurst Healthcare.

39.     Inasmuch as the mandate points to Edward-Elmhurst as the initiator (by virtue of its relationship with the Naperville Fire Department, and by virtue of Daryl Wilson's role as EMS Medical Director over Naperville's paramedics), Edward-Elmhurst's actions in the context of this matter were taken under color of law.

40.     The Supreme Court has recognized many times that the right to privacy (including bodily autonomy) is one of the fundamental rights protected by the constitution. For example, Roe v. Wade, 410 U.S. 113 (1973) points to several prior decisions of the Supreme Court identifying various amendments in the Bill of Rights as the source of this right[8].

41.     In Roe specifically, the Supreme Court noted that the right of women to procure an abortion existed despite the State of Texas's belief (consistent with the beliefs of many of the world's religions, and the beliefs of many people of conscience) that the life of a fetus begins at conception. Id. at 159. That is to say, bodily autonomy trumps even the possibility that the assertion of the same would be directly responsible for the termination of a human life.

42.     Whenever a fundamental right is implicated, the Supreme Court tells us, Courts must apply strict scrutiny in evaluating the constitutionality of the laws at issue. Specifically, Supreme Court states that the state may only threaten that interest when it is justified by a "compelling state interest," and that the "legislative enactments must be narrowly drawn to express only the legitimate state interests at stake. Roe v. Wade, 410 U.S. 113, 155 (1973); Planned Parenthood of Se. Pennsylvania v. Casey, 505 U.S. 833, 871 (1992).

---

[8] Specifically, it points to the First Amendment, Stanley v. Georgia, 394 U.S. 557, 564 (1969); the Fourth and Fifth Amendments, Terry v. Ohio, 392 U.S. 1, 8-9 (1968), Katz v. United States, 389 U.S. 347, 350 (1967); Boyd v. United States, 116 U.S. 616 (1886), Olmstead v. United States, 277 U.S. 438 (1928)(Brandeis, dissenting); the "penumbras of the Bill of Rights, Griswold v. Connecticut, 381 U.S. 479, 484-5 (1965); and the Ninth Amendment, Id.

43.     As the Supreme Court has found elsewhere, "[t]he guaranties of due process, though having their roots in Magna Carta's *'per legem terrae'* and considered as procedural safeguards 'against executive usurpation and tyranny,' have in this country 'become bulwarks also against arbitrary legislation." Planned Parenthood of Se. Pennsylvania v. Casey, 505 U.S. 833, 847(1992)

44.     In Washington v. Harper, 495 U.S. 210 (1990), the Supreme Court found that the forced injection of medicine implicated a "significant liberty interest." Similarly, in Cruzan v. Director, Missouri Dep't of Health, 497 U.S. 261, 278 (1990), the Supreme Court found that "a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment."

45.     In this case, the mandate at issue is not narrowly tailored to forward a compelling government interest.

46.     Vaccinating people is not a compelling government interest in and of itself. Rather, the government's interest is in protecting the lives and fundamental rights of the state's residents.

47.     Presently, COVID-19 cases are on the wane in Illinois, and, as stated above, there were many periods over the last 18 months when the number of new cases per day was much greater than at present. Nonetheless, there was no time during that period when weekly COVID-19 tests were required of EMS employees. There was also no time, over the last nine months when vaccines have been available, when a vaccine mandate was put in place in the State of Illinois, or in the City of Naperville's fire department.

48.     It is therefore evident that the weekly testing requirement is not narrowly tailored to forward the interest of preserving the life and health of Illinois' citizens; rather, it is a punitive measure taken against those who assert their fundamental rights.

49.     Given that many paramedics have already caught and recovered from COVID-19, singling out those who are not vaccinated against COVID-19 is neither narrowly tailored to nor rationall related to forwarding the interest of preserving the life and health of Illinois' citizens; those who

have not had COVID-19, and whose immunity comes from vaccination, are at a much greater risk of catching and transmitting COVID-19 to others than those who remain unvaccinated but who have natural immunity.

## COUNT I
### 42 U.S.C. § 1983
### Due Process

50.     If Defendants are not enjoined from putting the mandate into effect, their fundamental rights will be violated.

## COUNT II
### 42 U.S.C. § 1983
### Equal Protection

51.     As a result of the Executive Order, and the contemplated actions, Plaintiffs are being treated differently from employees who are willing to disclose their vaccination status arbitrarily, and singled out for disparate treatment.

