# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| JOHN HALGREN, JOHN K. STEIGLER, GIL CORTEZ, CHRIS GARON, ROBERT McCORMICK, and JOEL FOX, individually and on behalf of similarly situated employees of the CITY OF NAPERVILLE, | |
| Plaintiffs, | Case No. 21-cv-05039 |
| v. | |
| CITY OF NAPERVILLE, EDWARD-ELMHURST HEALTHCARE, and GOVERNOR JAY ROBERT PRITZKER, | |
| | Judge John Robert Blakey |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

This case concerns the constitutionality of a vaccine and testing mandate issued by Illinois Governor Jay Robert Pritzker. The mandate compels healthcare workers within the state to either immunize against the novel coronavirus or to submit to weekly testing. Faced with this choice, several first responders now challenge the constitutionality of the mandate, especially as it applies to individuals

with the benefit of natural immunity.[1]  They also moved for a preliminary

injunction to bar enforcement of the mandate while they litigate their constitutional

claims. [4].  On November 1, 2021, this Court held a hearing and denied the motion

preliminarily from the bench, subject to a written order.  [41].  The Court now

issues its memorandum opinion denying the motion [4]. The Court begins with the

case background and relevant injunctive relief standard, and then follows with the

requisite findings of fact and rulings of law.

## I.      Case Background

### A.      The COVID-19 Pandemic

In January 2020, Illinois health officials announced the first confirmed

Illinois case of an infection with the virus known as SARS-CoV-2, which can, in a

percentage of cases, result in a symptomatic disease termed "COVID-19."[2]  Around

the same time, the Director General of the World Health Organization ("WHO")

designated this novel coronavirus as a Public Health Emergency of International

Concern.  [21-1] ¶ 12.[3]  Shortly thereafter, the United States Secretary of Health

---

[1] "Natural immunity" refers to immunity obtained by way of a prior infection as opposed to vaccination.  [4] at 2 (defining "natural immunity" as "immunity caused by infection with COVID-19 and recovery").

[2] While the novel coronavirus needs little introduction, a note by way of terminology: Coronavirus disease ("COVID-19") is caused by a virus named severe acute respiratory syndrome coronavirus-2 ("SARS-CoV-2").  Accordingly, references to "COVID-19" in this decision denote the symptomatic disease; references to "SARS-CoV-2" in this decision denote the virus. *See*, Fang Li, *Structure, Function, and Evolution of Coronavirus Spike*, ANNUAL REVIEW OF VIROLOGY, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5457962/pdf/nihms861907.pdf (last visited Dec. 6, 2021); *see also About COVID-19*, ILLINOIS DEPARTMENT OF HEALTH, *available at* https://dph.illinois.gov/covid19/about-covid19.html (last visited Dec. 6, 2021) ("The first case of COVID-19 in the United States was reported January 21, 2020 and the first confirmed case in Illinois was announced January 24, 2020 (a Chicago resident).").

[3] *See also 2019-nCoV Outbreak is an Emergency of International Concern*, WORLD HEALTH ORGANIZATION (Jan. 31, 2020), *available at* https://www.euro.who.int/en/health-topics/health-

and Human Services ("HHS") declared the same.[4]  As the virus continued to spread throughout the United States, the Centers for Disease Control and Prevention ("CDC") recommended various community mitigation efforts to fight the growing pandemic.[5]  Following this lead, Illinois' Governor Jay Pritzker[6] declared a state of emergency by mid-March 2020.[7]

The SARS-CoV-2 virus spreads primarily through respiratory droplets such as those emitted when a person coughs, sneezes or speaks.  [21-1] ¶ 15; [21-2] ¶ 12. An individual need not be presently in the throes of sickness to spread the virus; individuals can acquire and spread the virus without ever experiencing any symptoms of COVID-19 disease.  [21-1] ¶ 16; [21-2] ¶ 13.  The evidence also shows that both vaccinated and unvaccinated individuals who become infected may be at their most contagious before they show any signs of disease.  [21-1] ¶ 17 ("[I]n

---

emergencies/coronavirus-covid-19/news/news/2020/01/2019-ncov-outbreak-is-an-emergency-of-international-concern (last visited Dec. 6, 2021).

[4] *Determination that a Public Health Emergency Exists*, U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES (Jan. 31, 2020), *available at* https://www.phe.gov/emergency/news/healthactions/phe/Pages/2019-nCoV.aspx (last visited Dec. 6, 2021).

[5] *See Implementation of Mitigation Strategies for Communities with Local COVID-19 Transmission*, CENTERS FOR DISEASE CONTROL AND PREVENTION (May 23, 2021), *available at* https://www.cdc.gov/coronavirus/2019-ncov/community/community-mitigation.html (last visited Dec. 6, 2021).

[6] Governor Pritzker is a defendant in this action and represented by the Office of the Illinois Attorney General; he will be referred to herein as simply "Governor" or "Governor Pritzker."

[7] GUBERNATORIAL DISASTER PROCLAMATION, Mar. 9, 2020, *available at* https://www.illinois.gov/content/dam/soi/en/web/coronavirus/documents/coronavirus-disaster-proc-03-12-2020.pdf (last visited Dec. 6, 2021); *see also id.* at 1, § 1 ("Pursuant to the provisions of Section 7 of the Illinois Emergency Management Agency Act, 20 ILCS 3305/7, I find that a disaster exists within the State of Illinois and specifically declare all counties in the State of Illinois as a disaster area.").

people who do develop symptoms, the highest levels of virus occur prior to the onset of symptoms."); [21-2] ¶ 13 ("People can acquire and spread COVID-19 without experiencing symptoms, and the highest levels of virus occur before the onset of any symptoms.").[8]

Following the initial detection of SARS-CoV-2, new variants or strains of the virus have also emerged. *See* [21-1] ¶ 25; [21-2] ¶ 18. The Delta variant, for example, was detected in India in late 2020. [21-2] ¶ 18. The CDC estimates that cases of infection due to the Delta variant were first seen in the United States in or around April 2021. *Id.*[9] The CDC's estimates also suggest that the Delta variant now accounts for more than 90 percent of all sequenced coronavirus infections in the United States. *Id.* ¶ 20; [21-1] ¶ 25 (describing the Delta variant as "more transmissible (i.e., more contagious) than previously circulating strains"), ¶ 28; *see also* [21] at 5–6 ("That variant is more aggressive, more transmissible, and may cause more severe disease than previous strains of the virus."). The Delta variant is

---

[8] *See also Coronavirus disease (COVID-19): How is it transmitted?*, WORLD HEALTH ORGANIZATION (Dec. 13, 2020), *available at* https://www.who.int/news-room/questions-and-answers/item/coronavirus-disease-covid-19-how-is-it-transmitted (last visited Dec. 6, 2021); Xi He et al., *Temporal dynamics in viral shedding and transmissibility of COVID-19*, NATURE MEDICINE (April 15, 2020), *available at* https://www.nature.com/articles/s41591-020-0869-5.pdf (last visited Dec. 7, 2021) ("We showed substantial transmission potential before symptom onset.").

[9] Citing Kendra Dougherty et al., *SARS-CoV-2 B.1.617.2 (Delta) Variant COVID-19 Outbreak Associates with a Gymnastics Facility – Oklahoma, April–May 2021*, CENTERS FOR DISEASE CONTROL AND PREVENTION (July 16, 2021), *available at* https://www.cdc.gov/mmwr/volumes/70/wr/mm7028e2.htm (last visited Dec. 6, 2021).

not alone; on November 26, 2021 the WHO recognized a new "variant of concern" termed "Omicron."[10]

Indisputably, the COVID-19 pandemic remains an important public health crisis, several times more serious than seasonal influenza for certain at-risk groups, especially senior citizens. *See Klaassen v. Trustees of Indiana Univ.*, No. 1:21-CV-238 DRL, 2021 WL 3073926, at *3 (N.D. Ind. July 18, 2021) ("*Klaassen I*") ("Individuals with longstanding systemic health inequities or preexisting or immunocompromising conditions, and elderly individuals prove at greater risk of severe illness or hospitalization following an infection."); *see also Democratic Nat'l Comm. v. Wisconsin State Leg.*, No. 20A66, 592 U.S. ----, 141 S. Ct. 28, 32 (2020) (Kavanaugh, J., concurring) ("The virus poses a particular risk to the elderly and to those with certain pre-existing conditions.").

The risks of COVID-19, however, do not present the same degree of danger for everyone; and there is a steep age-gradient associated with severity of disease.[11] Given

---

[10] *See generally, CDC Statement on B.1.1.529 (Omicron variant)*, CENTERS FOR DISEASE CONTROL AND PREVENTION (Nov. 26, 2021), *available at* https://www.cdc.gov/media/releases/2021/s1126-B11-529-omicron.html (last visited Dec. 6, 2021).

[11] Andrew T. Levin et al., *Assessing the age specificity of infection fatality rates for COVID-19: systematic review, meta-analysis, and public policy implications*, EUR. J. OF EPIDEMIOLOGY (Dec. 2020), *available at* https://pubmed.ncbi.nlm.nih.gov/33289900/ (last visited Dec. 6, 2021) ("The estimated age-specific IFRs [infection fatality rates] are close to zero for children and younger adults (e.g., 0.002% at age 10 and 0.01% at age 25) but increases progressively to 0.4% at age 55, 1.4% at age 75, and 15% at age 85."); *see also* John Ioannidis et al., *Population-level COVID-19 mortality risk for non-elderly individuals overall and for non-elderly individuals without underlying diseases in pandemic epicenters* (July 1, 2020), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7327471/pdf/main.pdf (last visited Dec. 6, 2021) ("Individuals with age <40 accounted for <1.3% of all COVID-19 deaths in European countries and Canada and 0.4–2.3% in the U.S. states, but were a much larger proportion in Mexico and India."); Smiriti Mallapaty, *The Coronavirus Is Most Deadly If You Are Older and Male*, NATURE (Aug. 28, 2020), https://media.nature.com/original/magazine-assets/d41586-020-02483-2/d41586-020-02483-2.pdf (last visited Dec. 6, 2021); *but see* [21-1] ¶ 31 (discussing multisystem inflammatory syndrome in children ("Mis-C"), a "rare but very serious complication of COVID-19").

the steep age gradient, the risk-benefit calculus for various COVID-19 vaccines and treatments differs sharply across various demographic groups, and the physiological effects of COVID-19 infection fall along a broad spectrum.[12]  Most COVID-19 cases are mild with minor symptoms; other less-common cases involve serious respiratory distress and damage, resulting in hospitalization, intubation, and in rare cases death.[13]  Overall, however, the evidence confirms that infection with the SARS-CoV-2 virus still retains an extremely high overall survivability rate.[14]

---

[12] John Ioannidis, *Infection fatality rate of COVID-19 inferred from seroprevalence data*, WORLD HEALTH ORGANIZATION BULLETIN (Jan. 1, 2021), *available at* https://www.who.int/bulletin/volumes/99/1/20-265892.pdf (last visited Dec. 6, 2021) (finding that COVID-19 has a "very steep age gradient for risk of death" and the "inferred infection fatality rates tended to be much lower than estimates made earlier in the pandemic."). For example, the CDC's best current estimate predicts an infection fatality ratio of 20 per 1,000,000 infections for people 17 years old and younger; or in other words, in the aggregate worst case scenario, children who get infected have only a 0.002 percent chance of dying from COVID-19. *COVID-19 Pandemic Planning Scenarios*, CENTERS FOR DISEASE CONTROL AND PREVENTION (Mar. 19, 2021), *available at* https://www.cdc.gov/coronavirus/2019-ncov/hcp/planning-scenarios.html (last visited Dec. 6, 2021). Even such low fatality numbers might be over-estimated. *See COVID-19 Alert No. 2: New ICD Code Introduced for COVID-19 Deaths*, NAT'L VITAL STATISTICS SYSTEM (Mar. 24, 2020), *available at* https://www.cdc.gov/nchs/data/nvss/coronavirus/Alert-2-New-ICD-code-introduced-for-COVID-19-deaths.pdf (last visited Dec. 7, 2021) (On March 24, 2020, the National Center for Health Statistics changed the rules applicable to coroners and others responsible for producing death certificates and making "cause of death" determinations for COVID-19. The rule change created a new cause of death standard that applied only to COVID-19 states: "COVID-19 should be reported on the death certificate for all decedents where the disease caused *or is assumed to have caused or contributed to* death.") (emphasis added). Public health statistics also reveal that 95 percent of deaths now listed as "COVID-19 deaths" involve an average of four or more co-morbidities.

[13] *See Symptoms of COVID-19*, CENTERS FOR DISEASE CONTROL AND PREVENTION (Feb. 22, 2021), *available at* https://perma.cc/5MLL-Q2L9 (last visited Dec. 6, 2021) ("People with COVID-19 have had a wide range of symptoms reported—ranging from mild symptoms to severe illness."); *see also People with Certain Medical Conditions*, CENTERS FOR DISEASE CONTROL AND PREVENTION (May 13, 2021), *available at* https://perma.cc/FJX8-5D9R (last visited Dec. 6, 2021).

[14] *See supra* note 12.

B.    **Vaccine Development**

In response to the pandemic, pharmaceutical companies began working on vaccines via the aid of generous public funding.[15]  In November 2020, Pfizer and BioNTech announced the completion of their new vaccine.  [21] at 2.  Days later, Moderna announced the same.  *Id*.  Both vaccines were developed using messenger RNA ("mRNA") technology and were granted emergency use authorization ("EUA") for select populations by the Food and Drug Administration ("FDA") by the end of December 2020, *id*. at 3, and, as of October 29, 2021, the EUA extends to ages five and older.[16]  At the beginning of 2021, Johnson and Johnson announced the formulation of its own vaccine, which was developed using a viral vector method of vaccine technology.  *Id*.  The FDA granted the vaccine EUA for select groups in February 2021.[17]

---

[15] Thus far, the government fight against COVID-19 has placed a strong focus on vaccines and put less funding, research, or public-awareness efforts, into therapeutic treatments, such as monoclonal antibodies or remdesivir (among many other treatment options), or even simple preventative measures like Vitamin D or Zinc. *See Treatments for COVID-19*, HARVARD HEALTH PUBLISHING (Nov. 5, 2021) *available at* https://www.health.harvard.edu/diseases-and-conditions/treatments-for-covid-19 (last visited Dec. 6, 2021); *COVID-19 early treatment: real-time analysis of 1,183 studies* (Dec. 6, 2021) *available at* https://c19early.com/ (last visited Dec. 6, 2021); *Know Your Treatment Options for COVID-19*, U.S. FOOD & DRUG ADMINISTRATION (Jul. 27, 2021), *available at* https://www.fda.gov/consumers/consumer-updates/know-your-treatment-options-covid-19 (last visited Dec. 6, 2021) (discussing FDA approval of antiviral drug Veklury (remdesivir) for adults and certain pediatric patients and several monoclonal antibodies).

[16] *FDA Authorizes Pfizer-BioNTech COVID-19 Vaccine for Emergency Use in Children 5 through 11 Years of Age*, U.S. FOOD & DRUG ADMINISTRATION (Oct. 29, 2021), *available at* https://www.fda.gov/news-events/press-announcements/fda-authorizes-pfizer-biontech-covid-19-vaccine-emergency-use-children-5-through-11-years-age (last visited Dec. 17, 2021).

[17] *Janssen COVID-19 Vaccine*, U.S. FOOD AND DRUG ADMINISTRATION (Nov. 11, 2021), *available at* https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/janssen-covid-19-vaccine (last visited Dec. 6, 2021).

The Pfizer-BioNTech COVID-19 vaccine received FDA approval on August 23, 2021 for individuals sixteen years of age and older; on September 22, 2021, the FDA amended the EUAs to allow for the use of a single booster dose to be administered at least six months after completion of the primary immunization series in select populations.  [21-1] ¶ 41; [21-2] ¶ 27.[18]  In November 2021, the FDA authorized both the Pfizer-BioNTech and Moderna vaccine boosters for all adults ages eighteen and older,[19] and on December 9, 2021, the FDA authorized boosters of Pfizer-BioNTech for ages 16 and 17.  The vaccine trials conducted with the FDA as part of the emergency use process were designed to look only at infection and severity of infection for outcomes.  [21-1] ¶ 42.  Those trials "did not evaluate the impact of vaccination on transmission of infection to others."  *Id.*[20]

---

[18] *FDA Authorizes Booster Dose of Pfizer-BioNTech COVID-19 Vaccine for Certain Populations*, U.S. FOOD AND DRUG ADMINISTRATION (Sept. 22, 2021), *available at* https://www.fda.gov/news-events/press-announcements/fda-authorizes-booster-dose-pfizer-biontech-covid-19-vaccine-certain-populations (last visited Dec. 6, 2021).

[19] *FDA authorizes Pfizer and Moderna booster shots for all adults*, ADVISORY BOARD (Nov. 19, 2021), *available at* https://www.advisory.com/daily-briefing/2021/11/19/boosters-authorization (last visited Dec. 6, 2021).

[20] Under normal conditions, the approval of such powerful new drugs would include years of study, including double-blind, randomized clinical trials with sufficient samples sizes and controls, all supported by prior animal studies.  Unfortunately, we don't live in normal times.  Time was short and the need was great.  As such, even though the rush to FDA approval was not surprising, the emergency nature of the approval process meant that the scientific trials for the new vaccines experienced a variety of important limitations, and the non-randomized observational studies now available do not provide the same type of scientific proof as traditional drug research and approval.  *See* Peter Doshi, *Will COVID-19 Vaccines Save Lives?  Current Trials Aren't Designed to Tell Us*, BRITISH MED. J. (Oct. 21, 2020), *available at* https://www.bmj.com/content/bmj/371/bmj.m4037.full.pdf (last visited Dec. 7, 2021).  Even with such flaws, however, the emergency approval involved several months of clinical trials for the vaccines.  *See Klaassen I*, 2021 WL 3073926, at *9–10 (explaining trials each vaccine went through prior to granting of emergency use authorization).

Since the three vaccines received EUA status, and as of today's decision, voluntary public awareness efforts have achieved high rates of vaccination. [21] at 4–5. Specifically, the public health data confirms that 197,838,728 people in the United States have been fully vaccinated.[21] That number translates to approximately 7,483,367 people in Illinois.[22]

### C. Vaccine Efficacy and Safety

The parties agree that the vaccines can mitigate the more dangerous symptoms of COVID-19 (including long term complications, hospitalizations, ICU admissions, and death). *See* [1] ¶¶ 21, 23 (Plaintiffs); [21] at 15 (Defendants).[23] Plaintiffs recognize that vaccines are at least 64 percent effective at preventing *symptomatic* cases of COVID-19 and concede that "the vaccines have been effective at preventing serious cases and deaths." [1] ¶¶ 21, 23. In turn, Defendants cite recent research, [21] at 15 nn.22, 23, which found vaccines to be highly effective at "preventing symptomatic disease," Jamie L. Bernal et al., *Effectiveness of COVID-19*

---

[21] *US Coronavirus vaccine tracker*, USA FACTS (Dec. 2, 2021), *available at* https://usafacts.org/visualizations/covid-vaccine-tracker-states/ (last visited Dec. 6, 2021).

[22] *COVID-19 Vaccine Administration Data*, ILLINOIS DEPARTMENT OF PUBLIC HEALTH, https://dph.illinois.gov/covid19/vaccine/vaccine-data.html?county=Illinois (last visited Dec. 6, 2021).

[23] Despite some concerns, the parties stand on common ground as to the ability of the vaccine to mitigate symptoms. For example, Plaintiffs note on the novelty of mRNA technology: "The COVID-19 vaccines are, like COVID-19, extremely novel [and w]ith each news cycle, Americans learn new things about these vaccines." [4] at 9–10. In addition, according to Plaintiffs, the vaccines "are far less effective than originally advertised" in part because long term effectiveness across different variants is still unknown, and recent evidence suggests that waning immunity is more pervasive than originally believed. *Id*. (citations omitted). Defendants, for their part, note that even though COVID-19 vaccines are not always "a perfect solution" [21-1] ¶ 33, they "have been proven to be safe and effective" and further that, even though the "vaccines are slightly less effective" against variants of COVID-19 (such as the Delta variant), they "still remain highly effective" including "88% effective against the Delta variant compared to 93.7% effective against the Alpha variant." [21] at 15 (citations omitted).