## COUNT III
### Declaratory Judgment

52.     The Executive Order, and the mandate upon which it is based, far exceeds the power of the governor granted to him by Illinois statute.

53.     The Illinois Emergency Management Act, which the governor points to as authorizing the vaccine mandates, does not give the governor the power to require employees to be vaccinated. This aspect of the Executive Order violates Illinois law and statute.

54.     Further, the factual basis underlying the Executive Order is woefully inadequate to justify such an imposition on the constitutional and fundamental rights of Illinois' residents.

55.     Finally, the mandate, and the Executive Order, violate the constitutional and fundamental rights of those who either choose not to be vaccinated, or choose not to disclose their vaccination status to either the state, or their employers.

## Prayer for Relief

WHEREFORE, Plaintiffs request that this Honorable Court enter an order:

A. Finding that the State of Illinois, and the City of Naperville, has violated the constitutional rights of Plaintiffs;

B. Finding that the Executive Order, and therefore the mandate, exceeds the authority granted to the governor and to governmental units granted by statute, and is therefore null and void as to the vaccine mandates complained of here;

C. Finding that Plaintiffs have a fundamental right to their bodily autonomy, and to make health decisions in accordance with their beliefs and conscience;

D. Ordering that Defendants be enjoined from putting the vaccine mandates contained in the Executive Order and the mandate into effect;

E. Ordering that Plaintiffs be compensated, to the extent allowable under the law and the Constitution of the United States of America, for their damages; and

F. Ordering that Defendants pay Plaintiffs' for the costs associated with bringing this lawsuit, including their reasonable attorneys' fees.

Respectfully Submitted,

s/Jonathan Lubin
Attorney for Plaintiffs

Jonathan Lubin
8800 Bronx Ave.
Suite 100H
Skokie, IL 60077
773 954 2608
jonathan@lubinlegal.com

Exhibit A



**STATE OF ILLINOIS**

**EXECUTIVE DEPARTMENT**

**SPRINGFIELD, ILLINOIS**

FILED
INDEX DEPARTMENT

SEP 0 3 2021

IN THE OFFICE OF
SECRETARY OF STATE

September 3, 2021                                     Executive Order 2021-22

### EXECUTIVE ORDER 2021-22
### (COVID-19 EXECUTIVE ORDER NO. 88)

**WHEREAS**, since early March 2020, Illinois has faced a pandemic that has caused extraordinary sickness and loss of life, infecting over 1,538,300, and taking the lives of more than 24,000 residents; and,

**WHEREAS**, at all times but especially during a public health crisis, protecting the health and safety of Illinoisans is among the most important functions of State government; and,

**WHEREAS**, the Illinois Department of Public Health (IDPH) has determined that the Delta variant is the most dominant strain of COVID-19 in Illinois and has spread quickly among unvaccinated people of all ages in Illinois; and,

**WHEREAS**, the Delta variant is more aggressive and more transmissible than previously circulating strains, and poses significant new risks in the ongoing effort to stop and slow spread of the virus; and,

**WHEREAS**, the Delta variant also may cause more severe disease than prior strains of the virus; and,

**WHEREAS**, the Centers for Disease Control and Prevention (CDC) estimates that the Delta variant now accounts for more than 90 percent of all sequenced coronavirus cases in the U.S.; and,

**WHEREAS**, the CDC has issued guidance recommending wearing a mask indoors in public in most circumstances, even for fully vaccinated people,[1] as well as where required by federal, state, local, tribal, or territorial laws, rules, and regulations, including local business and workplace guidance; and,

**WHEREAS**, every region in the State is experiencing increased numbers of COVID-19 cases and increased numbers of hospital beds and ICU beds utilized by COVID-19 patients; and,

**WHEREAS**, there are parts of the country in which there are few if any available ICU beds as a result of the Delta variant, and in many parts of Illinois, the number of available ICU beds has been decreasing in recent weeks as a result of the Delta variant; and,

**WHEREAS**, the CDC continues to advise that cloth face coverings or masks protect persons who are not fully vaccinated from COVID-19; and,

---

[1] Individuals are considered fully vaccinated 2 weeks after their second dose in a 2-dose series, such as the Pfizer-BioNTech or Moderna vaccines, or 2 weeks after a single-dose vaccine, such as Johnson & Johnson's Janssen vaccine. Individuals who do not meet these requirements, regardless of age, are not considered fully vaccinated.