*Vaccines against the B.1.617.2 (Delta) Variant*, 385 N. ENG. J. MED. 585–94 (Aug. 12, 2021), *available at* https://www.nejm.org/doi/full/10.1056/nejmoa2108891 (last visited Dec. 6, 2021) (the "Bernal Study").  For example, the Bernal Study finds that, after one vaccine dose, individuals enjoy a 30.7 percent effectiveness rate against symptomatic disease when exposed to the Delta variant, and a 48.7 percent effectiveness rate with respect to the Alpha variant.  After two doses (depending upon the brand of vaccine), the evidence shows a 67 to 88 percent effectiveness rate for the Delta variant, and 74.5 to 93.7 percent effectiveness for the Alpha variant. *Id.*  The CDC has also found that "COVID-19 vaccination reduces the risk of COVID-19 and its potentially severe complications [and] data suggest that vaccination may make symptoms less severe in people who are vaccinated but still get COVID-19."[24]

Beyond the benefits of mitigating COVID-19 symptoms, the parties also agree that both the unvaccinated and vaccinated can nevertheless "acquire and spread" the SARS-CoV-2 virus.  [21-1] ¶ 21; [1] ¶ 23.[25]  Unlike certain sterilizing

---

[24] *COVID-19 Vaccines Work*, CENTERS FOR DISEASE CONTROL AND PREVENTION (Nov. 9, 2021), *available at* https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/work.html (last visited Dec. 6, 2021) ("[D]ata suggest that vaccination may make symptoms less severe in people who are vaccinated but still get COVID-19.  mRNA COVID-19 vaccines have been shown to provide protection against severe illness and hospitalization among people of all ages eligible to receive them.").

[25] Not surprisingly, since the evidence in the record cited by both sides concedes that the non-sterilizing vaccines for COVID-19 do not prevent transmission, the parties concentrate on how the mitigation of symptoms (either by vaccination or natural immunity) might reduce rates of severe COVID-19 cases—which, of course, constitutes an important goal for healthcare providers.  Despite common areas of agreement, however, the parties dispute the relative protections of natural immunity, and they also disagree over the potential of vaccines to possibly "reduce" (albeit not prevent) transmission of the SARS-CoV-2 virus.  Given the nature of these two contested questions, this Court discusses them separately in its legal analysis. *See infra* § III.B.1.b.iii.

vaccines (such as the small pox vaccine at issue in *Jacobson v. Massachusetts*, 197 U.S. 11 (1905)), the vaccines for COVID-19 are, by design, non-sterilizing.[26]  As such, they do not kill the underlying virus like some traditional vaccines (*i.e.*, they cannot clear and prevent an infection from taking hold), and thus, the vaccines for COVID-19 cannot affirmatively preclude vaccinated persons from either contracting or transmitting the SARS-CoV-2 virus.[27]  Indeed, asymptomatic transmission by both vaccinated and unvaccinated persons may account for more than half of all transmission.[28] *See, e.g.,* S.V. Subramanian and Akhil Kumar, *Increases in COVID-19 are unrelated to levels of vaccination across 68 countries and 2947 counties in the*

---

[26] *See* James Myhre and Dennis Sifris, *Sterilizing Immunity and COVID-19 Vaccines* (Dec. 24, 2020), *available at* https://www.verywellhealth.com/covid-19-vaccines-and-sterilizing-immunity-5092148 (last visited Dec. 6, 2021) ("As game-changing as the Pfizer vaccine (and Moderna's equally effective mRNA-1273 vaccine) may be in affording protection against COVID-19 illness, the results do not reflect complete 'sterilizing immunity.'").

[27] *See Preventing "Silent Spread": Why Asymptomatic Testing is Crucial During Vaccine Rollout*, THERMOFISHER (Apr. 19, 2021), *available at https://www.thermofisher.com/blog/ask-a-scientist/preventing-silent-spread-why-asymptomatic-testing-is-crucial-during-vaccine-rollout/*(last visited Dec. 9, 2021) ("Based on existing data, it seems likely that the current COVID-19 vaccines confer excellent effective immunity [from severe disease and death], but do not provide complete sterilizing immunity against the SARS-CoV-2 virus.").  Many vaccines widely used today (like the measles vaccine) produce effective sterilizing immunity, but other vaccines (like the hepatitis B vaccine), do not.  With a non-sterilizing vaccine, an individual's immune system is trained to prevent illness or severe symptoms, yet the pathogen can persist in that person's body, potentially allowing them to infect others.  In this way, non-sterilizing vaccines can allow the pathogen to circulate within a population, where it may cause illness in other persons or otherwise allow the virus to evolve into new variants that present new immune challenges.  Nevertheless, both sterilizing and non-sterilizing vaccines constitute important health care measures.  *See, e.g.*, Marc Lipsitch et al., *SARS-CoV-2 breakthrough infections in vaccinated individuals: measurement, causes and impact*, NATURE REVIEWS IMMUNOLOGY (Dec. 7, 2021), *available at* https://www.nature.com/articles/s41577-021-00662-4 (last visited Dec. 9, 2021) ("[T]he role of [COVID-19] vaccines is not to provide durable herd immunity as with measles or smallpox, but to prevent severe outcomes during the transition to endemicity.").

[28] Michael A. Johansson et al., *SARS-CoV-2 Transmission from People Without COVID-19 Symptoms*, JAMA OPEN NETWORK (Jan. 7, 2021), *available at* https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2774707 (last visited Dec. 6, 2021).

*United States* (Sept. 9, 2021), *available*

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8481107/pdf/10654_2021_Article_80

8.pdf (last visited Dec. 6, 2021) (finding that "[t]here also appears to be no

significant signaling of COVID-19 cases decreasing with higher percentages of

population fully vaccinated.").[29]  In view of these developments, the CDC updated

its masking policy recommendation to cover all persons regardless of vaccination

status, as both groups are fully capable of virus transmission.[30]

Lastly, the parties do not dispute the existence of serious vaccine-induced

side-effects, nor do they dispute the rarity of their occurrence in the general

population.  *See* [31-1] at 6 (Plaintiffs concede the COVID-19 vaccines "are largely

safe" but note that "[l]argely safe does not mean completely safe [and] vaccines are

not without risk entirely.").  These known, but thankfully rare, vaccination risks

include death, anaphylaxis, heart and blood clotting issues, and a neurological

---

[29]*See also Statement from CDC Director Rochelle P. Walensky, MD, MPH on Today's MMWR*, CENTERS FOR DISEASE CONTROL AND PREVENTION (Jul. 30, 2021), *available at* https://www.cdc.gov/media/releases/2021/s0730-mmwr-covid-19.html (last visited Dec. 6, 2021) (Per CDC Director Rochelle Walensky, the data confirms that fully vaccinated persons can still get COVID-19 and transmit it to others, and that the vaccines "work well" to prevent "severe illness and death" but they cannot "prevent transmission.").

[30]*See, e.g.*, John A. Rubin and Robert J. Simandl, *CDC Changes Masking Guidance for Fully Vaccinated Individuals*, 11 NAT'L L. REV. 341 (2021) *available at* https://www.natlawreview.com/article/cdc-changes-masking-guidance-fully-vaccinated-individuals (last visited Dec. 6, 2021) ("In changing its masking recommendations, the CDC asserts that current scientific information indicates that the delta variant can be spread despite vaccine status, warranting an adjustment to its prior guidance."); *see also* Catherine M. Brown et al., *Outbreak of SARS-CoV-2 Infections, Including COVID-19 Vaccine Breakthrough Infections, Associated with Large Public Gatherings—Barnstable County, Massachusetts, July 2021*, CENTERS FOR DISEASE CONTROL AND PREVENTION (Aug. 6, 2021), *available at* https://www.cdc.gov/mmwr/volumes/70/wr/mm7031e2.htm?s_cid=mm7031e2_w (last visited Dec. 6, 2021) ("Cycle threshold values were similar among specimens from patients who were fully vaccinated and those who were not.").

disorder known as Guillain-Barre, among others.[31]  *See Klaassen I,* 2021 WL

3073926, at *11 (describing the adverse side-effects associated with the vaccines).[32]

Nevertheless, the parties agree that the COVID-19 vaccines are safe, at least for

most people, and serious side-effects are rare.[33]

### D.    Disputed Mandates

Over the course of the last year, Governor Pritzker has invoked emergency

powers under the Illinois Emergency Management Agency Act ("EMAA"), 20 ILCS

3305/1 *et seq.*, to issue a series of proclamations and executive orders that, among

---

[31] *See* Julia W. Gargano et al., *Use of mRNA COVID-19 Vaccine After Reports of Myocarditis Among Vaccine Recipients: Update from the Advisory Committee on Immunization Practices—United States*, CENTERS FOR DISEASE CONTROL AND PREVENTION, June 2021 (Jul. 9, 2021), *available at* https://www.cdc.gov/mmwr/volumes/70/wr/mm7027e2.htm?s_cid=mm7027e2_w (last visited Dec. 6, 2021) (identifying an increased risk for myocarditis among vaccine recipients, particularly among males aged 12-29); Vaccine Adverse Event Reporting System (VAERS), CENTERS FOR DISEASE CONTROL AND PREVENTION (Dec. 6, 2021), *available at* https://wonder.cdc.gov/controller/datarequest/D8;jsessionid=4B00649D3BF98E67CBBB6DC3DA3B (last visited Dec. 6, 2021); Steven R. Gundry, *Abstract 10712: Mrna Covid Vaccines Dramatically Increase Endothelial Inflammatory Markers and ACS Risk as Measured by the PULS Cardiac Test: a Warning*, AMERICAN HEART ASSOCIATION (Nov. 8, 2021), *available at* https://www.ahajournals.org/doi/abs/10.1161/circ.144.suppl_1.10712 (last visited Dec. 7, 2021) (significant increase in risk of heart disease); 42 C.F.R. § 110.100 (Pandemic Influenza Countermeasures Injury Table); *see also* 42 U.S.C. § 247d-6d *Targeted liability protections for pandemic and epidemic products and security countermeasures* (Under the Public Readiness and Emergency Preparedness Act (PREP) and the Countermeasures Injury Compensation Program (CICP) vaccine manufacturers enjoy liability protections from the normal tort system.); *About CICP*, HEALTH RESOURCES & SERVICES ADMINISTRATION (Nov. 2020), *available at* https://www.hrsa.gov/cicp/about (last visited Dec. 7, 2021).

[32] A heightened risk of an adverse reaction also exists when a person has a "preexisting immunity" (by way of vaccine or prior infection), which "may trigger unexpectedly intense, albeit relatively rare, inflammatory and thrombotic reactions in previously immunized and predisposed individuals."  *See* Fabio Angeli et al., *SARS-CoV-2 vaccines: Lights and shadows*, 88 EUR. J. OF INTERN. MED. 1, 7 (Apr. 20, 2021), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8084611/pdf/main.pdf (last visited Dec. 6, 2021).

[33] Of course, this rarity exists only in the aggregate, and the individual risk of an adverse side-effect could be unavoidable (*i.e.*, a 100 percent certainty) for those few persons prone to such complications; and unfortunately, there are no current screening procedures or other methods to identify this select subpopulation prior to vaccination.

other things, mandate COVID-19 vaccination (or testing) for certain categories of the Illinois citizenry. [1] ¶¶ 7, 24–28. As part of these measures, the Governor issued the order at issue in this case, Executive Order 2021-22 ("EO 2021-22" or "Order" or "mandate") on September 3, 2021.[34]

EO 2021-22 requires vaccination (or testing) for certain healthcare workers but makes room for two requisite exceptions. Individuals subject to the mandate may seek an exemption from vaccination if: (1) "vaccination is medically contraindicated, including any individual who is entitled to an accommodation under the Americans with Disabilities Act or any other law applicable to a disability-related reasonable accommodation",[35] or (2) "vaccination would require the individual to violate or forego a sincerely held religious belief, practice, or observance." [1] at 18 (EO 2021-22, § 2(e)). Both exemptions, however, do not extinguish the surveillance testing requirement—individuals exempt under either carve-out must still submit to weekly testing pursuant to the Order. *Id*.[36] Despite

---

[34] As discussed in greater detail below, the Governor bases his authority to issue emergency proclamations and declarations on Section 7 of the EMAA, 20 ILCS 3305/7 ("Emergency Powers of the Governor"). Under Section 7, any emergency declared by the Governor automatically lapses after a period of 30 days. *Id*. After the initial emergency declaration, Governor Pritzker extended the state of emergency beyond the initial proclamation by several subsequent executive decrees. [1] ¶¶ 26–29. Over a year after the initial disaster proclamation, Governor Pritzker extended the emergency yet again, and issued the mandate challenged here.

[35] Under the Americans with Disabilities Act, federal law requires vaccine mandates to include medical exemptions as reasonable accommodations. *See* 42 U.S.C. § 12112; *Beckerich v. St. Elizabeth Med. Ctr.*, No. CIV 21-105-DLB-EBA, 2021 WL 4398027, at *4 (E.D. Ky. Sept. 24, 2021) ("With specific respect to vaccination mandates, the Equal Employment Opportunity Commission has advised employers that the ADA does require employers to provide a process by which a disabled employee can seek a medical exemption to a COVID-19 vaccine requirement.").

[36] The testing of asymptomatic persons is known as "screening" or "surveillance" testing, rather than "diagnostic" testing (which is testing intended to identify current infections in symptomatic persons). *See Overview of Testing for SARS-CoV-2 (COVID-19)*, CENTERS FOR DISEASE CONTROL AND

14

the widespread availability of Covid-19 testing in Illinois for much of the end of 2020 and early days of 2021, Governor Pritzker's September 2021 Order was the first testing mandate applied to Plaintiffs. *Id*. ¶¶ 13–14.

The Order makes its own findings concerning the spread and attendant hazards of COVID-19, particularly with respect to the Delta variant. [1] at 15.[37] Furthermore, the EO 2021-22 purports to address the Delta variant by striving to increase vaccination rates across the state. *See id*. Per the Order, the stated purpose for emphasizing vaccination is that the CDC "has recognized vaccination as the leading public health prevention strategy to end the COVID-19 pandemic" and "while over 6.7 million Illinoisans have been fully vaccinated against COVID-19, in order to protect against the rapid spread of the Delta variant, additional steps are necessary to ensure that the number of vaccinated residents continues to increase." *Id*. The Order then attempts to increase vaccination rates by mandating immunization and testing for: (1) healthcare workers; (2) school personnel (including higher education); and (3) personnel of state-owned or operated congregate facilities. *Id*. at 17–21.[38]

---

PREVENTION (Oct. 22, 2021), *available at* https://www.cdc.gov/coronavirus/2019-ncov/hcp/testing-overview.html (last visited Dec. 7, 2021).

[37] For example, the Order finds that: (1) The Illinois Department of Health ("IDPH") determined that the Delta variant is the most dominant strain of COVID-19 in Illinois and has spread quickly among unvaccinated individuals of all ages; (2) the Delta variant is more aggressive and more transmissible than previously circulating strains, and poses significant new risks in the ongoing effort to stop and slow the spread of COVID-19; and (3) the Centers for Disease Control and Prevention estimates that the Delta variant accounts for more than 90 percent of all sequenced coronavirus cases in the United States. [1] at 15.

[38] The mandatory vaccination and testing provisions of the Order are largely the same with respect to school personnel and state-owned or operated congregate facilities. *See* [1] at 18–21.

15

According to the Governor, "health care workers, and particularly those involved in direct patient care, face an increased risk of exposure to COVID-19," and "requiring individuals in health care settings to receive a COVID-19 vaccine or undergo regular testing can help prevent outbreaks and reduce transmission to vulnerable individuals who may be at higher risk of severe disease." *Id*. at 16. The Order states that "stopping the spread of COVID-19 in health care settings is critically important" not solely because of the "increased risk" of exposure faced by healthcare workers, but also because they are frequently in contact with "people with underlying conditions or compromised immune systems." *Id*. Thus, the vaccination mandate for healthcare workers is rooted in an asserted goal of protecting those working on the front lines of the pandemic and the communities that they serve. *See* [21] at 14–15.

On September 9, 2021, following the Governor's lead, the City of Naperville—nestled in the northeast corner of Illinois—issued a vaccination mandate requiring its emergency medical technicians and firefighters to produce a weekly negative COVID-19 test or demonstrate proof of vaccination. *See* [1] ¶¶ 5, 35–39; [25] at 1; [24-1] (Naperville Fire Department Special Directive #21-01) (the "Directive"). Naperville interpreted the Governor's mandate as "giv[ing] an employer an option to offer a hard mandate (mandatory vaccinations) or a soft mandate (vaccination or at least weekly testing)." [24-1] at 1. Naperville opted for the "soft mandate," which

allows employees to refuse vaccination, contingent upon weekly testing.  *Id*.
Naperville's mandate is effectively coterminous with EO 2021-22.[39]

### E.    Current Lawsuit

On September 23, 2021, Plaintiffs brought this suit against Governor
Pritzker and the City of Naperville challenging the Governor's Order and
Naperville's Directive.  [1].  Plaintiffs are employees of the Naperville Fire
Department, which provides fire suppression and emergency medical services to
residents of Naperville and remain subject to Naperville's Directive.  [1] ¶ 4.
Plaintiffs also sued Edward-Elmhurst Healthcare ("Edward-Elmhurst"), which
operates a hospital in Naperville and works with the Naperville Fire Department to
coordinate emergency medical services ("EMS") services.  [1] ¶ 6.

Each of the six named Plaintiffs has worked for the Naperville Fire
Department for many years:  Gil Cortez has been with the department for over 26
years; Joel M. Fox for 21 years; John K. Stiegler for over 20 years; John Halgren for
20 years; Robert McCormick for 13 years; and Chris Garon for 9 years.  [4] at 26–31.
In the last eighteen months, all of the named Plaintiffs have assumed EMS duties,
primarily to provide emergency care to the citizens of Naperville who exhibit
symptoms of COVID-19.  *Id*. at 1.  Some of the employees of the Department are

---

[39] *See* [24-1] at 1 ("This special directive is being issued to comply with the Executive Order 2021-22."); *see also* [45] at 13:22–14:7.  Because the Order is effectively coterminous with the follow-on Directive, the constitutionality of the follow-on Directive rises and falls with the Order.  An open question remains, however, regarding the application of Plaintiffs' procedural due process claims against Naperville, and more specifically, whether Naperville provides procedures for employees subject to discipline.  *See* [45] at 31:23–32:5 ("Additionally, while plaintiff did not address any procedural due process claims, he would have to concede that if discipline was imposed by the City of Naperville on any of our firefighters, there would be process because they're all [union] employees.").

vaccinated against COVID-19; others are not.  [1] ¶ 4.  Some have contracted and recovered from COVID-19; others have not.  *Id*.[40]

Plaintiffs' suit alleges that the mandates adopted by the Governor and the City of Naperville infringe their constitutional rights.  *See generally id*.  The complaint includes allegations that EO 2021-22 violates the constitutional guarantee of due process (Count I) and equal protection (Count II) under the Fourteenth Amendment.  *Id*. at ¶¶ 50–51.  Plaintiffs also seek a declaratory judgment that the Governor exceeded his authority under the EMAA by promulgating EO 2021-22 (Count III).  *Id*. ¶¶ 26–33; 52–55.[41]  Further, Plaintiffs moved for a temporary restraining order and preliminary injunction [4] to enjoin Defendants from enforcing EO 2021-22.

In seeking a preliminary injunction, Plaintiffs' primary legal challenge sounds in due process (both substantive and procedural) and equal protection.  With respect to substantive due process, Plaintiffs maintain that the Order impinges upon two, long-recognized fundamental rights: (1) the right to bodily autonomy, free from intrusions by the state; and (2) the related right of privacy.  On bodily autonomy, Plaintiffs rely on *Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261 (1990), which held that a "competent person has a constitutionally

---

[40] During the early days of COVID-19, paramedics were especially hard-hit by the virus, as first responders heroically placed themselves at risk in order to provide for the safety of their communities.  *See* [4] at 2; [1] ¶ 12.