1

**WHEREAS**, social distancing, face coverings, and other public health precautions have proved to be critical in slowing and stopping the spread of COVID-19; and,

**WHEREAS**, COVID-19 cases for 5 to 11-year-olds and 12 to 17-year-olds went up dramatically over the past month; and,

**WHEREAS**, the CDC has recognized vaccination as the leading public health prevention strategy to end the COVID-19 pandemic and recommends that all teachers, staff, and eligible students be vaccinated as soon as possible; and,

**WHEREAS**, COVID-19 vaccines are safe, effective, and widely available free of cost to any Illinois resident 12 years of age and older; and,

**WHEREAS**, while over 6.7 million Illinoisans have been fully vaccinated against COVID-19, in order to protect against the rapid spread of the Delta variant, additional steps are necessary to ensure that the number of vaccinated residents continues to increase and includes individuals working in certain settings of concern, including those who work around children under the age of 12; and,

**WHEREAS**, increasing vaccination rates in schools is the strongest protective measure against COVID-19 available and, together with masking and regular testing, is vital to providing in-person instruction in as safe a manner as possible; and,

**WHEREAS**, health care workers, and particularly those involved in direct patient care, face an increased risk of exposure to COVID-19; and,

**WHEREAS**, stopping the spread of COVID-19 in health care settings is critically important because of the presence of people with underlying conditions or compromised immune systems; and,

**WHEREAS**, requiring individuals in health care settings to receive a COVID-19 vaccine or undergo regular testing can help prevent outbreaks and reduce transmission to vulnerable individuals who may be at a higher risk of severe disease; and,

**WHEREAS**, statewide measures are necessary to protect particularly vulnerable individuals, as well as employees, in high-risk health care settings; and,

**WHEREAS**, it is the duty of every employer to protect the health and safety of employees by establishing and maintaining a healthy and safe work environment and requiring employees to comply with health and safety measures; and,

**WHEREAS**, in light of the continued spread of COVID-19, the increasing threat of the Delta variant, and the significant percentage of the population that remains unvaccinated, I declared on August 20, 2021 that the current circumstances in Illinois surrounding the spread of COVID-19 continue to constitute an epidemic emergency and a public health emergency under Section 4 of the Illinois Emergency Management Agency Act;

**THEREFORE**, by the powers vested in me as the Governor of the State of Illinois, pursuant to the Illinois Constitution and the Illinois Emergency Management Agency Act, 20 ILCS 3305, Sections 7(1), 7(2), 7(3), 7(8), 7(12), and Section 19 thereof, and consistent with the powers in public health laws, I hereby order the following effective immediately:

**Section 1: Face covering requirements for individuals.** Beginning on Monday, August 30, 2021, all individuals in Illinois who are age two or over and able to medically tolerate a face covering (a mask or cloth face covering) shall be required to cover their nose and mouth with a face covering when in an indoor public place. All employers must ensure that employees wear face coverings in indoor workplaces. Illinoisans should also consider wearing a mask in crowded outdoor settings and for activities that involve close contact with others who are not fully vaccinated.

Face coverings may be removed temporarily while actively eating or drinking (including in bars or restaurants), and may be removed by employees at workplaces when they can consistently maintain six feet of distance (such as when employees are in their office or cubicle space).

All individuals, including those who are fully vaccinated, shall continue to be required to wear a face covering (1) on planes, buses, trains, and other forms of public transportation and in transportation hubs such as airports and train and bus stations; (2) in congregate facilities such as correctional facilities and homeless shelters; and (3) in healthcare settings.