[41] Plaintiffs bring their claims pursuant to 42 U.S.C. 1983 (Civil action for deprivation of rights). Section 1983 allows for individual suits against state officials acting under the color of state law.  *See generally West v. Atkins*, 487 U.S. 42, 48 (1988).

protected liberty interest in refusing unwanted medical treatment", *id*. at 278, and thus ask this Court to review the state's action through the lens of strict scrutiny, [4] at 6–7. On privacy, Plaintiffs rely on *Roe v. Wade*, 410 U.S. 113 (1973) and its progeny for the notion that "some liberty interests, including the right of privacy and the right of bodily autonomy, trump a concern about the possible loss of life," [4] at 7 (citing *Roe*, 410 U.S. at 159 and *Planned Parenthood of S.E. Pa. v. Casey*, 505 U.S. 833, 871 (1992)). Plaintiffs note, in passing, that they also have a protected right under the Fourteenth Amendment to earn a living. [4] at 7 (citing *Martinez v. Fox Valley Bus Lines*, 17 F. Supp. 576, 577 (N.D. Ill. 1936)). According to Plaintiffs, based on the undeniable liberties at stake, no legislative action can be sustained absent a compelling government interest of the highest order.[42]

In the alternative, Plaintiffs note that even if this Court declines to recognize their proffered rights as fundamental (ergo deserving of strict scrutiny), the Order fails to pass constitutional muster under rational basis review, arguing: The Order makes no exception for those who possess natural immunity and those with natural immunity enjoy equal (if not greater) protection against subsequent infection as those immunized through vaccination. [4] at 2–3. According to Plaintiffs, if

> the mandates were rationally related to the promotion of *public health*,
> those who have been vaccinated but who do not have natural immunity

---

[42] In their Complaint, Plaintiffs also point to other potential constitutional violations founded on the First, Fourth, and Fifth Amendments. [1] at 10 n.8. Yet, their preliminary injunction motion focuses on substantive due process, equal protection, and procedural due process. [4]. Because of this ambiguity, the Court ordered Plaintiffs to submit supplemental briefing to clarify whether they also seek a preliminary injunction based on other theories, such as the First or Fourth Amendments. [30]. In response, Plaintiffs indicated that, although one of the six named Plaintiffs (Christopher Garron), pursued an exemption (on religious grounds), *see* [33] at 8; [33-1], Plaintiffs decline to assert any preliminary challenges under the First or Fourth Amendments as part of their request for an injunction. [33] at 1–2, 8–9, 10.

> would not be exempt from the weekly-testing requirement, given that their immunity is inferior to those who have natural immunity but have not been vaccinated. Meanwhile, those who do not have the vaccines but do have natural immunity would be exempt.

*Id*. at 11–12 (emphasis in original). Based on the Order's failure to account for the robust nature of natural immunity, Plaintiffs argue that the Order cannot rationally be said to promote the public health and "is punitive rather than ameliorative." *Id*. at 12; *see also* [33] at 8 ("[T]he testing mandate, far from being necessary for the preservation of public health, is merely punitive.").

With respect to procedural due process, Plaintiffs contend that the EMAA does not grant the Governor the power to "enact the broad and sweeping enactments that comprise the Executive Order 2021-22." [4] at 12. Plaintiffs also argue that, regardless of the contours of their substantive due process rights, they also have the separate right not to be denied these rights without proper process, *id*. at 12, including their "right to earn a living," *id*. at 7, and "rights to follow a trade, profession or other calling," [31-3] at 13. (citations omitted).

Plaintiffs also lodge an equal protection challenge. [1] ¶ 51. An equal protection violation can occur when a regulation draws distinctions among people based on a person's membership in a "suspect class" or when the state denies someone a fundamental right. *Srail v. Vill. of Lisle, Ill.*, 588 F.3d 940, 943 (7th Cir. 2009). Plaintiffs allege (in the complaint) that they "are being treated differently from employees who are willing to disclose their vaccination status," [1] ¶ 51, and (in their supplemental preliminary injunction brief) that they are "being singled out for disparate treatment on the basis of their decision to assert [their] fundamental

20

rights," [33] at 8; *see also id.* ("This disparate treatment is irrational in part because it irrationally distinguishes between the vaccinated and the unvaccinated instead of between the immune and the vulnerable."). Plaintiffs conclude that the mandate "far from being necessary for the preservation of public health, is merely punitive." *Id.*

Following Plaintiffs' filing of the complaint [1], and contemporaneous preliminary injunction petition [4], each of the Defendants submitted a response, [21] (Governor Pritzker), [24] (City of Naperville), [26] (Edward-Elmhurst). In brief, the Governor argues that the Supreme Court's decision in *Jacobson*, 197 U.S. at 11, conclusively resolves this dispute, [21] at 8–9. There, the Supreme Court applied a deferential standard of review "of government action in a public health crisis," which Defendants argue disposes of Plaintiffs' substantive due process claims on the facts. *Id.* at 8. Because "COVID-19 is precisely the kind of public health crisis contemplated" in *Jacobson*, the Governor's mandate must stand "so long as there is (1) a 'real or substantial relation' to the public health and safety, and (2) the action does not constitute 'beyond all question, a plain, palpable invasion of rights secured by the fundamental law.'" *Id.* (quoting *Jacobson*, 197 U.S. at 31). The Governor also points to the Seventh Circuit's recent decision in *Klaassen v. Trustees of Indiana University* ("*Klaassen II*"), 7 F.4th 592 (7th Cir. 2021), which reaffirmed *Jacobson*'s continued vitality. The codefendants' arguments largely mirror Governor Pritzker's responses to Plaintiffs' claims.[43] [24], [26].

---

[43] Defendant Edward-Elmhurst also responded by way of motion to dismiss [28], arguing that (1) the complaint "fails to allege sufficient facts to support the contention that [Edward-Elmhurst] is in any

### F.     Court Proceedings

This Court held an initial conference on September 30, 2021.  *See* [6], [7]. During that conference, the parties agreed to convert Plaintiffs' combined motion for emergency relief into a motion for a preliminary injunction only, with each side submitting relevant materials the week following.  [18].  After multiple rounds of briefing to allow the parties to fully address Plaintiffs' arguments, the Court set the case for a hearing to evaluate any factual disputes in the record.  *See, e.g.*, *Medeco Sec. Locks, Inc. v. Swiderek*, 680 F.2d 37, 38 (7th Cir. 1981) ("It is well established that, in general, a motion for a preliminary injunction should not be resolved on the basis of affidavits alone.  Normally, an evidentiary hearing is required to decide credibility issues."); *Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1171 (7th Cir. 1997) (explaining that an evidentiary hearing is "required" for preliminary injunction motions in general, especially where either side "intends to introduce evidence [at the hearing] that if believed will so weaken [the other's] case as to affect the judge's decision on whether to issue the injunction."). *But see Goodman v. Illinois Dep't of Fin. & Pro. Regul.*, 430 F.3d 432, 439 (7th Cir. 2005) (noting that an evidentiary hearing is not required where the evidence would duplicate the declarations, depositions, and other documents the parties have already submitted (summarizing *Ty, Inc.*, 132 F.3d at 1171)).

---

way responsible for the directive"; and (2) "even if [Edward-Elmhurst] was responsible for such a directive, [it] is not a state actor amenable to suit for the constitutional violations alleged," [29] at 1. In response to the petition, Edward-Elmhurst also stated that "[w]here the Complaint fails to state a claim against a party, a preliminary injunction should not issue—a plaintiff who cannot state a claim cannot demonstrate likelihood of success on the merits."  [26] at 6 (citations omitted); *see also* [8].  The Court will address Edward-Elmhurst's motion to dismiss separately in due course.

As part of this process, this Court gave the parties an opportunity to conduct discovery prior to the hearing if they wished, or present evidence at the hearing, as needed. [45] at 6:23–7:4; 8:5–9:6. At the hearing, however, each of the parties decided to forgo the option to conduct discovery prior to the hearing or to present evidence or live testimony subject to cross-examination. *See id.* at 8:5–11 (Plaintiffs); 8:12–24 (Governor Pritzker); 8:25–9:3 (Naperville); 9:4–6 (Edward-Elmhurst). Instead, the parties agreed "simply to proceed on the papers" with oral argument. *Id.* at 7:3. The parties also expressly agreed that "the Court may consider material publicly available online as to the issues raised." [18].

Having extensively reviewed the issues and the parties' submissions and argument, the Court stated from the bench that it would deny the motion subject to a subsequent written order. This decision follows.[44]

## II.  **Legal Standard**

Temporary restraining orders and preliminary injunctions "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). This is because a preliminary injunction is "an exercise of a very far-reaching power, never to be indulged except in a case clearly demanding it." *Orr v. Shicker*, 953 F.3d 490, 501 (7th Cir. 2020). A

---

[44] In this process, of course, this Court is not bound by strict rules of evidence. *See, e.g., Streight v. Pritzker*, No. 3:21-CV-50339, 2021 WL 4306146, at *3 (N.D. Ill. Sept. 22, 2021) ("[T]he Court is not bound by strict rules of evidence at a preliminary injunction hearing.") (collecting cases); *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (Given its "limited purpose" and the "haste that is often necessary[,]" a "preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."); *Houdini Inc. v. Goody Baskets LLC*, 166 F. App'x 946, 947 (9th Cir. 2006) ("[T]he rules of evidence do not strictly apply to preliminary injunction proceedings.").

movant "must establish that it has some likelihood of success on the merits; that it has no adequate remedy at law; that without relief it will suffer irreparable harm." *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019).

The Seventh Circuit recently clarified the proper standard for evaluating a "likelihood of success" on the merits. For many years, courts in this Circuit inquired whether the moving party demonstrated a "better than negligible" chance of prevailing on its claim. *See, e.g., D.U. v. Rhoades*, 825 F.3d 331, 338 (7th Cir. 2016) ("In framing the probability of success necessary for a grant of injunctive relief, we have said repeatedly that the plaintiff's chances of prevailing need only be better than negligible."); *Omega Satellite Prod. Co. v. City of Indianapolis*, 694 F.2d 123 (7th Cir. 1982) (uttering the "better than negligible" standard for the first time); *see also* [4] at 6 ("Plaintiffs need only demonstrate a better than negligible change of succeeding." (*citing Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999))). The tides changed, however, following the Supreme Court's twin decisions in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), and *Nken v. Holder*, 556 U.S. 418 (2009), where the Court demanded a higher showing. The Seventh Circuit thus "retired" this "better than negligible" language and adopted a "strong" showing in its place. *See Illinois Republican Party v. Pritzker*, 973 F.3d 760, 762–63 (7th Cir. 2020) ("We note this to remind both the district courts and ourselves that the 'better than negligible' standard was retired by the Supreme Court."); *Mays v. Dart*, 974 F.3d 810, 821 (7th Cir. 2020) (explaining that the "better than negligible" standard "is not the proper standard to apply when evaluating the likelihood of

24

success on the merits in a preliminary injunction motion."); [21] at 8. The revision, however, is only a change in degree, not kind: a plaintiff must still only demonstrate that at least one of the claims presented has "some chance" of success; "better than negligible" will not do.

If the movant fails to make this three-part prefatory proffer, the court must deny the injunction. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008).

If, on the other hand, a plaintiff satisfies each part of the three-prong proffer, then the trial court proceeds to "weigh the harm that the plaintiff will suffer absent an injunction against the harm to the defendant from an injunction," and must consider "the public interest." *GEFT Outdoors*, 922 F.3d at 364. At this stage, this "Circuit employs a sliding scale approach for this balancing: if a plaintiff is more likely to win, the balance of harms can weigh less heavily in its favor, but the less likely a plaintiff is to win the more that balance would need to weigh in its favor.'" *Id*.

Finally, in reviewing the grant or denial of a preliminary injunction, the Seventh Circuit "examines legal conclusions de novo, findings of fact for clear error, and the balancing of harms for abuse of discretion." *Valencia v. City of Springfield, Illinois*, 883 F.3d 959, 966 (7th Cir. 2018). Thus, on appeal, the Seventh Circuit will affirm the district court's decision, unless the trial court, in conducting its preliminary injunction analysis, "commits a clear error of fact or an error of law."

*Id.* (quoting *Girl Scouts*, 549 F.3d at 1086 ("Absent such errors," the Seventh Circuit accords a district court's decision "great deference.")).

### III.    Analysis

#### A.    Threshold Considerations on *Jacobson* and Subsequent Supreme Court Precedent

At the outset, this Court considers *Jacobson* and the decades of constitutional precedent following in its wake.

Under the Tenth Amendment, the states—not the federal government—wield the general police power.  U.S. Const. amend. X. ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people.").  This police power, although it elides precise definition, permits the state to promote various community interests, including public health and safety.  *See Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 569 (1991).  Indeed, public health and safety are among the more "conspicuous examples of the traditional application of the police power" but such examples "merely illustrate the scope of the power and do not delimit it."  *Berman v. Parker*, 348 U.S. 26, 32 (1954).  States, therefore, "traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons."  *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996) (quoting *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985)).  This shared regulatory space is a result of the "structure and limitations" of federalism. *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006).

26

In *Jacobson*, the state of Massachusetts explored the constitutional periphery of its general police power. 197 U.S. at 11. Long before our modern understanding of infection and immunity, the state, battling a horrific outbreak of smallpox, passed a law that allowed any city within its bounds to compel vaccination, as necessary for public health and safety. *See id.* If a person refused immunization in contravention of the law, he could be fined $5.00 (about $140.00 today). *Roman Cath. Diocese of Brooklyn v. Cuomo*, --- U.S. ----, 141 S. Ct. 63, 70 (2020) (Gorsuch, J., concurring). The only exception written into the mandate applied to children who received a physician-signed-certificate declaring that they were unfit for vaccination. *Jacobson*, 197 U.S. at 12. The law did not contain a parallel exemption for adults. *Id.*

Trailing close behind, the city of Cambridge's board of health adopted an analogous provision. Henning Jacobson, a Swedish minister residing within the city, refused to submit to vaccination. *Id.* at 13. He was found guilty by a jury and sentenced to jail until he agreed to pay the $5.00 criminal fine. *Id.* He appealed, arguing that the Massachusetts law authorizing the local mandate violated his constitutional rights—and specifically those rights secured by the Fourteenth Amendment. *Id.* at 13–14. In the words of Henning: not only is liberty "invaded when the state subjects" its citizens to "unreasonable, arbitrary, and oppressive" vaccine mandates, but such laws are "hostile to the inherent right of every freeman to care for his own body and health in such a way as to him seems best." *Id.* at 26. Enforcing the law "against one who objects to vaccination, no matter for what

27

reason, is nothing short of an assault upon his person." *Id.* Given the facts presented, the Supreme Court rejected Henning's challenge.

Plaintiffs argue that *Jacobson* is a relic of a "bygone era in American jurisprudence" and, in so arguing, imply the case is no longer binding on this Court. [7]. On the other hand, Defendants, claiming that the current pandemic is the same as smallpox, argue that *Jacobson* conclusively resolves this dispute on the facts. Both are wrong.

Contrary to Defendants' claim, the nature of the disease and vaccines involved in *Jacobson* (and thus the legitimate government interest furthered by the legislation) present sharp factual distinctions from the current case. Unlike COVID-19, which presents an infection fatality rate range of ostensibly 0.0-1.63 percent, the smallpox pandemic killed tens of millions with an infection fatality rate of 30 percent, exceeding the death toll of World War I and II combined, and leaving even its survivors permanently scarred, blind or disabled.[45] Likewise, the *Jacobson* pandemic involved higher transmissibility "attack rates" (*i.e.* the rate of contraction among the at-risk populations),[46] and unlike the vaccines for COVID-19 (which are

---

[45] Frank Fenner et al., *Smallpox and its Eradication*, WORLD HEALTH ORGANIZATION (1988), *available at* https://apps.who.int/iris/handle/10665/39485 (last visited Dec. 7, 2021); *see also* Ioannidis, *Infection fatality rate of COVID-19*, *supra* note 12.(COVID-19 "infection fatality rates ranged from 0.00% to 1.63%, corrected values from 0.00% to 1.54%" and in "people younger than 70 years, infection fatality rates ranged from 0.00% to 0.31% with crude and corrected medians of 0.05%.").

[46] *See* Grace E. Patterson et al., *Societal Impacts of Pandemics: Comparing COVID-19 With History to Focus Our Response*, FRONTIERS IN PUBLIC HEALTH (Apr. 12, 2021), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8072022/pdf/fpubh-09-630449.pdf ("Policymakers should use lessons from previous pandemics to develop appropriate risk assessments" and "COVID-19 is different; it has a low attack rate and severe clinical disease occurs mainly in the old and those with pre-existing health conditions.").

designed to mitigate symptomatic infection in the person vaccinated), the available vaccine in *Jacobson* was, in fact, a sterilizing vaccine that affirmatively killed the virus and prevented transmission within the community at large.[47]  Factually, this case isn't *Jacobson*.

Nevertheless, even though *Jacobson* is not necessarily dispositive on the facts, the decision is still binding precedent on the law generally.  Therefore, despite Plaintiffs' invitation to disregard it, this Court must still look to *Jacobson* for guidance. *Klaassen II*, 7 F.4th at 593 (discussing *Jacobson* and recognizing that "a court of appeals must apply the law established by the Supreme Court").

In *Jacobson*, the Supreme Court underscored three significant concepts in that continue to shape the controlling body of law:

*First*, concerns of federalism.  The Court considered Massachusetts' authority to enact the mandate and found that according to "settled principles, the police power of a state must be held to embrace, at least, such reasonable regulations established directly by legislative enactment as will protect the public health and the public safety.*" Jacobson*, 197 U.S. at 25.  So too, "the state may invest local bodies called into existence for purposes of local administration with authority in some appropriate way to safeguard the public health and the public safety."  *Id.*

---

[47] In *Jacobson*, the public interest asserted by the government was to stop the spread of the disease from one member of the public to another (*i.e.*, viral transmission, which plainly affects the rights of others, not just those refusing vaccination), rather than simply an alleged interest in improving the individual health outcomes of those persons refusing vaccination (*i.e.*, mitigation of symptoms of each patient).  In the absence of a public health component for the community at large, this latter government interest is less compelling in a free society, especially where a blanket mandate overrides informed-consent, and adopts a cookie-cutter "one-size-fits-all" approach to the individualized cost-benefit calculus arising from each person's medical circumstances.

The state's power and the "mode and manner" by which it acts are "subject, of course, so far as Federal power is concerned, only to the condition that no rule prescribed by a state, nor any regulation adopted by a local government agency acting under the sanction of state legislation, shall contravene the Constitution of the United States" or any rights "secured by that instrument." *Id.* In the case before it, the Court found the legislation to be a proper exercise of Massachusetts' inherent police power.

*Second*, limits of liberty. Liberty is important, but it is not absolute: "the liberty secured by the Constitution of the United States to every person within its jurisdiction does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint." *Id.* at 26. Instead, there are moments when an individual's liberty must bow to an exercise of the state's police power in the interest of public health. *Id.* ("This court has more than once recognized it as a fundamental principle that persons and property are subjected to all kinds of restraints and burdens in order to secure the general comfort, health, and prosperity of the state." (citation omitted)). "Even liberty itself, the greatest of all rights," must give to the "governing authority [if] essential to the safety, health, peace, good order, and morals of the community." *Id.* at 26–27.

*Third*, separation of powers. The legislature, as the elected voice of the people of Massachusetts, determined that extraordinary measures were needed to combat the active and escalating pestilence of smallpox in the community at large. *Id.* at 27 ("[W]hen the regulation in question was adopted, smallpox . . . was

prevalent to some extent in the city of Cambridge, and the disease was increasing."). During the time of crisis, the Court preserved the space between the legislative and judicial branches of government and declined to revisit the wisdom of competing policy choices: "We must assume that, when the statute in question was passed, the legislature of Massachusetts was not unaware of these opposing theories, and was compelled, of necessity, to choose between them." *Id*. at 30. Accordingly, it is "no part of the function of a court or a jury to determine which one of two modes was likely to be the most effective for protection of the public against disease. That was for the legislative department." *Id*. Faced with competing theories concerning measures bearing on public health, the Court exercised restraint. *See id.* at 31 ("In a free country, where the government is by the people, through their chosen representatives, practical legislation admits of no other standard of action, for what the people believe is for the common welfare must be accepted as tending to promote the common welfare, whether it does in fact or not."). Were it otherwise, the Court concluded, the judiciary "would practically strip the legislative department of its function to care for the public health and safety when endangered by epidemics of disease." *Id*. at 37.

With these concepts in mind, the *Jacobson* Court defined a deferential "substantial relation" standard of review for a court's evaluation of compelled vaccination during an active smallpox pandemic within the community: courts should intervene only "if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial

relation to those objects, or is beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *Id*. at 31.  Given the facts in *Jacobson*, the Supreme Court concluded that Massachusetts' law was no such invasion.