**Section 2: Vaccination and Testing Requirements for Health Care Workers.**
- a. Definitions
  - i. "Health Care Worker" means any person who (1) is employed by, volunteers for, or is contracted to provide services for a Health Care Facility, or is employed by an entity that is contracted to provide services to a Health Care Facility, and (2) is in close contact (fewer than 6 feet) with other persons in the facility for more than 15 minutes at least once a week on a regular basis as determined by the Health Care Facility. The term "Health Care Worker" does not include any person who is employed by, volunteers for, or is contracted to provide services for any State-owned or operated facility. The term "Health Care Worker" also does not include any person who is present at the Health Care Facility for only a short period of time and whose moments of close physical proximity to others on site are fleeting (e.g., contractors making deliveries to a site where they remain physically distanced from others or briefly entering a site to pick up a shipment).
  - ii. "Health Care Facility" means any institution, building, or agency, or portion of an institution, building or agency, whether public or private (for-profit or nonprofit), that is used, operated or designed to provide health services, medical treatment or nursing, or rehabilitative or preventive care to any person or persons. This includes, but is not limited to, ambulatory surgical treatment centers, hospices, hospitals, physician offices, pharmacies, emergency medical services, IDPH licensed emergency medical service vehicles, chiropractic offices, dental offices, free-standing emergency centers, urgent care facilities, birth centers, post-surgical recovery care facilities, end-stage renal disease facilities, long-term care facilities (including skilled and intermediate long-term care facilities licensed under the Nursing Home Care Act, the ID/DD Community Care Act or the MC/DD Act), Specialized Mental Health Rehabilitation Facilities, assisted living facilities, supportive living facilities, medical assistance facilities, mental health centers, outpatient facilities, public health centers, rehabilitation facilities, residential treatment facilities, and adult day care centers. The term "Health Care Facility" does not include any State-owned or operated facilities.
  - iii. An individual is "fully vaccinated against COVID-19" two weeks after receiving the second dose in a two-dose series of a COVID-19 vaccine authorized for emergency use, licensed, or otherwise approved by the U.S. Food and Drug Administration (FDA), or two weeks after receiving a single-dose COVID-19 vaccine authorized for emergency use, licensed, or otherwise approved by the FDA.
- b. All Health Care Workers must have, at a minimum, the first dose of a two-dose COVID-19 vaccine series or a single-dose COVID-19 vaccine by September 19, 2021, and the second dose of a two-dose COVID-19 vaccine series within 30 days following administration of their first dose in a two-dose vaccination series. Any Health Care Workers who have not established that they are fully vaccinated against COVID-19 must be tested consistent with the requirements of Subsection (d). To establish that they are fully vaccinated against COVID-19, Health Care Workers must provide proof of full vaccination against COVID-19 to the Health

3

Care Facility. Proof of COVID-19 vaccination may be met by providing one of the following: (1) a CDC COVID-19 vaccination record card or photograph of the card; (2) documentation of vaccination from a health care provider or electronic health record; or (3) state immunization records.

c. Health Care Facilities shall exclude Health Care Workers who are not fully vaccinated against COVID-19 from the premises unless they comply with the testing requirements specified in Subsection (d).

d. Beginning September 19, 2021, to enter or work at or for a Health Care Facility, Health Care Workers who have not been fully vaccinated against COVID-19 must undergo testing for COVID-19, as described below, until they establish that they are fully vaccinated against COVID-19:

   i. Health Care Workers who are not fully vaccinated against COVID-19 must be tested for COVID-19 weekly, at a minimum. The testing must be done using a test that either has Emergency Use Authorization by the FDA or be operating per the Laboratory Developed Test requirements by the U.S. Centers for Medicare and Medicaid Services.

   ii. Such testing for Health Care Workers who are not fully vaccinated against COVID-19 must be conducted on-site at the Health Care Facility or the Health Care Facility must obtain proof or confirmation from the Health Care Worker of a negative test result obtained elsewhere.

   iii. IDPH recommends that Health Care Workers be tested using a PCR test if available.

e. Individuals are exempt from any requirement to be fully vaccinated against COVID-19 if (1) vaccination is medically contraindicated, including any individual who is entitled to an accommodation under the Americans with Disabilities Act or any other law applicable to a disability-related reasonable accommodation, or (2) vaccination would require the individual to violate or forgo a sincerely held religious belief, practice, or observance. Individuals who demonstrate they are exempt from the vaccination requirement shall undergo, at a minimum, weekly testing as provided for in Subsection (d).

f. State agencies, including but not limited to IDPH, the Illinois Department of Human Services, and the Illinois Department of Healthcare and Family Services, may promulgate emergency rules as necessary to effectuate this Executive Order.