The *Jacobson* case, however, does not stand for the proposition that anything goes in mandating vaccines.  Before closing, the Court warned that in other cases the police power of a state may be exercised in ways so arbitrary or oppressive as to justify judicial interference, *id*. at 38, and further that the Court's decision did not address a challenge by an individual with legitimate medical concerns, *id*. at 38–39, or an individual asserting fundamental rights, *id*. at 31.  Finally, there will come a time—perhaps never quite soon enough—that the worst of the epidemic ends, and in the absence of exigency and the immediate need for health protections for the community, a court's review need not be so forgiving.  *Id*. at 27 (finding that regulation protecting the public health, and not merely individual health, was permitted where smallpox was "prevalent" and the "disease was increasing."); *see also Calvary Chapel Dayton Valley v. Sisolak*, --- U.S. ----, 140 S. Ct. 2603, 2605 (2020) (Alito, J., dissenting) ("[A]t the outset of an emergency, it may be appropriate for courts to tolerate very blunt rules[,] but a public health emergency does not give . . . public officials *carte blanche* to disregard the Constitution for as long as the medical problem persists."); *Cassell v. Snyders*, 458 F. Supp. 3d 981, 994 (N.D. Ill. 2020) ("*Cassell I*") ("[C]ourts must remain vigilant, mindful that government claims of emergency have served in the past as excuses to curtail constitutional freedoms.").  In sum, even under *Jacobson* deference, the executive and legislative

branches of government may not escape constitutional scrutiny by the courts. In the words of the *Jacobson* Court, the courts must intervene when the state's imposition amounts to an "invasion of the rights secured by the fundamental law" and "it is the duty of the courts to so adjudge, and thereby give effect to the Constitution." *Jacobson*, 197 U.S. at 31 (emphasis added).

The Court's decision in *Jacobson* has since become a talisman for the state's "right to protect itself against an epidemic of disease which threatens the safety of its members." *Id.* at 27. Throughout the COVID-19 pandemic, federal courts have continued to look to *Jacobson* in adjudicating a range of constitutional challenges to pandemic-related restrictions, and this includes the Seventh Circuit. *Illinois Republican Party*, 973 F.3d at 763 ("The district court appropriately looked to *Jacobson* for guidance, and so do we."); *Elim Romanian Pentecostal Church v. Pritzker*, 962 F.3d 341, 347 (7th Cir. 2020) (*Jacobson* sustained a "public-health order against constitutional challenge"); *Democratic Nat'l Comm. v. Bostelmann*, 977 F.3d 639, 643 (7th Cir. 2020) (*Jacobson* instructs that deciding "how best to cope with difficulties caused by disease is principally a task for the elected branches of government."); *Haney v. Pritzker*, No. 20-CV-3653, 2021 WL 4402418, at *9 (N.D. Ill. Sept. 27, 2021) ("During much of the COVID-19 pandemic, federal courts have looked to *Jacobson* in adjudicating a range of constitutional challenges to pandemic-related restrictions.").

Given the Seventh Circuit's guidance, there can be no doubt that *Jacobson* endures. A more complicated question arises, however, regarding how to apply

*Jacobson* in conjunction with subsequent Supreme Court cases. Obviously, *Jacobson* is an antiquated opinion and thus it predates our "modern tiers of constitutional analysis (strict scrutiny and rational basis)." *Klaassen I*, 2021 WL 3073926, at *17; *Delaney v. Baker*, 511 F. Supp. 3d 55, 71 (D. Mass. 2021) (noting that "*Jacobson* predates the tiers of scrutiny by thirty to sixty years depending on which academic you ask." (citing *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938))). In the 116 years since *Jacobson*, courts have, for decades, looked to the constitutional right at issue to determine the appropriate degree of scrutiny. This approach includes the due process clause, which "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). Fundamental rights, it follows, are reviewed through the lens of strict scrutiny; otherwise (and with important exceptions[48]) rational basis review will suffice. *Id.* Abiding by these controlling cases, therefore, modern courts cannot adopt a blunt application of *Jacobson*'s "substantial relation" deference test. Instead, courts must interpret *Jacobson* through the lens of contemporary constitutional analysis.

The case of *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63 (2020), is instructive. In *Cuomo*, the Court faced a free exercise challenge to the Governor of New York's executive order, which placed pandemic restrictions on religious services in various "zones" of the state. *Id.* at 65–66. The Court found

---

[48] The Court sets aside intermediate scrutiny, which generally applies in the equal protection context to quasi-suspect classifications, including gender, sex and illegitimacy. *See, e.g.*, *J.E.B. v. Alabama*, 511 U.S. 127, 136 (1994); *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 725 (1982).

that based on the First Amendment interests at stake, the plaintiffs were likely to

prevail.  Justice Kavanaugh, in concurrence, distinguished the Chief Justice's

invocation of *Jacobson* in *South Bay United Pentecostal Church v. Newsom*, --- U.S. -

---, 140 S. Ct. 1613, 1614 (2020),[49] and warned that: "judicial deference in an

emergency or crisis does not mean wholesale abdication, especially when important

questions of religious discrimination, racial discrimination, free speech, or the like

are raised."  *Cuomo*, 141 S. Ct. at 74 (Kavanaugh, J., concurring); *see also Calvary*

*Chapel*, 140 S. Ct. at 2608 (Alito, J., dissenting) ("[I]t is a mistake to take the

language in *Jacobson* as the last word on what the constitution allows public

officials to do during the COVID-19 pandemic.").  Both Justices Gorsuch and Alito

appear to agree that *Jacobson*'s deferential approach does not replace modern

constitutional analysis: "traditional legal tests associated with the right at issue"

govern, and *Jacobson* did nothing to change that.  *Cuomo*, 141 S. Ct. at 70 (Gorsuch,

J., concurring); *accord Calvary*, 140 S. Ct. at 2608 (Alito, J., dissenting) ("Language

in *Jacobson* must be read in context, and it is important to keep in mind that

*Jacobson* primarily involved a substantive due process challenge . . . . It is a

considerable stretch to read the decision as establishing the test to be applied when

statewide measures of indefinite duration are challenged under the First

Amendment or other provisions not at issue in that case."); *Klaassen I*, 2021 WL

---

[49] In *South Bay*, the Court upheld the Governor of California's executive order restricting attendance at public gatherings, and Chief Justice Roberts, in concurrence, cited *Jacobson* for the principle that the "Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect,'" and when local "officials 'undertake[ ] to act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially broad.'" *South Bay*, 140 S. Ct. at 1613–14 (quoting *Jacobson*, 197 U.S. at 38).

3073926, at \*21 ("Because *Cuomo* involved a fundamental right, a 'right[] secured by the fundamental law' under today's jurisprudence, the court intervened."); *see also Tandon v. Newsom*, --- U.S. ----, 141 S. Ct. 1294, 1296 (2021) (per curiam) (applying strict scrutiny and finding that California cannot restrict at-home religious exercise while permitting secular activities that pose similar risks of increasing COVID-19 cases).

In short, the correct application of Supreme Court precedent (including *Jacobson*) first requires a case-specific identification of the nature of the constitutional right at stake, and then a tiered-application of the requisite standard of judicial review and attendant levels of deference to the legislature. This Court follows this path in assessing Plaintiffs' likelihood of success as to each claim below.

## B.    Likelihood of Success on the Merits

The Court now turns to the strength of Plaintiffs' merits showing. The Court considers only those arguments raised by Plaintiffs in support of their request for injunctive relief. As noted above, Plaintiffs surrendered—for purposes of the present motion only—any challenge beyond the Fourteenth Amendment. *See generally* [33]. Consequently, the Court limits its present review to Plaintiffs' current due process and equal protection theories.[50]

---

[50] Invariably, Plaintiffs retain the right to amend their complaint, and through the course of these proceedings, other legal and factual theories may arise. As noted above, one named Plaintiff is pursuing a religious exemption based on his beliefs concerning the sanctity of human life. *See* [33-1] (Affidavit of Chris Garon) (outlining his religious objections to the mandate). Specifically, Mr. Garon objects to the use of fetal stem cell lines in the use and "testing of the Moderna and Pfizer COVID-19 vaccines." *Id.* Clearly, this type of claim would alter the requisite constitutional standard of review and thus would have a profound impact on this Court's analysis. *See, e.g., Dahl v. Board of Trustees of Western Michigan Univ.*, 15 4th 728, 732 (6th Cir. 2021) (applying strict scrutiny and noting that because "[t]he University put plaintiffs to the choice: get vaccinated or stop fully participating in

### 1.   Substantive Due Process

The Fourteenth Amendment provides, in pertinent part, that no State shall "deprive any person of life, liberty or property without due process of law." U.S. Const. amend. XIV.  The "touchstone of due process is protection of the individual against arbitrary action of government."  *Wolf v. McDonnell*, 418 U.S. 558 (1974).  The Due Process Clause is part procedural, part substantive. By requiring that the government follow proper procedure when depriving a person of life, liberty or property, the Due Process clause promotes fairness.  And, by barring certain government actions regardless of the fairness of the procedures used, the Due Process Clause prevents legislative power from being used as a force for oppression.  *Hughes v. Jones*, 40 F. Supp. 3d 969, 979 (N.D. Ill. 2014) (citing *Daniels v. Williams*, 474 U.S. 327, 331 (1986)); *see also GEFT Outdoors*, 922 F.3d at 368 (substantive component of due process prevents wrongful government actions).

Despite its lofty aims, the "scope of substantive due process is very limited." *Campos v. Cook County*, 932 F.3d 972, 975 (7th Cir. 2019) (quoting *Tun v. Whitticker*, 398 F.3d 899, 902 (7th Cir. 2005)).  Unless a governmental practice "encroaches on a fundamental right, substantive due process requires only

---

intercollegiate sports," the University impermissibly "condition[ed] the privilege of playing sports on plaintiffs' willingness to abandon their sincere religious beliefs."); *see also Espinoza v. Montana Dep't of Revenue*, --- U.S. ----, 140 S. Ct. 2246, 2254 (2020) (The Free Exercise Clause "protects religious observers against unequal treatment and against laws that impose special disabilities on the basis of religious status." (internal quotation marks and citations omitted)); *see also Does 1–3 v. Mills*, 595 U.S. ----, -- (2021) (Gorsuch, J., dissenting) (viewing Maine's COVID-19 vaccination mandate through the lens of strict scrutiny).  Even so, no decision has yet been made regarding Mr. Garon's requested exemption, and therefore, any First Amendment issues are not yet ripe for judicial review.  *Indiana Right to Life, Inc. v. Shepard*, 507 F.3d 545, 549 (7th Cir. 2007) ("A case or controversy requires a claim that is ripe and a plaintiff who has standing."); *Bostelmann*, 466 F. Supp. 3d at 963–64 ("Ripeness is a justiciability concern regarding the appropriate timing of judicial intervention.").

that the practice be rationally related to a legitimate government interest, or alternatively phrased, that the practice be neither arbitrary nor irrational." *Platt v. Brown*, 872 F.3d 848, 852 (7th Cir. 2017); *see also Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1071 (7th Cir. 2013). If, on the other hand, fundamental rights are at stake, then the state bears the burden of showing that the regulation is necessary to serve a compelling state interest and prove that it is narrowly drawn to achieve that end. *See, e.g., Burson v. Freeman*, 504 U.S. 191, 198 (1992).

Under the substantive due process framework, courts "begin with a careful description of the asserted right." *Reno v. Flores*, 507 U.S. 292, 302 (1993). Substantive due process specifically protects those fundamental rights and liberties which are, objectively, "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Khan v. Bland*, 630 F.3d 519, 535 (7th Cir. 2010) (quoting *Glucksberg*, 521 U.S. at 720–21). Among other rights, the list of recognized fundamental liberty interests includes "things like the right to marry, the right to have children, the right to marital privacy, the right to contraception, and the right to bodily integrity." *Sung Park v. Indiana Univ. Sch. of Dentistry*, 692 F.3d 828, 832 (7th Cir. 2012). In addition, the Supreme Court has recognized the right to abortion, *see Casey*, 505 U.S. at 870, and has "assumed, and strongly suggested, that the Due Process Clause protects the traditional right to refuse unwanted

lifesaving medical treatment," *Glucksberg*, 521 U.S. at 720 (citing *Cruzan*, 497 U.S. at 278–79).

Beyond this "handful of fundamental rights [for which] the due process clause has a substantive component," *Khan*, 630 F.3d at 535 (quoting *Taake v. Cnty. of Monroe*, 530 F.3d 538, 542 (7th Cir. 2008)), the Supreme Court counsels against finding that state action implicates a new, nascent "fundamental" right, as "guideposts for responsible decision-making in this uncharted area are scarce and open-ended," *Collins v. Harker Heights, Tex.*, 503 U.S. 115, 125 (1992). Substantive due process analysis, therefore, requires courts to "exercise the utmost care whenever we are asked to break new ground in this field." *Collins*, 503 U.S. at 125.

### a. Classifying the Rights

Plaintiffs argue that the Order and Directive constitute government-coerced medical procedures that threaten their bodily autonomy and medical privacy rights. *See* [4] at 6–8, 12; [1] ¶ 40. According to Plaintiffs, these rights fall within the select handful of fundamental rights under the Fourteenth Amendment. *See* [4] at 6–8, 12; [33] at 7. In so doing, Plaintiffs seek to distill the right to refuse the government mandated medical procedures at issue from a long line of cases beginning with the Court's decisions in *Cruzan*, 497 U.S. at 277 (bodily autonomy) and *Griswold v. Connecticut*, 381 U.S. 479 (1965) (privacy). *See* [4] at 6–9. As discussed below and in view of the Supreme Court's decisions, this Court agrees that Plaintiffs clearly possess a *significant* liberty interest in refusing coercive medical treatment without their informed consent, and this right is recognized by the Due

Process Clause. But they fail to identify a *fundamental* liberty interest to warrant strict scrutiny under prevailing case law.

To begin: *Cruzan*. In *Cruzan*, the Supreme Court faced, for the first time, the question of "whether the United States Constitution grants what is in common parlance referred to as a 'right to die.'" 497 U.S. at 277.[51] Nancy Cruzan, the petitioner, slipped into a persistent vegetative state after losing control of her vehicle on a cold January evening. *Id*. at 266. After it became clear that she would never recover cognitive function, her parents (and co-petitioners) pleaded with the court for an "order directing the withdrawal of their daughter's artificial feeding and hydration equipment." *Id*. The Supreme Court of Missouri searched for evidence of Nancy's intent; and in the absence of clear and convincing evidence of her consent to withdraw life-sustaining treatment, held her parents lacked the authority to make such a request on her behalf. *Id*. at 269. The Supreme Court affirmed.

In reaching its decision, the Supreme Court considered whether an individual possesses a cognizable "liberty interest" under the Due Process Clause in refusing medical treatment. The answer was yes; and, consistent with *Jacobson*, the right arises from the long-recognized, common-law doctrine of informed consent: "the common-law doctrine of informed consent is viewed as generally encompassing the

---

[51] This language was revisited by the Supreme Court in *Glucksberg*: "[A]lthough *Cruzan* is often described as a 'right to die' case . . . we were, in fact, more precise: We assumed that the Constitution granted competent persons a 'constitutionally protected right to refuse lifesaving hydration and nutrition.'" *Glucksberg*, 521 U.S. at 722–23.

right of a competent individual to refuse medical treatment," and *Jacobson* and its progeny permit the inference that "a competent person has a *constitutionally protected* liberty interest in refusing unwanted medical treatment." *Cruzan*, 497 U.S. at 277–78 (emphasis added) (discussing *Washington v. Harper*, 494 U.S. 210, 221–22 (1990)).[52]  The Court found that, in view of this nation's longstanding history of informed consent and prior precedent, it could "*assume* that the United States Constitution would grant a competent person a constitutionally protected right to refuse lifesaving hydration and nutrition." *Id*. at 279 (emphasis added). Cognizable right notwithstanding, the Court also found that the Constitution permits a state (there, Missouri) to require clear and convincing evidence of a patient's consent concerning the withdrawal of such life-sustaining treatment.  *Id*. at 280–81.

Clearly, *Cruzan* supports Plaintiffs' assertion of a constitutionally protected liberty interest.  *See Cruzan*, 497 U.S. at 278; [1] ¶ 44; [4] at 6–7.  As Justice O'Connor explained in concurrence, "our notions of liberty are inextricably entwined with our idea of physical freedom and self-determination [and] the Court has often deemed state incursions into the body repugnant to those interests protected by the Due Process Clause." *Cruzan*, 497 U.S. at 287 (citing *Rochin v. California*, 342 U.S. 165, 172 (1952)).  That right of self-determination emanates from informed consent, or "the concept, fundamental in American jurisprudence, that '[e]very human being

---

[52] The EUA statute itself incorporates the long-recognized principle of informed consent, stating that anyone to whom the product (*i.e.*, the vaccine) is administered must be informed of the option to accept or refuse it, as well as the alternatives to the product and the risks and benefits of receiving it.  *See* 21 U.S.C. § 360bbb-3.

of adult years and sound mind has a right to determine what shall be done with his own body." *Cruzan*, 497 U.S. at 306, n.5 (citations omitted) (Brennan, J., dissenting); *see also id.* at 302 (classifying Nancy Cruzan's interest as "the *fundamental* right to be free of unwanted artificial nutrition and hydration" (emphasis added)). The "right to be free from medical attention without consent, to determine what shall be done with one's own body, *is* deeply rooted in this Nation's traditions . . . entrenched in American tort law [and] securely grounded in the earliest common law." *Id.* at 305 (cleaned up). While the *Cruzan* majority and dissent parted ways on whether Nancy Cruzan's protected interest should be classified as "fundamental," both agreed that the constitutional right was firmly embedded in this nation's longstanding recognition of self-determination and informed consent. *Compare id.* at 269 (informed consent is "firmly entrenched" in American tort law) *with id.* at 305 ("[T]he freedom from unwanted medical attention is unquestionably among those principles 'so rooted in the traditions and conscience of our people as to be ranked as fundamental." (Brennan, J., dissenting) (citations omitted)). The principles of informed consent and self-determination color the Court's analysis here; "[s]uch forced treatment may burden [an] individual's liberty interest as much as any state coercion." *Id.* at 288 (O'Connor, J., concurring); *see also* [4] at 6–7.

Later, in *Glucksberg*, 521 U.S. at 708, the Supreme Court clarified the scope of the rights recognized in *Cruzan* when it considered whether a right to "assisted suicide" also enjoys due process protection under the Fourteenth Amendment. In

*Glucksberg*, three terminally ill patients (among others) argued for the right of

"mentally competent, terminally ill adult[s] to commit physician-assisted suicide."

521 U.S. at 708. The parties proffered a panoply of potential "fundamental" rights:

"liberty to choose how to die," "a right to control one's final days," "the right to

choose a humane, dignified death," and even "the liberty to shape death." *Id.* at 722

(internal citations and quotations omitted). None carried the day, and the Court

rejected the plaintiffs' argument that prior precedent endorsed "a general tradition

of self-sovereignty" or that "the 'liberty' protected by the Due Process Clause" can be

read so broadly to include all "basic and intimate exercises of personal autonomy."

*Id.* at 724 (internal quotation marks and citations omitted). Constitutional rights,

said the Court, cannot be "simply deduced from abstract concepts of personal

autonomy," and the mere fact that "many of the rights and liberties protected by the

Due Process Clause sound in personal autonomy does not warrant the sweeping

conclusion that any and all important, intimate, and personal decisions are so

protected." *Id.* at 725, 727–28 (citing *San Antonio Indep. Sch. Dist. v. Rodriguez*,

411 U.S. 1, 33–35 (1973)).

The rejection of an overly broad right to assisted suicide in *Glucksberg*,

however, does not undermine Plaintiffs' assertion here of a constitutionally

protected right. The *Glucksberg* Court differentiated from *Cruzan* on the grounds

that the asserted right to assistance in "hastening one's own death" had never been

recognized, much less permitted, in this nation's history and constitutional

traditions. In the Court's words, the "history of the law's treatment of assisted

suicide in this country has been and continues to be one of the rejection of nearly all efforts to permit it." *Id*. at 728. Thus, the unique historical nature of assisted suicide distinguishes the liberty interest in *Glucksberg* from the liberty interest here or in *Cruzan*; in *Cruzan,* the right to refuse medical treatment was based on "the common-law rule that forced medication was a battery, and the long legal tradition protecting the decision to refuse." *Id*. at 725. Because the liberty "interest" in *Glucksberg* "never enjoyed similar legal protection," it could not be deemed fundamental. In this way, the Court's decision in *Glucksberg* does nothing to curtail the longstanding recognition of self-determination and informed consent underlying the constitutional right of a competent individual to refuse medical treatment—the grounds on which Plaintiffs base their claims in this case. *Id*.; [4] at 6–7.