**Section 3: Vaccination and Testing Requirements for School Personnel.**

a. Definitions

   i. "School Personnel" means any person who (1) is employed by, volunteers for, or is contracted to provide services for a School or school district serving students in pre-kindergarten through 12th grade, or who is employed by an entity that is contracted to provide services to a School, school district, or students of a School, and (2) is in close contact (fewer than 6 feet) with students of the School or other School Personnel for more than 15 minutes at least once a week on a regular basis as determined by the School. The term "School Personnel" does not include any person who is present at the School for only a short period of time and whose moments of close physical proximity to others on site are fleeting (e.g., contractors making deliveries to a site where they remain physically distanced from others or briefly entering a site to pick up a shipment).

   ii. "School" means any public or nonpublic elementary or secondary school, including charter schools, serving students in pre-kindergarten through 12th grade, including any State-operated residential schools such as the Philip J. Rock Center and School, the Illinois School for the Visually Impaired, the Illinois School for the Deaf, and the Illinois Mathematics and Science Academy. The term "School" does not include the Illinois Department of Juvenile Justice.

   iii. An individual is "fully vaccinated against COVID-19" two weeks after receiving the second dose in a two-dose series of a COVID-19 vaccine authorized for emergency use, licensed, or otherwise approved by the

4

UFDA, or two weeks after receiving a single-dose COVID-19 vaccine authorized for emergency use, licensed, or otherwise approved by the FDA.

b. All School Personnel must have, at a minimum, the first dose of a two-dose COVID-19 vaccine series or a single-dose COVID-19 vaccine by September 19, 2021, and the second dose of a two-dose COVID-19 vaccine series within 30 days following administration of their first dose in a two-dose vaccination series. Any School Personnel who have not established that they are fully vaccinated against COVID-19 must be tested consistent with the requirements of Subsection (d). To establish that they are fully vaccinated against COVID-19, School Personnel must provide proof of full vaccination against COVID-19 to the School. Proof of COVID-19 vaccination may be met by providing one of the following: (1) a CDC COVID-19 vaccination record card or photograph of the card; (2) documentation of vaccination from a health care provider or electronic health record; or (3) state immunization records.

c. Schools shall exclude School Personnel who are not fully vaccinated against COVID-19 from the premises unless they comply with the testing requirements specified in Subsection (d).

d. Beginning September 19, 2021, to enter or work at or for a School, School Personnel who have not been fully vaccinated against COVID-19 must undergo testing for COVID-19, as described below, until they establish that they are fully vaccinated against COVID-19:

    i. School Personnel who are not fully vaccinated against COVID-19 must be tested for COVID-19 weekly, at a minimum. The testing must be done using a test that either has Emergency Use Authorization by the FDA or be operating per the Laboratory Developed Test requirements by the U.S. Centers for Medicare and Medicaid Services.

    ii. Such testing for School Personnel who are not fully vaccinated against COVID-19 must be conducted on-site at the School or the School must obtain proof or confirmation from the School Personnel of a negative test result obtained elsewhere.

    iii. IDPH recommends that School Personnel be tested using a PCR test if available.

e. Individuals are exempt from any requirement to be fully vaccinated against COVID-19 if (1) vaccination is medically contraindicated, including any individual who is entitled to an accommodation under the Americans with Disabilities Act or any other law applicable to a disability-related reasonable accommodation, or (2) vaccination would require the individual to violate or forgo a sincerely held religious belief, practice, or observance. Individuals who demonstrate they are exempt from the vaccination requirement shall undergo, at a minimum, weekly testing as provided for in Subsection (d).

f. State agencies, including but not limited to IDPH and the Illinois State Board of Education, may promulgate emergency rules as necessary to effectuate this Executive Order.

## Section 4: Vaccination and Testing Requirements for Higher Education.

a. Definitions

    i. "Higher Education Personnel" means any person who (1) is employed by, volunteers for, or is contracted to provide services for an Institution of Higher Education, or is employed by an entity contracted to provide services for an Institution of Higher Education, and (2) is in close contact (fewer than 6 feet) with other persons on the campus or in a campus-affiliated building or location for more than 15 minutes at least once a week on a regular basis. The term "Higher Education Personnel" does not include any person who is present on the campus or at an affiliated off-campus location for only a short period of time and whose moments of close physical proximity to others on site are fleeting (e.g.,

           contractors making deliveries to a site where they remain physically distanced from others or briefly enter a site to pick up a shipment).