Building upon these constitutional precedents, the Supreme Court in *Washington v. Harper*, 494 U.S. 210, 221–22 (1990), addressed the constitutionality of the state mandating that a prisoner take antipsychotic medication against his will. *See also* [1] at ¶ 44. For years, Mr. Harper buoyed in and out of the prison system. *Harper*, 494 U.S. at 214. While incarcerated in Washington state, he received neuroleptic treatment for various mental health issues and continued that treatment while out on parole. *Id*. at 214–15, n.2. Later, upon reincarceration in a facility designed for treating convicted felons with serious mental health disorders, Harper refused his prescribed medications. *Id*. at 214. The treating physician,

finding that Harper was a danger to himself and the safety of other inmates, sought to force medications on him over his objections. *Id.*

In the clearest terms possible, the Supreme Court expressed "no doubt" that Harper possessed "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." *Id*. at 221–22; *see also id.* at 241 (Stevens, J., concurring) ("There is no doubt . . . that a competent individual's right to refuse [psychotropic] medication is a fundamental liberty interest deserving the highest order of protection."). It follows that the "forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty." *Id*. at 229; *see also United States v. Charters*, 829 F.2d 479, 491 (4th Cir. 1987) ("The right to be free of unwanted physical invasions has been recognized as an integral part of the individual's constitutional freedoms."). As Justice Stevens explained in concurrence, the "dimensions" of Harper's right were "both physical and intellectual. Every violation of a person's bodily integrity is an invasion of his or her liberty." *Id*. at 237 (Stevens, J., concurring). That "invasion is particularly intrusive if it creates," as Plaintiffs allege, a substantial "risk of permanent injury." *Id*.[53]

Despite the significant liberty interest at stake, however, Harper's rights were outweighed by the needs of state action within a prison setting, especially

---

[53] The antipsychotic drugs at issue in *Harper* were accompanied by the possibility of rare but serious side effects: "While the therapeutic benefits of antipsychotic drugs are well documented, it is also true that the drugs can have serious, even fatal, side effects[.]" *Id*. at 229–30.

where mental illness compromised the ability of the prisoner to properly exercise informed consent. *Id*. at 225–26. In such a special circumstance, the Court yielded to the state's overriding "interest in combating the danger posed by a person to both himself and others" in the prison environment, "which, 'by definition,' is made up of persons with 'a demonstrated proclivity for antisocial criminal, and often violent, conduct.'" *Id*. at 225 (quoting *Hudson v. Palmer*, 469 U.S. 517, 526 (1984)). Accordingly, given "the requirements of the prison environment," the *Harper* Court held that "the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." *Harper*, 494 U.S. at 227; *see also Turner v. Safley*, 482 U.S. 78, 84 (1987) (holding that prisoners are entitled to constitutional protections, but their due process rights may be "subject to substantial restrictions as a result of incarceration"); *Riker v. Lemmon*, 798 F.3d 546, 551 (7th 2015) (same). In short, the Court recognized Harper's constitutional liberty interest, but found that the state action was justified given the unique facts of the case.

Read together, the Supreme Court's decisions confirm that Plaintiffs assert a recognized and significant liberty interest well within the protected zone of the Fourteenth Amendment, and this liberty interest does not lose constitutional protection merely because the Supreme Court did not label it "fundamental" in its prior decisions. *See Cook v. Gates*, 528 U.S. F.3d 42, 53 (1st Cir. 2008) ("It is thus

clear that the Supreme Court does not always use the word 'fundamental' when it wishes to identify an interest protected by substantive due process.").

The *degree* of protection afforded, however, *does* depend on the ultimate nature of the right as recognized by the Court, because "*only* fundamental rights qualify for . . . heightened scrutiny protection" and *only* those "rights which are 'deeply rooted in this Nation's history and tradition'" can be deemed fundamental. *Lawrence v. Texas*, 539 U.S. 558, 593 (2003) (Scalia, J., dissenting) (emphasis in original) (discussing *Glucksberg*, 521 U.S. at 721).  All other liberty interests may be "abridged or abrogated pursuant to a validly enacted state law if that law is rationally related to a legitimate state interest."  *Id.*

Further, contrary to Plaintiffs' privacy arguments, *see* [31-1] at 7–10, the Supreme Court's jurisprudence also does not recognize a general "privacy interest" that encompasses their claims or otherwise justifies an application of heightened scrutiny here.  Instead, although the Supreme Court has recognized a fundamental right to privacy in certain contexts and has expanded the right of privacy on many occasions,[54] simply abstracting a recognized privacy right, even a constitutional one, does not automatically render that right fundamental.  The Supreme Court's privacy cases underscore that only those rights found to be "fundamental" warrant

---

[54] *See, e.g., Griswold*, 381 U.S. at 479 (right to contraception); *Eisenstadt v. Baird*, 405 U.S. 438, 454–55 (1972) (right of unmarried couples to purchase contraceptives); *Roe*, 410 U.S. at 152 (abortion); *Lawrence*, 539 U.S. at 578 (sexual privacy); *Obergefell v. Hodges*, 576 U.S. 644, 664 (marital privacy).

heightened scrutiny.[55]  Indeed, in *Roe*, Justice Blackmun expressly uncoupled the right of privacy from any unlimited assertion of a liberty interest:

> In fact, it is not clear to us that the claim asserted by some *amici* that one has an unlimited right to do with one's body as one pleases bears a close relationship to the right of privacy previously articulated in the Court's decision.  The Court has refused to recognize an unlimited right of this kind in the past.  *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) (vaccination); *Buck v. Bell*, 274 U.S. 200 (1927) (sterilization).

410 U.S. at 152; *see also* [31-1] at 8.

In other words, a general right of privacy exists, but it certainly does not extend so far as to include the "right to do with one's body as one pleases."  *Roe*, 410 U.S. at 152.  As such, any liberty interest within the scope of bodily autonomy or privacy cannot automatically be deemed "fundamental" for purposes of the substantive due process analysis.  While the state cannot simply "override" individual liberty by asserting a government interest in "protection of life," that individual liberty is only accorded heightened scrutiny if the rights involved are recognized as fundamental.  *Casey*, 505 U.S. at 857.

---

[55] *See Roe*, 410 U.S. at 152–53 ("[O]nly personal rights that can be deemed fundamental or implicit in the concept of ordered liberty are included in this guarantee of personal privacy."); *see also Moore v. East Cleveland,* 431 U.S. 494, 503 (1997) ("[T]he Constitution protects the sanctity of the family *precisely because* the institution of the family is deeply rooted in this Nation's history and tradition" (emphasis added)); *Griswold*, 381 U.S. at 485–86 (intrusions into the "sacred precincts of marital bedrooms" offend rights "older than the Bill of Rights"); *Loving v. Virginia*, 388 U.S. 1 (1967) ("The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness."); *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541 ("Marriage and procreation are fundamental."); *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (Liberty includes "those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men."); *Klaassen I*, 2021 WL 3073926, at *17 (noting Supreme Court has normally found "privacy rights" to be fundamental when they involve "sexual and reproductive rights, such as the right to use contraceptives or have an abortion or engage in homosexual acts") (quoting *Wolfe v. Schaefer*, 619 F.3d 782, 784 (7th Cir. 2010)).

In short, despite the long history of informed consent and the established right to bodily autonomy and privacy, Plaintiffs point to no case justifying an application of strict scrutiny to their due process claims. Certainly, given controlling precedent, Plaintiffs have a constitutionally protected liberty interest in refusing the government-coerced medical procedures in this case (*i.e.*, mandated vaccination or testing upon threat of termination). But these cases do not establish that Plaintiffs' due process interests (*i.e.*, their right to voluntary and informed consent as to such medical procedures) trigger "fundamental" classification (and thus strict scrutiny) under the law.

To the contrary, controlling precedent requires that this Court discount the impact of *Cruzan*, *Glucksberg* and *Harper*, and apply rational basis review to Plaintiffs' constitutional challenges. For example, mere months ago, the Seventh Circuit upheld Indiana University's fall vaccination policy under the aegis of *Jacobson*. *Klaassen II*, 7 4th at 592. Much like the mandates at issue here, the university's policy required students to be vaccinated against COVID-19 unless exempt for religious or medical reasons. *Id.* Eight students challenged the policy under the Due Process Clause, arguing that "the rational-basis standard used in *Jacobson* does not offer enough protection for their interests and that courts should not be as deferential to the decisions of public bodies as *Jacobson* was." *Id.* at 593. The Seventh Circuit affirmed the rejection of Plaintiffs' request for injunctive relief on the facts presented, noting "there can't be a constitutional problem with vaccination against SARS-CoV-2" in view of *Jacobson*, and that "a court of appeals

must apply the law established by the Supreme Court." *Id.*; *accord Cuomo*, 141 S. Ct. at 70 (2020) (Gorsuch, J., concurring) ("Although *Jacobson* pre-dated the modern tiers of scrutiny, this Court essentially applied rational basis review to Henning Jacobson's challenge."); *see Klaassen I*, 2021 WL 3073926, at *24 ("Added comfort comes from the consistent use of rational basis review to assess mandatory vaccination measures." (collecting cases)).[56]

Despite finding that heightened scrutiny does not govern Plaintiffs' constitutional liberty interest, this Court remains mindful that this case involves serious implications for personal liberty and public health, and that "even in a pandemic, the Constitution cannot be put away and forgotten." *Cuomo*, 141 S. Ct. at 68. To underscore the magnitude of these issues, Plaintiffs invoke the Supreme Court's infamous decision in *Buck v. Bell*, 274 U.S. 200 (1927). [31-1] at 8 n.21 (adopting the view that *Jacobson* and *Buck* are "birds of a feather"); [4] at 7.[57] Certainly, for their part, Plaintiffs face a grave set of circumstances and stand

---

[56] Thus far, other lower courts have addressed the tension between our modern tiers of constitutional analysis and *Jacobson* by either (1) recognizing that under either standard, the result would be the same, *see, e.g.*, *Vill. of Orland Park v. Pritzker*, 475 F. Supp. 3d 866, 882 (N.D. Ill. 2020) (holding that under both *Jacobson* and contemporary constitutional analysis, Plaintiffs did not demonstrate likelihood of success on the merits); or (2) simply equating *Jacobson*'s deferential approach to rational basis review, *see, e.g.*, *Klassen I*, 2021 WL 3073926, at *21 (finding *Jacobson* "effectively endorsed—as a considered precursor—rational basis review"); *Haney*, 2021 WL 4402418, at *12 ("The deferential standard articulated in *Jacobson* appears to be the same as rational basis review.").

[57] In *Buck*, the Supreme Court upheld a Virginia law permitting the compulsory sterilization of the "feeble-minded," under the Due Process Clause, based on the purported government interest of promoting "the health of the patient and the welfare of society." 274 U.S. at 205, 207. Echoing the horrific eugenics theories of the time, the Court found that the plaintiff, Carrie Buck, was "the daughter of a feeble-minded mother" and "the mother of an illegitimate feeble-minded child" and that three "generations of imbeciles are enough." *Id.* at 205–08. According to the Court, it was "better for all the world, if instead of waiting to execute degenerate offspring for crime, or to let them starve for their imbecility, society can prevent those who are manifestly unfit from continuing their kind." *Id.* at 207. The hate and bigotry of *Buck* plays no role in this Court's analysis today.

caught between losing their livelihood or submitting to invasive medical procedures against their will; but the facts here do not paint a picture resembling *Buck*. As the district Court stated in *Klaassen I*: "[t]his case isn't *Buck*; and one over-extension of *Jacobson* merely counsels once more that the Constitution cannot be cut loose even now, in a pandemic's seeming twilight." 2021 WL 3073926, at *20.

In sum, this Court concludes that strict scrutiny does not apply to Plaintiffs' substantive due process claims. Instead, the Court fully recognizes the constitutional rights possessed by Plaintiffs but, consistent with the controlling precedent of the Supreme Court and Seventh Circuit, this Court adopts the rational basis standard to review these claims. *See, e.g.*, *Cuomo*, 141 S. Ct. at 70 (Gorsuch, J. concurring); *Klaassen II*, 7 F.4th at 593 (referring to *Jacobson*'s deferential standard as a "rational-basis standard").[58]

### b. Rational Basis Review

Having determined that the rational basis standard applies to Plaintiffs' substantive due process claims, the Court now looks to whether Plaintiffs have demonstrated "some" likelihood of success in showing that the mandate at issue is

---

[58] Finally, Plaintiffs also assert in passing "that it is beyond a doubt that the right to earn a living is a protected right under the Fourteenth Amendment." [4] at 7. Courts have long recognized the right to occupational liberty. *See Wroblewski v. City of Washburn*, 965 F. 2d 452, 455 (7th Cir. 1992) (noting the "concept of liberty protected by the due process clause has long included occupational liberty"). But the Seventh Circuit has confined any due process claim based on occupational liberty to procedural due process. *See Zorzi v. Cty. of Putnam*, 30 F.3d 885, 895 (7th Cir. 1994) ("Occupational liberty . . . is not protected by substantive due process. Rather, any cause of action for the deprivation of occupational liberty would be confined to a claim under procedural due process; there is no such cause of action under substantive due process." (internal citations omitted); *Vill. of Orland Park v. Pritzker*, 475 F. Supp. 3d 866, 884 (N.D. Ill. 2020) (rejecting right to work raised under substantive due process). Accordingly, this Court only considers Plaintiffs' cited occupational interest as part of its procedural due process analysis. [31-1] at 13 ("The Petition seeks to enforce Plaintiffs' procedural due process rights to follow a trade, profession or other calling.").

either arbitrary or irrational. *See Lee v. City of Chicago*, 330 F.3d 456, 467 (7th Cir. 2003).

### i.      Court's Preliminary Fact-Finding Role

Given the deferential nature of the rational basis standard, this Court pauses to address the lens through which it reviews the preliminary factual record in reaching its conclusions.

In general, the mechanics of the preliminary injunction assessment are well-known: Courts must make factual findings and recite conclusions of law. Fed. R. Civ. P. 65(d)(1); *see also Streight*, 2021 WL 4306146, at *3 ("[T]he Court is not bound by struct rules of evidence at a preliminary injunction hearing" (citations omitted)). After finding the relevant facts, courts apply the appropriate legal standard—in essence, running those facts through the lens of a hypothetical trial to ascertain whether the movant has demonstrated "some" likelihood of future success on the merits. 11A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2948.3 (3d ed. 2021) (describing likelihood of success as a "preliminary estimate of the strength of plaintiff's suit"); *see also Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996) (trial court "need not predict the eventual outcome on the merits with absolute assurance" at the preliminary injunction stage). While the movant need not demonstrate likelihood of success by a preponderance, a satisfactory showing "normally includes a demonstration of how the applicant proposes to prove the key elements of its case." *Tully v. Okeson*, 977 F.3d 608, 613 (7th Cir. 2020). Here, as explained above, rational basis standard

governs the future success or failure of Plaintiffs' substantive due process

challenges (and, as discussed below, it also governs their equal protection claims).[59]

Based on this standard, the Governor contends that because the Court will

eventually uphold the Governor's action under the rational basis test *even if* it is

based on "rational speculation unsupported by evidence or empirical data," then any

argument or citation to the evidence or data at the preliminary injunction stage is

"unnecessary" and "beyond" that which is required. [37] at 5–6; *see also Lee v. City

of Chicago*, 330 F.3d 456, 467 (7th Cir. 2003) (challenged law need only "be

rationally related to a legitimate government interest, or alternatively phrased,

that the practice be neither arbitrary nor irrational.").[60] At oral argument, counsel

for the Governor doubled down on this argument and claimed that any data

submitted on the Governor's behalf "was quite a bit unnecessary" because, under

---

[59] The "rational basis" inquiry under substantive due process and equal protection is essentially the same, with the minor exception that instead of determining the rationality of the state's impingement upon a protected right (substantive due process), the court must determine the rationality of making a distinction or classification between two groups of people for differential treatment (equal protection). *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1071 (7th Cir. 2013) ("Rather than identify a rational reason for infringing on citizen's [liberty], we must identify a rational reason for the distinction the ordinance draws between [two classes].").

[60] Even though the Governor's office is part of the executive branch, federal courts across the country have found that public health orders, like the Executive Order here, are properly considered in the same manner as legislative enactments for the purposes of constitutional review. *See, e.g.*, *ETP Rio Rancho Park, LLC v. Grisham*, 522 F. Supp. 3d 966, 1028–29 (D.N.M. 2021) (explaining that the executive order was properly classified as legislative in nature because it was "attempting through policy, to achieve a stated government purpose," rather than adjudicate disputed facts of a particular case); *Bauer v. Summey*, No. 21-CV-02952-DCN, 2021 WL 4900922, at *8 (D.S.C. Oct. 21, 2021) (noting that "public health orders . . . are properly considered legislative enactments"). In this District, reviewing courts have routinely addressed Governor Pritzker's orders as legislative enactments, not specific executive actions. *See, e.g.*, *Williams v. Trump*, 495 F. Supp. 3d 673, 684 (N.D. Ill. 2020), *aff'd sub nom. Williams v. Pritzker*, No. 20-3231, 2021 WL 4955683 (7th Cir. Oct. 26, 2021) (Governor Pritzker's stay-at-home orders); *Vill. of Orland Park*, 475 F. Supp. 3d at 882. This Court will do the same.

the rational basis test, government actions will be upheld even if based only on rational speculation. [45] 23:8–15.

Even though this argument is true in part (as to the ultimate deference of the rational basis test and the absence of any defense burden to produce evidence), the Defendants' "no-facts" approach improperly puts the cart before the horse. As the Supreme Court's explained in *United States v. Carolene Products Co.*, 304 U.S. 144 (1938), courts must fulfill an initial fact-finding role under rational basis review, even though those facts are subsequently evaluated through a deferential lens as a matter of law:

> Where the existence of a rational basis for legislation whose constitutionality is attacked depends upon facts beyond the sphere of judicial notice, such facts may properly be made the subject of judicial inquiry, [ ] and the constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist. [ ] Similarly we recognize that the constitutionality of a statute, valid on its face, may be assailed by proof of facts tending to show that the statute as applied to a particular article is without support in reason because the article, although within the prohibited class, is so different from others of the class as to be without the reason for the prohibition, [ ] though the effect of such proof depends on the relevant circumstances of each case [ ] … But by their very nature such inquiries, where the legislative judgment is drawn in question, must be restricted to the issue whether any state of facts either known or which could reasonably be assumed affords support for it.

*Id.* at 153–54 (citations omitted). Thus, even in the absence of any alleged violation of a fundamental right subject to strict scrutiny, judicial fact-finding still plays a necessary, but limited, role in answering the legal "rationality" question. *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464 (1981) ("parties challenging legislation under the [Fourteenth Amendment] may introduce evidence supporting

54

their claim that it is irrational"); *Vance v. Bradley*, 440 U.S. 93, 111 (1979) (quoting *Brotherhood of Locomotive Firemen v. Chicago, R.I. & P.R. Co.*, 393 U.S. 129, 138–39 (1968)) (trial court bears the "responsibility for makings 'findings of fact,'" even though rational review does not later authorize a court to ultimately "resolve conflicts in the evidence against the legislature's conclusion or even to reject the legislative judgment on the basis that" the legislature acted on "pure speculation."); *St. Joseph Abbey v. Castille*, 712 F.3d 215, 223 (5th Cir. 2013) ("[A]lthough rational basis review places no affirmative evidentiary burden on the government, plaintiffs may nonetheless negate a seemingly plausible basis for the law by adducing evidence of irrationality" and any "hypothetical rational, even post hoc, cannot be fantasy."); *City of Monterey*, 526 U.S. at 753 (ultimate question of rationality remains a question of law) (Souter, J., concurring) (citing *FM Props. Op. Co. v. City of Austin*, 93 F.3d 167, 172 n.6 (5th Cir. 1996)); *see also Klaassen I*, 2021 WL 3073926, at *14 (considering "over a hundred written exhibits, including sworn depositions and declarations," and "hear[ing] three hours of argument"); *Streight*, 2021 WL 4306146, at *2 (holding "an evidentiary hearing" on the plaintiff's motion for preliminary injunction and permitting each side to call witnesses and submit affidavits).[61]

---

[61] As to this initial factual predicate, the challenger also bears the burden of proof and must show facts that negate "any reasonably conceivable" basis for the challenged law. *Srail*, 588 F.3d at 946; *see also Smith v. City of Chicago*, 457 F.3d 643, 651 (7th Cir. 2006); *Gusewelle v. City of Wood River*, 374 F.3d 569, 578 (7th Cir. 2004) ("[T]he burden is upon the challenging party to negate 'any reasonably conceivable state of facts that could provide a rational basis for the classification.'" (citations omitted)).