    ii.   "Institution of Higher Education" means any publicly or privately operated university, college, community college, junior college, business, technical or vocational school, or other educational institution offering degrees, programs, or instruction beyond the secondary school level.

    iii.   "Higher Education Student" means an individual enrolled in credit-bearing or non-credit bearing coursework at an Institution of Higher Education, either on campus or at an affiliated off-campus location. The term "Higher Education Student" does not include individuals who complete their coursework exclusively remotely.

    iv.   An individual is "fully vaccinated against COVID-19" two weeks after receiving the second dose in a two-dose series of a COVID-19 vaccine authorized for emergency use, licensed, or otherwise approved by the FDA, or two weeks after receiving a single-dose COVID-19 vaccine authorized for emergency use, licensed, or otherwise approved by the FDA.

b.  All Higher Education Personnel and Higher Education Students must have, at a minimum, the first dose of a two-dose COVID-19 vaccine series or a single-dose COVID-19 vaccine by September 19, 2021, and the second dose of a two-dose COVID-19 vaccine series within 30 days following administration of their first dose in a two-dose vaccination series. Any Higher Education Personnel or Higher Education Students who have not established that they are fully vaccinated against COVID-19 must be tested consistent with the requirements of Subsection (d). To establish that they are fully vaccinated against COVID-19, Higher Education Personnel and Higher Education Students must provide proof of full vaccination against COVID-19 to the Institution of Higher Education. Proof of COVID-19 vaccination may be met by providing one of the following: (1) a CDC COVID-19 vaccination record card or photograph of the card; (2) documentation of vaccination from a health care provider or electronic health record; or (3) state immunization records.

c.  An Institution of Higher Education shall exclude Higher Education Personnel and Higher Education Students who are not fully vaccinated against COVID-19 from the premises unless they comply with the testing requirements specified in Subsection (d).

d.  Beginning September 19, 2021, to enter or work at or for an Institution of Higher Education, Higher Education Personnel and Higher Education Students who have not been fully vaccinated against COVID-19 must undergo testing for COVID-19, as described below, until they establish that they are fully vaccinated against COVID-19:

    i.   Higher Education Personnel and Higher Education Students who are not fully vaccinated against COVID-19 must be tested for COVID-19 weekly, at a minimum. Testing must be done using a test that either has Emergency Use Authorization by the FDA or be operating per the Laboratory Developed Test requirements by the U.S. Centers for Medicare and Medicaid Services.

    ii.   Such testing for Higher Education Personnel and Higher Education Students who are not fully vaccinated against COVID-19 must be conducted on-site at the Institution of Higher Education or the Institution of Higher Education must obtain proof or confirmation from the Higher Education Personnel or Higher Education Student who is not fully vaccinated against COVID-19 of a negative test result obtained elsewhere.

    iii.   IDPH recommends that Higher Education Personnel and Higher Education Students be tested using PCR tests if available.

e.  Individuals are exempt from any requirement to be fully vaccinated against COVID-19 if (1) vaccination is medically contraindicated, including any

individual who is entitled to an accommodation under the Americans with Disabilities Act or any other law applicable to a disability-related reasonable accommodation, or (2) vaccination would require the individual to violate or forgo a sincerely held religious belief, practice, or observance. Individuals who demonstrate they are exempt from the vaccination requirement shall undergo, at a minimum, weekly testing as provided for in Subsection (d).

    f. State agencies, including but not limited to IDPH, the Illinois Community College Board, and the Illinois Board of Higher Education, may promulgate emergency rules as necessary to effectuate this Executive Order.

## Section 5: Vaccination Requirements at State-Owned or Operated Congregate Facilities.

    a. Definitions

        i. "State-owned or operated congregate facilities" means congregate facilities operated by the Illinois Department of Veterans' Affairs, the Illinois Department of Human Services, the Illinois Department of Corrections, and the Illinois Department of Juvenile Justice.

        ii. An individual is "fully vaccinated against COVID-19" two weeks after receiving the second dose in a two-dose series of a COVID-19 vaccine authorized for emergency use, licensed, or otherwise approved by the U.S. FDA, or two weeks after receiving a single-dose COVID-19 vaccine authorized for emergency use, licensed, or otherwise approved by the FDA.