Given this controlling precedent, this Court declines the Governor's invitation to forego any consideration of the evidence.[62]

### ii.　　　Court's Analytical Inquiries

Essentially, when rational basis applies, the inquiry may be broken down into analytical steps: *first*, the court needs to identify some legitimate government purpose for the challenged law; *second*, the court must examine the relationship between the purpose and the government's chosen approach. If there is a rational relationship between the two (*i.e.*, ends and means), then the Court must uphold the state action. *See W. & S. Life Ins. Co. v. State Bd. of Equalization of California*, 451 U.S. 648, 668 (1981) (adopting a two-part analytical approach to rational basis test).

With respect to the government purpose, the Court needs to identify "some legitimate aim pursued by the legislature. *St. Joan Antida High Sch. Inc. v. Milwaukee Public Sch. Dist.*, 919 F.3d 1003, 1010 (7th Cir. 2019); *Turner v. Glickman*, 207 F.3d 419, 424 (7th Cir. 2000). A government purpose is legitimate where it is "properly cognizable" by the government entity asserting it and "relevant to interests" that the entity "has the authority to implement." *City of*

---

[62] In sum, as explained further herein, this Court must make factual findings based on the record, and then assess, with deference, whether the legislative view of such facts survives rational review as a matter of law; or more specifically here, in assessing injunctive relief, determine how the factual record will play out at a future trial under rational review (*i.e.*, the likelihood of success factor). Rational review does not, as the Governor suggests, dispense with any fact-finding by this Court either now or at trial. *Carolene Products Co.*, 304 U.S. at 152–54. In essence, the Governor conflates the Plaintiffs' factual showing of irrationality and some likelihood of success now, with the subsequent deference the Court will show the government's view of the facts under the rational basis test. This is not the law. Indeed, if the Governor's "no-facts" approach were the law, even the most irrational or arbitrary actions by government officials would go unchecked by the Constitution. *Schweiker*, 450 S. Ct. at 234 (rational basis review must not melt into the "toothless" form of judicial review); *Hadix*, 230 F.3d at 843 ("rational basis review is not a rubber stamp of all legislative action").

*Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 441 (1985). That the Court need only identify "some" purpose "is key" because if the reviewing court can imagine a rational and otherwise lawful purpose, then the court's own "conceivable" purpose will suffice. *St. Joan*, 919 F.3d at 1010. In other words, it is entirely irrelevant for constitutional review "whether the conceived reason" the trial court finds for the challenged law "actually motivated the legislature" to act. *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993); *Nordlinger v. Hahn*, 505 U.S. 1, 15 (1992) (Rational basis review "does not demand . . . that a legislature or governing decisionmaker actually articulate at any time the purpose or rationale supporting its classification."); *Goodpaster*, 736 F.3d at 1071 (same); *United States v. Marshall*, 908 F.2d 1312, 1325 (7th Cir. 1990) ("[T]he Supreme Court tells us that it is enough that a rational basis may be hypothesized, whether or not the legislature acted on it."). This legitimacy of purpose inquiry is also a question of law that falls within the province of the judge. *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 753–54 (1999) (Souter, J., concurring).

With respect to the rationality of the means to further such end, the Court must discern whether there is a rational factual relationship between the legitimate government interest and the challenged law's approach. *Romer v. Evans*, 517 U.S. 620, 631 (1996) (a challenged law must bear "a rational relation to some legitimate end."); *Segovia v. United States*, 880 F.3d 384, 390 (7th Cir. 2018) (citing *Armour v. City of Indianapolis*, 566 U.S. 673, 681 (2012)). If the law's "relationship

to an asserted goal is so attenuated as to render [it] arbitrary or irrational" then the law will be invalidated. *City of Cleburne*, 473 U.S. at 446.

While these two analytical steps remain legal (*i.e.*, purpose and means), both questions invite, and indeed require, an initial consideration of the factual predicates in the case, because a plaintiff has a right to present evidence of irrationality and a law will fail the rational basis test if it relies upon factual assumptions that exceed the "limits of 'rational speculation.'" *Lewis v. Thomas*, 252 F.3d 567, 590 (2d Cir. 2001) (citing *Heller v. Doe*, 509 U.S. 312, 320 (1993)) (holding that legislative speculation, while permissible, must be rational); *Wal-Mart Stores, Inc. v. Texas Alcoholic Beverage Comm'n*, No. 1:15-CV-134-RP, 2017 WL 9481047, at *3 (W.D. Tex. May 22, 2017) (discussing *St. Joseph Abbey v. Castille*, 712 F.3d 215 (5th Cir. 2013) and explaining that the rational basis test is "a highly deferential inquiry, but it is nonetheless a fact-intensive inquiry")). In other words, if the government's factual assumptions are so irrational or arbitrary as to exceed the bounds of "rational speculation," the law cannot stand. *Nordlinger*, 505 U.S. at 11 (explaining that the "relationship" between a challenged law and legitimate aim cannot be "so attenuated as to render" it "arbitrary or irrational."); *Hines v. Quillivan*, 982 F.3d 266, 273 (5th Cir. 2020) ("[W]e have made clear that 'rational' still must be actually rational, not a matter of fiction."); *Greater Houston Small Taxicab Co. Owners Ass'n v. City of Houston, Tex.*, 660 F.3d 235, 239 (5th Cir. 2011) ("[A] necessary corollary to and implication of rationality as a test is that

there will be situations where proffered reasons are not rational." (citations omitted)).

Finally, because the legislative act "may be based on rational speculation unsupported by evidence or empirical data," *F.C.C.*, 508 U.S. at 307, the state need not "produce evidence to sustain" its decision, *Heller*, 508 U.S. at 320–21. Instead, despite any initial fact-finding by the court, the rational basis test commands deference to legislative choice in the end. *F.C.C.*, 508 U.S. at 313 (Rational basis review "is not a license for courts to judge the wisdom, fairness, or logic" of legislative choices *de novo*.); *see also Heller*, 509 U.S. 319; *Goodpaster*, 736 F.3d at 1071 (7th Cir. 2013) (noting that courts must uphold a rational law "even if it is 'unwise, improvident, or out of harmony with a particular school of thought'" (citing *Eby-Brown Co., LLC v. Wisconsin Dep't of Agriculture*, 295 F.3d 749, 754 (7th Cir. 2002)); *Maguire v. Thompson*, 957 F.2d 374 (7th Cir. 1992). This is precisely because the "problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific." *Metropolis Theatre Co. v. Chicago*, 228 U.S. 61, 69–70 (1913). Courts must, therefore, "accept a legislature's generalizations even when there is an imperfect fit between means and ends" because a law can pass muster even if "it is not made with mathematical nicety or because in practice it results in some inequality." *Heller*, 509 U.S. at 321 (internal quotations and citations omitted); *see also Clover Leaf Creamery*, 449 U.S. at 466 ("The Court has made clear that a legislature need not 'strike at all evils at the same time or in the same way.'"

59

(citations omitted)).  Likewise, if there was "evidence before the legislature reasonably supporting the classification, litigants may not procure invalidation of the legislation merely by tendering evidence in court that the legislature was mistaken." *Clover Leaf Creamery* 449 U.S. at 464 ("Although parties challenging legislation under the [Fourteenth Amendment] may introduce evidence supporting their claim that it is irrational[,] they cannot prevail so long as it is evident from all the considerations presented to [the legislature], and those of which we may take judicial notice, that the question is at least debatable.").  Through "faithful adherence to this guiding principle of judicial review of legislation," the courts "preserve to the legislative branch its rightful independence and its ability to function." *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 365 (1973) (citations omitted).

Nevertheless, this requisite independence of the legislative and judicial branches of government is a door that swings both ways; a reviewing court must not let deference become abdication.  If it did, rational basis review would melt into the "toothless" form of judicial review the Supreme Court has consistently cautioned against.  *Schweiker v. Wilson*, 450 U.S. 221, 234 (1981) (citing *Mathews v. Lucas*, 427 U.S. 495, 510 (1976)).  Rational review is not a "rubber stamp," and "there must be a role for active fact-finding, and it must be possible for a plaintiff to prove facts to overcome the presumption of constitutionality." *Pittsfield Dev., LLC v. City of Chicago*, No. 17-CV-1951, 2017 WL 5891223, at *10–11 (N.D. Ill. Nov. 28, 2017) (citations omitted) (denying motion to dismiss where Court could not assess

"hypothesized, unsubstantiated rational bases surmised entirely without the benefit of fact discovery"); *see also Nordlinger*, 505 U.S. at 31 (Stevens, J., dissenting) ("[D]eference is not abdication and 'rational-basis scrutiny' is still scrutiny."); *Hadix v. Johnson*, 230 F.3d 840, 843 (6th Cir. 2000) ("[R]ational basis review is not a rubber stamp of all legislative action."); *Fritz*, 449 U.S. at 184 (Brennan, J., dissenting) (Courts may not be "satisfied by flimsy or implausible justifications for the legislative classification, proffered after the fact by Government attorneys." (citations omitted)); *Johnson v. Robison*, 415 U.S. 361, 374–375 (1974) (noting that a challenged law's classifications "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.").  As the Fifth Circuit aptly summarized, the great deference due to legislative action "does not demand judicial blindness to the history of a challenged rule or the context of its adoption nor does it require courts to accept nonsensical explanations for regulation."  *Castille*, 712 F.3d at 226 (affirming the invalidation of a state economic regulation under rational review); *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, --- U.S. ----, 141 S. Ct. 2485, 2490 (2021) ("It is indisputable that the public has a strong interest in combating the spread of the COVID–19 Delta variant.  But our system does not permit agencies to act unlawfully even in pursuit of desirable ends."); *Klaassen I*, 2021 WL 3073926, at *17 ("To be sure, the Constitution isn't put on the shelf.  Indeed, in times of crisis, perhaps constitutional adherence proves the very anchor we all need against

61

irrational and overweening government intrusion that would otherwise scuttle the ship.").

### iii.     Factual Findings on Irrationality

Having set out the Court's preliminary fact-finding role and subsequent deference in evaluating the "rationality" question, the Court now turns to Plaintiffs' claim that the mandate is irrational on the facts and thus unconstitutional as a matter of law.

The thrust of Plaintiffs' due process challenge is two-fold: (1) the mandate is based on a misconception that vaccinated individuals are less likely to spread the SARS-CoV-2 virus than the unvaccinated and naturally immune; and (2) natural immunity provides incredibly strong protection against infection from COVID-19, and it does so on par with any vaccine protection. Thus, Plaintiffs argue that even if the Order is only subject to the rational basis standard, it irrationally ignores the fact that "natural immunity to COVID-19—that is, immunity caused by infection with COVID-19 and recovery—is incredibly strong" and that there is no discernible difference in protection between the naturally immune and vaccinated. [4] at 2–3 (among other benefits, "antibodies against the spike protein of the COVID-19 virus remain in 98% of people who have recovered from the virus 6 to 8 months after infection" if not longer). In this way, the mandate is not rationally related to its stated goal regarding transmission within the general public, because the vaccines do not actually reduce transmission of the SARS-CoV-2 virus; and "by ignoring natural immunity, the Executive Order articulates an arbitrary and irrational standard that cannot be squared against substantive due process" especially with

respect to individuals like Plaintiff John Halgren, whose "natural immunity likely makes him more immune to contracting and spreading COVID-19 than his counterparts who merely have been vaccinated." [31-1] at 18.

As to both transmission rates and natural immunity, the parties agree on some points, and on others, they disagree. In support, both parties rely on statistical health data, scientific studies and public reports, and Defendants also proffer two medical expert affidavits, [21-1]; [21-2]. As such, the record requires this Court to evaluate the presented issues and evidence. The Court does so below.

### a.  Degree of Transmission

As to virus transmission, Defendants concede, as they must, that "vaccinated people can still acquire and spread COVID-19," but they suggest instead that vaccination might mitigate the *degree* of transmissibility of COVID-19 because the "evidence available" indicates "that they do so at much lower rates." [21-1] ¶ 21 (Defendants' cited study acknowledges vaccines cannot prevent infection). This theory, regarding a possible reduction in the "degree of COVID-19" transmission, remains problematic for several reasons,[63] and it also stands in conflict with the

---

[63] First, Defendants' argument conflates reducing the spread of COVID-19 (*i.e.*, the spread of *symptomatic* infections, or in other words, the mitigation of symptoms) with reducing the spread of SARS-CoV-2 (*i.e.*, the transmission of the virus itself—a separate issue of concern). Second, even though last spring the CDC had previously stated that some studies "suggest that fully or partially vaccinated people who got COVID-19 might be less likely to spread the virus to others," that possibility was based upon evidence suggesting that the *mitigation of symptoms* may differentiate how individuals might carry viral loads: "fully or partially vaccinated study participants had 40 percent less detectable virus in their nose (i.e., a lower viral load), and the virus was detected for six fewer days (i.e., viral shedding) compared to those who were unvaccinated when infected." *CDC COVID-19 Study Shows mRNA Vaccines Reduce Risk of Infection by 91 Percent for Fully Vaccinated People*, CENTERS FOR DISEASE CONTROL AND PREVENTION (June 7, 2021), *available at* https://www.cdc.gov/media/releases/2021/p0607-mrna-reduce-risks.html (last visited Dec. 7, 2021). But, even at that time, the CDC also warned that "these indicators are not a direct measure of a person's ability to spread the virus," *id.*; and the more recent evidence (including CDC reports)

most current evidence that confirms no proven differential in the transmission of the SARS-CoV-2 virus based upon vaccination status for those infected, and that: "clinicians and public health practitioners should consider vaccinated persons who become infected with SARS-CoV-2 to be no less infectious than unvaccinated persons." *See Transmission Potential Study* ("Cumulatively, available data have not clearly or consistently identified markers of reduced transmission potential in vaccinated persons with SARS-CoV-2 infection.").  Nevertheless, this Court need not resolve in detail the viability of Defendant's "degree of transmission" theory.[64]

This Court need not do so because, even though the evidence does not establish that COVID-19 vaccines, in fact, reduce the degree of SARS-CoV-2 viral transmission, the question of whether they *might reduce the rate* of transmission still constitutes an issue falling within the bounds of rational speculation.  *See, e.g.,* A. S. V. Shah, et al., *Effect of Vaccination on Transmission of SARS-CoV-2*, NEW ENG. J. MED. 385;18 (Oct. 28, 2021) *available at* https://www.nejm.org/doi/full/10.1056/nejmc2106757#article_citing_articles (last visited Dec. 13, 2021) (finding it "plausible that vaccination reduces transmission"

---

undermines the existence of any proven material difference in the degree of virus transmission by vaccinated and unvaccinated persons. *See* Phillip P. Salvatore et al., *Transmission potential of vaccinated and unvaccinated persons infected with the SARS-CoV-2 Delta variant in a federal prison, July–August 2021* (Nov. 19, 2021), *available at* https://www.medrxiv.org/content/10.1101/2021.11.12.21265796v1 .full?fbclid=IwAR1TOHSJaum8fUVJ-tXXz69JazCwjW6JvT_LA8a7n_VBuX78eRYziJbQ7os (last visited Dec. 6, 2021) ("Transmission Potential Study").

[64] As to the spread of the virus, however, one can say that there is no evidence to claim that Illinois is facing a "pandemic of the unvaccinated" [33] at 3 (citing statements made by Governor Pritzker), because both vaccinated and unvaccinated persons can readily spread the virus.

even though "data from clinical trials and observational studies are lacking" because there is "empirical evidence suggesting" that "vaccination may reduce transmission by showing that vaccination of health care workers is associated with a decrease in documented cases of Covid-19 among members of their households.").

Consequently, the Defendants' "degree of transmission" theory provides a "conceivable" basis for the mandate under the rational basis test, at least as to those without natural immunity.[65] That is all that the rational basis test requires. *See F.C.C.*, 508 U.S. at 315 (1993) (even without evidence, "rational speculation" is enough, as a matter of law, to uphold legislative choices under rational basis test); *Smith*, 457 F.3d at 651 (legislative choices cannot be overturned by "courtroom factfinding" because laws "may be based on rational speculation unsupported by evidence or empirical data" (citations omitted)); *Nat'l Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1127 (7th Cir. 1995) (even an "imagined" dispute as to a material issue of fact can require "a decision for the state").[66]

---

[65] *See* Ruian Ke et al., *Longitudinal analysis of SARS-CoV-2 vaccine breakthrough infections reveal limited infectious virus shedding and restricted tissue distribution* (Sept. 2, 2021), *available at* https://www.medrxiv.org/content/10.1101/2021.08.30.21262701v1.full.pdf (last visited Dec. 9, 2021) (stating that data indicate "that vaccination shortens the duration of time of high transmission potential, minimizes symptom duration, and may restrict tissue dissemination."); Michael Klompas, *Understanding Breakthrough Infections Following mRNA SARS-CoV-2 Vaccination*, JAMA NETWORK (Nov. 4, 2021), *available at* https://jamanetwork.com/journals/jama/fullarticle/2786040 ("Studies of viral dynamics further suggest that while viral loads in breakthrough infections may be as high in vaccinated individuals as they are in unvaccinated individuals, viral loads in those who are vaccinated decline more rapidly, and the virus that they shed is less likely to be culture-positive than virus shed by unvaccinated individuals").

[66] Putting the vaccine option aside, the record leaves no doubt that the alternative testing option could obviously help to reduce viral transmissions, because vigorous surveillance testing of asymptomatic persons (regardless of vaccination status) promotes early diagnosis and quarantine of infected individuals (as noted above in the background section). *See supra* § I.C (Vaccine Efficacy and Safety).

### b.    Protection of Natural Immunity

There is no scientific dispute that natural immunity exposes the human body to the entire virus and not just the spike protein used by the COVID-19 vaccines to mitigate symptoms; nor is there any dispute that the vaccines themselves are anything more than an artificial attempt to trigger the same biological mechanism of natural immunity: the body's own immune system.[67]  There is, however, a dispute between the parties over the relative protection provided by natural immunity and COVID-19 vaccines.

As required, this Court has examined the record evidence on the issue presented and finds that Plaintiffs have, in fact, made a preliminary showing that that natural immunity equals the material benefits of vaccine-induced protection alone.[68]  *See also* Paul Elias Alexander, *140 Research Studies Affirm Naturally*

---

[67] Upon review, there is currently more data on the durability of natural immunity than there is available data for vaccine immunity; and thus, researchers rely on the expected durability of natural immunity to predict that of vaccine immunity and find that infection-survivors possess a robust immunity response, including as to bone marrow plasma cells, memory T and B cells, spike-specific neutralizing antibodies, and IgG+, in addition to other protections.  *See* Kristen W. Cohen et al., *Longitudinal analysis shows durable and broad immune memory after SARS-CoV-2 infection with persisting antibody responses and memory B and T cells* (Apr. 27, 2021), *available at* https://www.medrxiv.org/content/10.1101/2021.04.19.21255739v1.full.pdf (last visited Dec. 7, 2021) (Infection acquired immunity produces "broad-based immune memory response," including polyfunctional virus-specific T cells generation and "a sustained IgG+ memory B cell response, which bodes well for a rapid antibody response upon virus re-exposure."); *see also* Nina Le Bert et al., *SARS-CoV-2-specific T cell immunity in cases of COVID-19 and SARS, and uninfected controls*, NATURE (July 15, 2020), *available at* https://www.nature.com/articles/s41586-020-2550-z.pdf (last visited Dec. 7, 2021) (finding that infected patients who survived prior coronaviruses retained trigger T cell responses 11 years after recovery).