    b. All State employees at State-owned or operated congregate facilities must have both doses of a two-dose COVID-19 vaccine series or a single-dose COVID-19 vaccine by no later than October 4, 2021, subject to bargaining.

    c. All contractors and vendors who work at State-owned or operated congregate facilities must have both doses of a two-dose COVID-19 vaccine series or a single-dose COVID-19 vaccine by no later than October 4, 2021. This does not include any person who is present at a State-owned or operated congregate facility for only a short period of time and whose moments of close physical proximity to others on site are fleeting, as determined by the facility (e.g., contractors making deliveries to a site where they remain physically distanced from others or briefly enter a site to pick up a shipment).

    d. To meet the requirement to be fully vaccinated against COVID-19, State employees and contractors and vendors at State-owned or operated congregate facilities must provide proof of full vaccination against COVID-19 to the State-owned or operated congregate facility. Proof of COVID-19 vaccination may be met by providing one of the following: (1) a CDC COVID-19 vaccination record card or photograph of the card; (2) documentation of vaccination from a health care provider or electronic health record; or (3) state immunization records.

    e. Individuals will be exempt from the requirement to be fully vaccinated against COVID-19 if (1) vaccination is medically contraindicated, including any individual who is entitled to an accommodation under the Americans with Disabilities Act or any other law applicable to a disability-related reasonable accommodation, or (2) vaccination would require the individual to violate or forgo a sincerely held religious belief, practice, or observance. Individuals who demonstrate they meet the requirements for an exemption will be subject to additional testing requirements.

    f. The Illinois Department of Central Management Services Labor Relations team is instructed to negotiate effectuating this Executive Order with the relevant labor unions, and to bargain these provisions as appropriate under the law.

## Section 6: Additional Vaccination and Testing Requirements.

    a. Information about available testing resources, including state-supported community-based testing sites, is available at: http://dph.illinois.gov/testing. Additional information is also available in IDPH's Interim Guidance on Testing for COVID-19 in Community Settings and Schools, available at:

http://dph.illinois.gov/covid19/community-guidance/rapid-point-care-testing-covid-19.

b. Nothing in this Executive Order prohibits any entity, public or private, from implementing vaccination or testing requirements for personnel, contractors, students or visitors that exceed the requirements of this Executive Order, including a requirement to be fully vaccinated by a date sooner than required by this Executive Order.

c. Nothing in this Executive Order prohibits any entity, public or private, from implementing a requirement that personnel, contractors, students or visitors be fully vaccinated without providing the alternative to test on a weekly basis, consistent with applicable law.

d. IDPH and the Illinois State Board of Education may adopt emergency rules to require facilities to conduct more frequent testing than required by this Executive Order, and nothing in this Executive Order is intended to supersede or replace any IDPH protocols for facilities to implement more frequent testing in areas of high transmission or for facilities experiencing an outbreak.

e. All entities are encouraged to implement robust vaccination and testing programs to reduce the spread of COVID-19.

f. Entities may permit Health Care Workers, School Personnel, Higher Education Personnel, and Higher Education Students to be present on premises while they are awaiting the results of a weekly COVID-19 test required by this Executive Order as long as they do not have any symptoms of COVID-19 that warrant exclusion until a test result is received.

**Section 7.** During the duration of the Gubernatorial Disaster Proclamation, the requirement in the Hospital Licensing Act, 210 ILCS 85/10(c) that the Department must receive prior approval from the Hospital Licensing Board before adopting a rule is suspended.

**Section 8: Savings Clause.** If any provision of this Executive Order or its application to any person or circumstance is held invalid by any court of competent jurisdiction, this invalidity does not affect any other provision or application of this Executive Order, which can be given effect without the invalid provision or application. To achieve this purpose, the provisions of this Executive Order are declared to be severable.

**Section 9: Prior Executive Orders.** This Executive Order supersedes Executive Order 2021-20 and any contrary provision of any other prior Executive Order. Any provisions that are not contrary to those in this Executive Order shall remain in full force and effect.

**JB Pritzker, Governor**

Issued by the Governor September 3, 2021
Filed by the Secretary of State September 3, 2021

FILED
INDEX DEPARTMENT

SEP 0 3 2021

IN THE OFFICE OF
SECRETARY OF STATE

8