[68] As the key evidence of the strength of infection-induced immunity, Plaintiffs rely on the State of Israel's experience with COVID-19: "Israel, which is distributing the Pfizer vaccine, has watched as natural immunity has eclipsed vaccine immunity tremendously."  [4] at 3 (citing Sivan Gazit et al., *Comparing SARS-CoV-2 natural immunity to vaccine-induced immunity; reinfections versus breakthrough infections* (Aug. 25, 2021), *available at* https://www.medrxiv.org/content/10.1101/2021.08.24.21262415v1.full.pdf (last visited Dec. 7, 2021) (the "Israel Study")) (5.96 to 13.06-fold "increased risk of breakthrough infection with vaccines over simple [natural] immunity"); *see also* [1] ¶¶ 20–21.  Based on such data, Plaintiffs conclude that

*Acquired Immunity to COVID-19*, BROWNSTONE INSTITUTE (Oct. 17, 2021), *available at* https://brownstone.org/articles/79-research-studies-affirm-naturally-acquired-immunity-to-covid-19-documented-linked-and-quoted/ (last visited Dec. 7, 2021); Kojima N, et al, *A Systematic Review of the Protective Effect of Prior SARS-CoV-2 Infection on Repeat Infection*, Evaluation & the Health Professions (Sept. 20, 2021), *available at* https://journals.sagepub.com/doi/full/10.1177/01632787211047932 (last visited Dec. 19, 2021) ("There is consistent epidemiologic evidence that prior SARS-CoV-2 infection provides substantial immunity to repeat SARS-CoV-2 infection" and "[p]rior SARS-CoV-2 infections provide similar protection when compared to vaccination for SARS-CoV-2."); Stefan Pilz, *SARS-CoV-2 re-infection risk in Austria* (Feb. 11, 2021), *available at* https://onlinelibrary.wiley.com/doi/10.1111/eci.13520 (last visited Dec. 7, 2021) ("Protection against SARS-CoV-2 after natural infection is

---

while "the vaccines have been effective at preventing serious cases and deaths, they lag far behind natural immunity in preventing symptomatic cases of COVID-19, and, therefore, transmission of COVID-19." [1] ¶ 23. Plaintiffs also invoke data from within the United States, including a 52,238-person study conducted within the Cleveland Clinic Health System, which found "very low rates of reinfection among individuals with prior SARS-CoV-2 infection." Nabin K. Shrestha et al., *Necessity of COVID-19 vaccination in previously infected individuals* (June 19, 2021), *available at* https://www.medrxiv.org/content/10.1101/2021.06.01.21258176v3.article-info (last visited Dec. 7, 2021) (recommending prioritizing those without any prior infection for vaccination over those with prior SARS-CoV-2 infection). In their responses, Defendants attack the weight of Plaintiffs' evidence of natural immunity (and thus Plaintiffs' showing of the mandate's alleged irrationality), but these attacks fail to undermine the factual showing that the protective nature of natural immunity is the functional equivalent of vaccination. Here again, however, two important points bear repeating: (1) Defendants have no burden of proof, but to the degree they have presented evidence and argument, this Court has assessed it; and (2) regardless of any findings of fact by this Court about the power of natural immunity, the legislative choice here still prevails in the end under rational review. Given this record, this Court need not recount chapter and verse of its findings regarding the Defendants' offer of proof—suffice to say, this Court finds Defendants' efforts unavailing (including their citation to a fatally-flawed study from Kentucky), but this Court still can surmise more than one "conceivable basis" for the mandate within the bounds of rational speculation.

comparable with the highest available estimates on vaccine efficacies.").[69]  Given

such studies and the general benefits of natural immunity established over the last

---

[69] *See, e.g.*, Anu Haveri et al., *Persistence of neutralizing antibodies a year after SARS-CoV-2 infection in humans*, EUR. J. OF IMMUNOLOGY (Sept. 27, 2021), *available at* https://onlinelibrary.wiley.com/doi/epdf/10.1002/eji.202149535 (last visited Dec. 7, 2021); Amin Addetia et al., *Neutralizing Antibodies Correlate with Protection from SARS-CoV-2 in Humans during Fishery Vessel Outbreak with a High Attack Rate*, J. OF CLINICAL MICROBIOLOGY (Oct. 21, 2020), *available at* https://journals.asm.org/doi/10.1128/JCM.02107-20 (last visited Dec. 7, 2021); Victoria Jane Hall et al., *SARS-CoV-2 infection rates of antibody-positive compared with antibody-negative health-care workers in England: a large, multicentre, prospective cohort study*, LANCET (Apr. 9, 2021), *available at* https://www.thelancet.com/action/showPdf?pii=S0140-6736%2821%2900675-9 (last visited Dec. 7, 2021); Claudia Gonzalez et al., *Live virus neutralization testing in convalescent patients and subjects vaccinated against 19A, 20B, 201/501Y.VI and 20H/501Y.V2 isolates of SARS-CoV-2* (May 11, 2021), *available at* https://www.medrxiv.org/content/10.1101/2021.05.11.21256578v1.full.pdf (last visited Dec. 7, 2021); Sheila F. Lumley et al., *Antibody Status and Incidence of SARS-CoV-2 Infection in Health Care Workers*, N. ENG. J. MED. (Feb. 11, 2021), *available at* https://www.nejm.org/doi/full/10.1056/NEJMoa2034545 (last visited Dec. 7, 2021) (Oxford University Hospitals conducted a study of 12,541 health care works and found that "previous infection resulting in antibodies to SARS-CoV-2 is associated with protection from reinfection for most people for at least 6 months" and that the evidence of "post-infection immunity was also seen when anti-nucleocapsid IgG or the combination of anti-nucleocapsid and anti-spike IgG was used as a marker of previous infection."); J.M. Dan et al., *Immunological memory to SARS-CoV-2 assessed for up to 8 months after infection*, SCIENCE 371 (Feb. 5, 2021), *available at* https://www.science.org/doi/epdf/10.1126/science.abf4063?adobe_mc=MCMID%3D8307287400903382 86121846337833289975538%7CMCORGID%3D242B6472541199F70A4C98A6%2540AdobeOrg%7CT S%3D1638923653 (last visited Dec. 7, 2021) (In a longitudinal study of immunological memory to SARS-CoV-2, about 95 percent of individuals retained immunity for up to eight months after infection based on measurements of antibodies, memory B cells, and CD4 and CD8 T cells); Jackson S. Turner et al., *SARS-CoV-2 infection induces long-lived bone marrow plasma cells in humans*, NATURE (May 24, 2021) (analyzing bone marrow plasma cells of recovered COVID-19 patients and reporting durable evidence of antibodies for at least 11 months after infection, describing "robust antigen-specific, long-lived humoral immune response in humans"); Ewen Callaway, *Had COVID? You'll probably make antibodies for a percent lifetime*, NATURE (May 27, 2021), *available at* https://www.nature.com/articles/d41586-021-01442-9 (last visited Dec. 7, 2021) ("The study provides evidence that immunity triggered by SARS-CoV-2 infection will be extraordinarily long-lasting" and "people who recover from mild COVID-19 have bone-marrow cells that can churn out antibodies for decades"); Tyler J. Ripperger et al., *Orthogonal SARS-CoV-2 Serological Assays Enable Surveillance of Low-Prevalence Communities and Reveal Durable Hemoral Immunity*, IMMUNITY (Nov. 17, 2020), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7554472/pdf/main.pdf (last visited Dec. 7, 2021).  The Governor's own experts also cite studies recognizing the strength of natural immunity and the well-established complexity of a person's natural immune system beyond antibody levels. [21-1] ¶ 25 (citing Turner, J.S., E. et al., S*ARS-CoV-2 infection induces long-lived bone marrow plasma cells in humans*, NATURE Vol. 595 at 421–25 (May 24, 2021), https://www.nature.com/articles/s41586-021-03647-4. (last visited Dec. 7, 2021) ("Overall, our results indicate that mild infection with SARS-CoV-2 induces robust antigen-specific, long-lived humoral immune memory in humans.")); *see also* Rebecca J. Cox and Karl A Brokstad, *Not just antibodies: B cells and T cells mediate immunity to COVID-19*, NATURE REVIEWS IMMUNOLOGY (Aug. 24, 2020), *available at* https://www.nature.com/articles/s41577-020-00436-4 (last visited Dec. 7, 2021) ("It is

century of science, it is not surprising that the European Union (among other authorities) considers proof of recovery from infection as the functional equivalent to vaccination.

Nevertheless, Plaintiffs fail to show that the benefits of vaccination on top of natural immunity (and thus combining both forms of protection via hybrid immunity) exceeds the bounds of rational speculation as a "conceivable basis" for the mandates under the rational review test.[70] *F.C.C.*, 508 U.S. at 315 (rational speculation is sufficient); *Vance*, 440 U.S. at 110–11. As such, totally apart from

---

important to remember that memory B cells and T cells may be maintained even if there are not measurable levels of serum antibodies."); *Antibody Testing Is Not Currently Recommended to Assess Immunity After COVID-19 Vaccination*, U.S. FOOD AND DRUG ADMINISTRATION (May 19, 2021), *available at* https://www.fda.gov/medical-devices/safety-communications/antibody-testing-not-currently-recommended-assess-immunity-after-covid-19-vaccination-fda-safety (last visited Dec. 7, 2021); Yair Goldberg et al., *Protection of previous SARS-CoV-2 infection is similar to that of BNT 162b2 vaccine protection: A three-month nationwide experience from Israel* (Apr. 24, 2021), *available at* https://www.medrxiv.org/content/10.1101/2021.04.20.21255670v1.full.pdf (last visited Dec. 7, 2021), (another study from Israel questions the need to vaccinate previously infected persons, and ultimately finds that both natural immunity and vaccination were fairly effective at preventing future harm to patients); *CDC admits having no evidence of naturally immune infecting others*, ISRAEL NATIONAL NEWS (Nov. 22, 2021), *available at* https://www.israelnationalnews.com/news/317349 (last visited Dec. 9, 2021) (In response to a Freedom of Information Act (FOIA) request for records, CDC stated a search of their records failed to reveal any documented case of viral transmission by a naturally immune individual to another person, and that their Emergency Operations Center said such information is not even collected).

[70] While it is enough "that a rational basis may be hypothesized" by courts for a law to survive rational basis review, this Court has the added benefit of Defendants' arguments supporting the hybrid-immunity theory, and as they aptly note, the mandate likely survives the rational basis test based on hybrid immunity. *Marshall*, 908 F.2d at 1325. The Israel Study itself (cited by Plaintiffs) speculated that previously infected people who receive a single dose of the vaccine might possibly enjoy greater protection against the Delta variant of SARS-CoV-2. [21] at 19–20 (While not statistically significant, the data from "Model-3 of the study" suggests that "hybrid immunity is more effective than previous immunity alone."); *see also* [21-2] ¶ 36 ("Plaintiffs completely ignore the Model-3 hybrid immunity theory which shows a lower rate of hospitalization in the vaccinated group. These results support other evidence that suggests that hybrid immunity is more effective than vaccination or previous infection immunity alone."). Here, Plaintiffs do not address, much less counter with facts, the possible benefits of combining vaccine-induced and natural-immunity protections.

viral transmission levels, the mandate survives constitutional scrutiny here, because the state may conceivably use vaccination (or the testing alternative) to help reduce COVID-19 symptoms, even as to the group with natural immunity. As to persons with natural immunity who choose the vaccination option, the added potential protection of hybrid immunity might reduce the severity of symptoms in the unlikely event of symptomatic reinfection with a variant;[71] and, as to persons with natural immunity who choose the testing option, an early diagnosis could permit more effective use of therapeutics in the same scenario. In either case, the mandate could mitigate potential COVID-19 symptoms in these healthcare workers, decrease the number of the sick days they take, and thus protect the public at large by increasing the number of hours they can work serving the public. These hours are, by themselves, a vital public resource, especially during a pandemic.

As the First Circuit noted in *Does 1-6 v. Mills*, promoting vaccination in health care facilities to mitigate symptoms of their employees is a conceivable rational basis to "ensure that healthcare workers remain healthy and able to provide the needed care to an overburdened healthcare system." 16 F.4th 20, 30–31 (1st Cir. 2021). *But see State of Missouri v. Joseph R. Biden, Jr.,* Case No. 21-CV-01329-MTS, 2021 WL 5564501, at \*7 (E.D. Mo. Nov. 29, 2021) (considering all the evidence presented and issuing an injunction against a federal vaccine mandate for

---

[71] *See* Stefan Pilz et al., *SARS-CoV-2 re-infection risk in Austria* (Feb. 13, 2021), *available at* https://onlinelibrary.wiley.com/doi/10.1111/eci.13520 (last visited Dec. 9, 2021) (Study of over 8,885,640 persons revealed a COVID-19 reinfection risk of .07–.13 percent); Eamon O. Murchu, *Quantifying the risk of SARS-CoV-2 reinfection over time* (May 27, 2021), *available at* https://onlinelibrary.wiley.com/doi/10.1002/rmv.2260 (last visited Dec. 9, 2021) (Systemic review of cohort studies found that: "Reinfection was an uncommon event (absolute rate 0%–1.1%), with no study reporting an increase in the risk of reinfection over time.").

health care workers under the Administrative Procedure Act, 5 U.S.C. § 553; 42 U.S.C § 1395hh(b)(1), as "arbitrary and capricious" because "the evidence does not show a rational connection to support implementing the vaccine mandate, the mandate's broad scope, the unreasonable rejection of alternatives to vaccination, [the defendant's] inadequate explanation for its change in course, and its failure to consider or properly weigh reliance interests.").

### iv.    Ultimate Findings on Rational Basis

Even though the record establishes the robust nature of natural immunity, and the lack of proof that the COVID-19 vaccines do, in fact, reduce the degree of transmission of the SARS-CoV-2 virus, the Plaintiffs have still failed to make the "heavy legal lift" required under rational basis review. *Valenti*, 889 F.3d at 430. Under the deferential standard, the challenger faces "an onerous test" as "the burden is upon the challenging party to eliminate any reasonably conceivable state of facts that could provide a rational basis" for the law. *Srail*, 588 F.3d at 946 (citing *Smith*, 457 F.3d at 652). As a matter of law, the Plaintiffs have failed to do so here.

Plaintiff fail because this Court has found, as discussed above, "conceivable" grounds for the mandate, and therefore on the present record, this Court cannot say that the relationship between the government's legitimate ends (*i.e.*, decreasing the possible degree of viral transmission, or possibly decreasing the number of sick days taken by healthcare workers during a pandemic, including those with natural immunity) is "so attenuated" from the chosen means (*i.e.*, compelling healthcare workers to either submit to vaccination or surveillance testing) as to be arbitrary,

irrational, or otherwise beyond the bounds of reasonable speculation. As the Supreme Court says, the "problems of government are practical ones and they may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific." *Metropolis Theater,* 228 U.S. at 69–70; *see also Marshall*, 908 F.2d at 1325 ("Judges assess the validity of legislative decisions" but "[e]ven laws that resulted from mistakes in the drafting process or ignorance in the halls of Congress survive if a rational basis may be supplied for the result.") (citations omitted); Nat'l Paint, 45 F.3d at 1127 ("The [legislature's] power to decide, to be wrong as well as to be right on contestable issues, is both privilege and curse of democracy.").[72]

---

[72] Indeed, in many ways, the mandate may not be, in fact, the most logical or scientific approach. For example, as noted above, transmission by asymptomatic individuals, regardless of vaccination status, may account "for more than half of all transmission' and it is likely that "the identification and isolation of persons with symptomatic COVID-19 alone will not control the ongoing spread of SARS-CoV-2." *See supra* note 29. Therefore, leaving the volume of vaccinated persons untested (which obviously represents the majority) presents a greater potential danger as compared to the risk posed by the smaller group of unvaccinated and asymptomatic persons, because the combination of high vaccination rates and uncontrolled transmission may lead to the development of more deadly strains of the virus. In other words, even though vaccines themselves do not cause the virus to mutate, the under-testing of asymptomatic persons can lead to more viral replication, especially in highly vaccinated populations, and that increased replication, in turn, leads to new variants in conjunction with the evolutionary stress vaccines place on the virus. *See* Simon A. Rella, *Rates of SARS-CoV-2 transmission and vaccination impact the fate of vaccine-resistant strains*, NATURE PORTFOLIO (Scientific Reports) (July 20, 2021), *available at* https://www.nature.com/articles/s41598-021-95025-3.pdf (last visited Dec. 7, 2021) ("[A] counterintuitive result of our analysis is that the highest risk of resistant strain establishment occurs when a large fraction of the population has already been vaccinated but the transmission is not controlled" and persons "[f]ully vaccinated were more likely than unvaccinated persons to be infected by variants carrying mutations associated with decreased antibody neutralization" and in "unvaccinated cases, most viruses consisted of non-resistant" variants); *see also* Kasen K. Riemersma et al., *Shedding of Infectious SARS-CoV-2 Despite Vaccination when the Delta Variant is Prevalent—Wisconsin, July 2021* (Aug. 11, 2021), *available at* https://www.medrxiv.org/content/10.1101/2021.07.31.21261387v2.full.pdf (last visited Dec. 7, 2021); Venice Servellita et al., *Predominance of antibody-resistant SARS-CoV-2 variants in vaccine breakthrough cases from the San Francisco Bay Area, California* (Oct. 8, 2021), *available at* https://www.medrxiv.org/content/10.1101/2021.08.19.21262139v2.full.pdf (last visited Dec. 7, 2021) ("Overall, fully vaccinated cases were significantly more likely than unvaccinated cases to be infected by resistant variant"). In short, the more a virus is allowed to spread, the more chances it gets to randomly change, and thus, general surveillance testing (in conjunction with symptom-based or exposure-based testing) of both unvaccinated *and* vaccinated persons plays a vital role in the interruption of transmission of SARS-CoV-2; and it does so because the identification of asymptomatic infection by general surveillance testing permits rapid mitigation efforts (i.e.,

This is enough to doom Plaintiffs' substantive due process challenge;[73] and therefore, Plaintiffs have not demonstrated a likelihood of success on the merits of their substantive due process claim. *St. Joan*, 919 F.3d at 1010 (if the reviewing court can imagine a rational and otherwise lawful purpose, then the court's own "conceivable" justification will suffice); *Fritz*, 449 U.S. at 179 (Once a plausible and rational basis for the legislation is identified, the court's inquiry "is at an end.").

## 2. Procedural Due Process

The fundamental right of procedural due process is "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). To demonstrate a procedural due process violation at trial, the plaintiff must establish: (1) a cognizable liberty or property interest; (2) a deprivation of that interest; and (3) a denial of due process. *Khan*, 630 F.3d at 527. Under the deprivation prong, this Court employs a three-factor test, weighing the "nature of the private interest at stake, the risk of decisional error, and the government's interest." *Vargas v. Cook Cty. Sheriff's Merit Bd.*, 952 F.3d 871, 874 (7th Cir. 2020) (citing *Mathews*, 424 U.S. at 335). Before turning to deprivation, though, Plaintiffs must identify a constitutionally protected liberty or property interest under

---

quarantining, contact-tracing). Ostensibly, the mandate here appears to disregard the need for general surveillance testing and instead targets only the unvaccinated with the surveillance testing; The mandate, nevertheless, survives constitutional scrutiny.

[73] What's more, this same result holds true even if there's a possibility that later scientific studies might prove that hybrid immunity is immaterial to patient outcomes, or if subsequent proof might ultimately end any further speculation about the ability of vaccines to reduce the degree of viral transmission. *Clover Leaf Creamery*, 449 U.S. at 464 (rational speculation prevails even if the future evidence might show that the "legislature was mistaken.").

procedural due process. *Santana v. Cook Cty. Bd. of Rev.*, 679 F.3d 614, 621 (7th Cir. 2012). On this preliminary factual record, Plaintiffs have failed to do so.

The thrust of Plaintiffs' procedural due process challenge is that "the Executive Order is illegal under Illinois law, and therefore violates Plaintiffs' rights to procedural due process," [4] at 6. In response, the Governor raises the shield of sovereign immunity. [21] at 24–27. Plaintiffs respond that their claim is purely constitutional (and therefore federal) in nature, [31-1] at 13; the Governor replies that "Plaintiffs' procedural due process argument is based solely on the Governor allegedly exceeding his authority under [state law]," [21] at 26. As explained below, sovereign immunity precludes part, but not all, of Plaintiffs' challenge under procedural due process.

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The doctrine of sovereign immunity prevents private individuals from suing a state (or state officials acting in their official capacities) in federal court without the state's consent. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984) ("A claim that state officials violated state law in carrying out their official responsibilities is a claim against the State that is protected by the Eleventh Amendment."). Thus, federal courts cannot instruct state officials on "how to conform their conduct to state law" as "it is difficult to think of a greater intrusion

74

on state sovereignty." *Id.* at 106. To do so would conflict directly with the

"principles of federalism that underlie the Eleventh Amendment." *Id.*

While powerful, "sovereign immunity is not absolute immunity." *Council 31*

*Am. Fed'n of State, Cnty. & Mun. Emps. v. Quinn*, 680 F.3d 875, 882 (7th Cir. 2012).

The *Ex parte Young* doctrine, 209 U.S. 123 (1908), creates an important caveat:

"private parties [can] sue individual state officials for prospective relief to enjoin

ongoing violations of federal law," *MCI Telecommunications Corp. v. Illinois Bell*

*Tel. Co.*, 222 F.3d 323, 337 (7th Cir. 2000) (citations omitted). The doctrine assumes

that "a suit challenging the constitutionality of a state official's action in enforcing

state law is not one against the state." *Green v. Mansour*, 474 U.S. 64, 68 (1985);

*see also Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 254–55 (2011) ("[The

doctrine] rests on the premise—less delicately called a 'fiction'—that when a federal

court commands a state official to do nothing more than refrain from violating

federal law, he is not the State for sovereign-immunity purposes." (internal citation

omitted)). To ascertain whether *Ex parte Young* applies, the Court must "conduct a

straightforward inquiry into whether [Plaintiffs'] complaint alleges an ongoing

violation of federal law and seeks relief properly characterized as prospective."

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (internal

quotation marks and citations omitted).

Here, Plaintiffs sue a state official (Governor Pritzker) in his official capacity,

and they seek prospective relief. *Pennhurst*, 465 U.S. at 102–03 ("[W]hen a plaintiff

sues a state official alleging a violation of federal law, the federal court may award

an injunction that governs the official's future conduct, but not one that awards retroactive monetary relief."); *MCI Telecommunications*, 222 F.3d at 345 (finding request for injunctive relief to be prospective, despite the fact that "proof for the claim necessitating relief can be based on historical facts, and most often will be." (quoting *Entergy, Arkansas, Inc. v. Nebraska*, 210 F.3d 887, 898 (8th Cir. 2000))). The Governor does not dispute these aspects of Plaintiffs' case. [21] at 24–25. Instead, the central dispute between the parties is whether the present suit seeks prospective relief against an "ongoing violation of *federal* law." *MCI Telecommunications*, 222 F.3d at 337.

Without doubt, sovereign immunity bars any claims against the Governor in his official capacity for alleged violations of Illinois law—including whether Governor Pritzker exceeded his authority under the EMAA. While "individual state officials may be sued personally for federal constitutional violations committed in their official capacities" that "principle does not extend to claims that officials violated state law in carrying out their official responsibilities." *Cassell I*, 458 F. Supp. 3d at 999 (cleaned up). In *Cassell*, a church and pastor challenged Governor Pritzker's stay-at-home orders, arguing that the restrictions violated the First Amendment's Free Exercise Clause, Illinois' Religious Freedom Restoration Act ("RFRA"), the Illinois Department of Health Act ("IDPHA"), and notably, the EMAA. *Id*. at 987. The court looked to *Goodman v. Carter*, No. 2000 C 948, 2001 WL 755137, at *1 (N.D. Ill. July 2, 2001), for guidance. In *Carter*, the court had concluded that state-law claims "may not be entertained under this court's

supplemental jurisdiction simply because a proper § 1983 claim is also presented," *id*. at *10, and the *Cassell I* court agreed: "For the same reason, the Eleventh Amendment almost certainly forecloses Plaintiffs' state law claims here," *Cassell I*, 458 F. Supp. at 999.

On appeal the Seventh Circuit found that "the Eleventh Amendment may completely bar the plaintiffs' state-law claims" *including* "plaintiffs' request to enjoin Governor Pritzker" from "misusing his emergency powers." *Cassell v. Snyders*, 990 F.3d 539, 551 (7th Cir. 2021) ("*Cassell II*"). The court understood that the alleged violation of the EMAA sounded in state law, and the same understanding applies here.

Notably, *Cassell II* also added a layer of nuance to *Cassell I*. On appeal, plaintiffs argued that Governor Pritzker (among other defendants) deprived them of liberty without minimal procedural protections guaranteed by the Fourteenth Amendment when they failed to comply with substantive provisions of Illinois law (namely, by failing to follow the hearing process outlined in the Illinois Department of Public Health Act). *Cassell II*, 990 F.3d at 551. In rejecting plaintiffs' *post-hoc* attempt to reframe their arguments below, the court noted that "while the plaintiffs argued before the district court that the defendants ignored state-law procedures for closing down premises, they did not make the *very different* argument that the alleged state-law procedural violations amounted to federal due process violations." *Id*. (emphasis added). Based on the plaintiffs' failure to raise the argument below,

their "attempt to constitutionalize their state-law procedural argument [was] thus forfeited because it [was] new on appeal." *Id.*

Likewise, in *Village of Orland Park*, a trial court found that the Eleventh Amendment barred related claims against the Governor in his official capacity for alleged violations of Illinois state law. 475 F. Supp. at 878, 887–88. There, plaintiffs brought several state law claims against the Governor, including (as relevant here) claims that the Governor violated the Illinois Constitution by: (1) issuing executive orders that exceeded his authority; and (2) failing to present the Executive Order to the Illinois General Assembly for approval. *Id.* at 878, 889. The court also considered a *federal* claim that the Governor violated the plaintiffs' procedural due process rights under the Fourteenth Amendment by failing to comply with the requirements of the IDPHA when he issued the Executive Orders. *Id.* at 877. While the Governor did not invoke "sovereign immunity as a defense to Plaintiffs' federal constitutional claims," *id.* at 888, the court read the plaintiffs' theory as the "Governor failed to comply with the requirements of Illinois state law prior to issuing the Executive Orders." *Id.* at 883. Therefore, because "there is no constitutional procedural due process right to state-mandated procedures," the court found that plaintiffs failed to "establish[ ] a federal constitutional violation." *Id.* (discussing *GEFT Outdoors*, 922 F.3d at 366).[74]

---

[74] The facts set forth in the Complaint in this case invite a variety of other state law claims. For example, the complaint provides that the Plaintiffs may be entitled to certain procedural due process protections under the Emergency Medical Services (EMS) Systems Act, 210 ILCS 50/3.40, which states that an "EMS Medical Director may suspend any EMS personnel, but [they] must first be given a hearing before the local system review board." [1] ¶ 34. Given that there are no constitutional procedural due process rights to state-mandated procedures, *GEFT Outdoors*, 922 F.3d at 366, all such claims belong in another forum.

Here, as in *Village of Orland Park* and *Cassell II*, this Court finds that, to the extent Plaintiffs' procedural due process challenge turns on the Governor's authority under the EMAA (or other state law theories), that challenge is barred by the Eleventh Amendment.[75]

On the other hand, the question of whether the mandate also violates the guarantees of the Fourteenth Amendment by depriving Plaintiffs of a protected property interest *in their employment*—a sufficiently different question—is a federal one. *See Cassell II*, 990 F.3d at 551; *Brown v. Ga. Dep't of Revenue*, 881 F.2d 1018, 1023 (11th Cir. 1989) ("Under *Pennhurst*, however, the determinative question is not the relief ordered, but whether the relief was ordered pursuant to state or federal law."). Thus, this Court finds that the Eleventh Amendment does not bar a federal procedural due process claim based on the right to work.

Nevertheless, Plaintiffs have not shown a sufficient procedural due process violation of federal law based on this theory. In *Board of Regents v. Roth*, the Supreme Court made plain that to have a "property interest in a benefit, a person must have more than an abstract need or desire for it. He must have more than a

---

[75] At oral argument, Plaintiffs' counsel renewed the argument that the "reference, in both the Complaint and the Petition, to the Illinois Emergency Management Act was to demonstrate, *as the Complaint states explicitly*, 'what the statute does not state.'" [31-1] at 14; *see also* [45] 37:22–38:24. To support the notion that the Governor acted absent statutory authority, Plaintiffs invoke *Village of Orland Park*. [31-1] at 14. But there, the court rejected a similar argument against sovereign immunity on the grounds that: "the Governor was not acting without any authority whatsoever. To the contrary, by statute, the Governor has sweeping powers in the event a disaster strikes all or part of Illinois." 475 F. Supp. 3d at 888 (citing 20 ILCS 3305/7). Therefore, while "he may or may not have *exceeded* his statutory powers or violated the Illinois Constitution by issuing the Executive Orders," the Governor nonetheless was ostensibly "acting *pursuant* to an Illinois statute and simply exceeding the scope of his powers under the statute, without more, would fail to make his actions *ultra vires*." *Vill. of Orland Park*, 475 F. Supp. 3d at 888 (emphases added).

unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." 408 U.S. 564, 577 (1972) (finding no protected property interest where state university declined to renew one-year fixed-term employment contract). It follows that a "legitimate claim of entitlement" is "one that is legally enforceable—one based on statutes or regulations containing explicitly mandatory language that links specified substantive predicates to prescribed outcomes." *Miller v. Crystal Lake Park Dist.*, 47 F.3d 865, 867 (7th Cir. 1995) (cleaned up). Here, the only support for Plaintiffs' procedural due process claim based on a protected "employment interest" appears not in the complaint (which fails to properly distinguish between procedural and substantive due process), but rather in one sentence in the petition (intertwined with a discussion on substantive due process): "Further, it is beyond doubt that the right to earn a living is a protected right under the Fourteenth Amendment." [4] at 7. Beyond this cursory glance, Plaintiffs state only that "even if an employee has no property interest in continued *public* employment, the determination to terminate or not renew a public employment contract cannot be premised upon the employee's protected activities." [38] at 3 (emphasis in original). On this scant record, Plaintiffs have not established the kind of "legitimate claim" contemplated in *Roth*. Nor, for that matter, have Plaintiffs demonstrated factually that any termination of their employment is otherwise predicated upon an exercise of any "protected activities." The Order permits those who refuse vaccination to continue working as long as they submit to surveillance testing, and Plaintiffs have not sufficiently developed any

factual basis for finding surveillance testing to be a violation of procedural due process.

Ostensibly, Plaintiffs also appear to assert, in passing, another potential deprivation of a protected property interest—occupational liberty. [31-1] at 13. Plaintiffs contend that the Petition "seeks to enforce Plaintiffs' procedural due process rights to follow a trade, profession or other calling" because, Plaintiffs assert, the "challenged Executive Order not only threatens their ability to work for their present employer," but it also "threatens their ability to work as EMS providers altogether." *See id.* (citing *Wroblewski v. City of Washburn*, 965 F.2d 452, 455 (7th Cir. 1992)).

"Occupational liberty" encompasses the "liberty to pursue a calling or occupation, and not the right to a specific job" meaning that Plaintiffs have a liberty interest encompassing their freedom to work in a chosen profession—as EMS providers. *Wroblewski*, 965 F.2d at 455 (citing *Lawson v. Sheriff of Tippecanoe County*, 725 F.2d 1136, 1138 (7th Cir. 1984)); *see also Illinois Psychological Ass'n v. Falk*, 818 F.2d 1337, 1344 (7th Cir. 1987) ("Being a psychologist is an occupation; being a member of a hospital's medical staff is not."). But Plaintiffs have not established that the Order denies them the opportunity to work as EMS providers— instead, on its face, the Order permits Plaintiffs to continue working as paramedics so long as they agree to submit to weekly tests. In this way, the soft mandate is not a blanket prohibition effectively cutting off the ability to pursue a chosen occupation. Given the limited factual record (and Plaintiffs' failure to properly

81

develop separate procedural and substantive due process theories), this Court cannot say that Plaintiffs have demonstrated that the Order amounts to an unreasonable government interference with their right to earn a living.

Consequently, Plaintiffs have failed to establish a likelihood of success on their procedural due process claim. *See, e.g.*, *Cassell II*, 990 F.3d at 551 ("The plaintiffs forfeited this claim for purposes of their motion for a preliminary injunction. The plaintiffs' complaint framed their due process claim only in explicitly substantive rather than procedural terms."); *United States v. Olmeda-Garcia*, 613 F.3d 721, 723 (7th Cir. 2010) (Where a party's "arguments are underdeveloped" the court need not "rule on the issue."); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

### 3. Equal Protection

The Equal Protection Clause of the Fourteenth Amendment provides that no state shall make or enforce a law that denies to any person within its jurisdiction the equal protection of the laws. U.S. Const. amend. XIV. This is "essentially a direction that all persons similarly situated should be treated alike." *St. Joan*, 919 F.3d at 1008. At worst, an equal protection violation occurs either where "a regulation draws distinctions among people based on a person's membership in a 'suspect' class [or] based on denial of a fundamental right." *Srail*, 588 F.3d at 943 (internal citations omitted). Race, alienage, and national origin have long been recognized as "suspect classes." *Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 1000 (7th Cir. 2006). In the "absence of deprivation of a fundamental right or the

existence of a suspect class," the proper standard of review is the rational basis test. *Srail*, 588 F.3d at 943. Thus, if there is no suspect class or fundamental right at issue, differential treatment is presumed to be valid, so long as it is "rationally related to a legitimate state interest." *City of Cleburne*, 473 U.S. at 439–40.

In select equal protection cases, however, a court may adopt a more critical lens, even in the absence of a suspect class or fundamental right. Specifically, where a law exhibits a "desire to harm a politically unpopular group," the Supreme Court has "applied a more searching form of rational basis review to strike down such laws under the Equal Protection Clause." *Lawrence*, 539 U.S. at 580 (O'Connor, J., concurring); *see also Romer*, 517 U.S. at 633 ("If the adverse impact on the disfavored class is an apparent aim of the legislature, its impartiality would be suspect.") (citing *Fritz*, 449 U.S. at 181 (Stevens, J., concurring)); *Pyler v. Doe*, 457 U.S. 202, 224 (1982) ("In light of these countervailing costs, the discrimination contained in [the challenged law] can hardly be considered rational unless it furthers some substantial goal of the State."); *Bishop v. Smith*, 760 F.3d 1070, 1099 (10th Cir. 2013) (Holmes, J., concurring) ("Sometimes the animus cases are said to apply 'heightened rational-basis review,' or—more colorfully—'rational basis with bite,' 'rational basis with teeth,' or 'rational basis plus.'" (internal citations omitted)). This "more searching" form of rational basis review has been used to invalidate laws in a variety of contexts, including cases irrationally targeting groups based on low-income housing arrangements, *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 537–38 (1973); sexual orientation cases, *Romer*, 517 U.S. at 635;

marriage equality cases, *United States v. Windsor*, --- U.S. ----, 133 S. Ct. 2675 (2013); and still others, *Jimenez v. Weinberger*, 417 U.S. 628, 632–37 (1974) (applying heightened scrutiny to strike down statutory provision that differentiated between two groups of illegitimate children).

The case of *Pyler v. Doe*, 457 U.S. 202 (1982), illustrates this heightened form of rational basis review. In *Pyler*, the Supreme Court considered a challenge to a state statute that withheld funding for the education of children who were not legally admitted into the United States and authorized public schools to deny enrollment to these children. At the outset, the Court rejected the argument that undocumented immigrants were a suspect class or that public education was a fundamental right. *Id.* at 216–17. Nevertheless, the Court applied a heightened form of scrutiny, and required that the challenged statute further a "substantial goal" of the state based on the human cost of the law. *Id.* at 224. The Court stated that it was "difficult to conceive of a rational justification for penalizing" children for "a legal characteristic over which [they] have little control." *Id.* at 220. Notably, the Court also examined the evidentiary record, found that it failed to support the contention that the law furthered the state's proffered interests, and then second-guessed the legislative choice: "[T]here is no evidence in the record suggesting that illegal entrants impose any significant burden on the State's economy," and "the record is clear that many of the undocumented children disabled by this classification will remain in this country indefinitely, and that some will become lawful residents or citizens of the United States." *Id.* at 228–30. Thus, the Court

invalidated the measure where it was "difficult to understand precisely what the State hopes to achieve by promoting the creation and perpetuation of a subclass of illiterates within our boundaries." *Id.* at 230.

Based on this precedent, this Court must assess Plaintiffs' equal protection claim under traditional rational basis review, absent the existence of a suspect class or deprivation of a fundamental right (which are subject to strict scrutiny), or the existence of a special circumstance, such as political animus (which is subject to heightened rational basis review). Plaintiffs identify two classes that the disputed mandates treat differently: the vaccinated and the unvaccinated (including those with and without natural immunity). *See* [33] at 8. While the mandates undoubtedly treat the groups differently, Plaintiffs have not identified any legal support for the notion that vaccination status alone is a traditional suspect (or quasi-suspect) class within the meaning of the Equal Protection Clause.[76] Nor, as discussed above, have Plaintiffs established that the rights involved constitute "fundamental rights" under the Constitution.

Plaintiffs do claim, however, that the unvaccinated constitute a politically demonized group, which the mandate seeks to harm. [33] at 3. In promulgating the Order, Plaintiffs argue, the Governor (and other political leaders) expressed "palpable hostility to the unvaccinated," further demonstrating that the purpose of the mandate is punitive, rather than ameliorative. *Id.* at 7. If the purpose of the

---

[76] Likewise, as to their surveillance testing challenge, Plaintiffs fail to develop the theory that vaccination-status plus natural immunity constitutes a suspect class or involves fundamental rights under equal protection, nor have Plaintiffs otherwise asserted any disparate impact theory as to any other suspect class or marginalized group.

mandate is to punish, as Plaintiffs suggest, the Court should review the mandate more strictly. *Id.* (citing *Romer*, 517 U.S. at 633 ("If the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare . . . desire to harm a politically unpopular group cannot constitute a legitimate government interest.")). Specifically, Plaintiffs point to the Governor's effort to unjustly demonize vaccine-hesitant persons with the false statements that the "unvaccinated make up 99% of the deaths that are occurring in the State of Illinois," and further that the current public health crisis is a "pandemic of the unvaccinated." *Id.* In so doing, Plaintiffs endeavor to invoke a more searching form of judicial review.

Given the preliminary factual record, however, Plaintiffs have failed to show that the statements made by the Governor constitute sufficient evidence of animus and thus, absent more facts, traditional rational basis review governs their equal protection challenge. *Cf. Dr.A v. Hochul*, No. 21A145, --- S. Ct. ----, 2021 WL 5873126, at *3 (U.S. Dec. 13, 2021) (Gorsuch, J. and Alito, J., dissenting) (discussing overt proof of a vaccine mandate's "animus" as to those seeking religious exemptions under the first amendment).

Under the rational basis test and factual record presented, Plaintiffs have also failed to show that the mandate's differential treatment of the vaccinated and unvaccinated violates equal protection. As explained during this Court's substantive due process analysis, a "conceivable" rational basis supports the mandate's vaccine and testing provisions, as to persons with or without natural

immunity. *See supra* § III.B.1.b.iii.. Moreover, even though all employees are subject to mandatory vaccination, they still can obtain a religious or medical exemption, or otherwise choose the alternative of testing weekly. *See* [1] at 3–4 (EO 2021-22). Under the controlling standard, this Court accepts "a legislature's generalizations even when there is an imperfect fit between means and ends" because a law will pass constitutional muster even if "it is not made with mathematical nicety or because in practice it results in some inequality." *Heller*, 509 U.S. at 321 (internal quotations and citations omitted); *Illinois Republican Party*, 973 F. 3d at 771 ("When disparate treatment of two groups occurs, the state is free to erase that discrepancy in any way that it wishes. . . . In other words, the state is free to 'equalize up' or to 'equalize down.'").[77]

Given this finding, Plaintiffs have not demonstrated a likelihood of success on their equal protection challenge.

## C. Other Injunction Factors

With Plaintiffs having failed to establish a likelihood of success on the merits, this Court need not address the other factors in the injunction analysis. *GEFT Outdoors*, 922 F.3d at 368 (explaining that because plaintiff "has no likelihood of success on the merits of [its] claim, there was no need for the district court to conduct further analysis"); *Valencia*, 883 F.3d at 966 ("If it is plain that the party

---

[77] Just because Plaintiffs call the mandate "punitive," [33] at 3, does not make it so. Theoretically, of course, an ostensibly lawful COVID-19 vaccine or testing requirement (or other pandemic restriction) might be *implemented* in such a manner as to become punitive (or otherwise implicate a constitutional right deemed fundamental)—and thus potentially trigger a heightened review—but Plaintiffs fail to develop such facts here.

seeking the preliminary injunction has no case on the merits, the injunction should be refused regardless of the balance of the harms.").

## IV.    Conclusion

For the reasons above, and consistent with the oral preview from the bench, this Court hereby denies Plaintiffs' motion for preliminary injunction [4].

Entered: December 19, 2021

John Robert Blakey
United States District Judge